Richard Flowers, Z-632
Holman Correctional Facility
P.O. Box 3700
Atmore, AL 36503

RECEIVED

2010 JUL -6  P 4: 45

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| RICHARD FLOWERS,      ) | |
|     ) | |
|   Petitioner,     ) | |
|     ) | **DEATH PENALTY CASE** |
| vs.     ) | |
|     ) | Case No. __2:10-CV-579-MEF-CSC__ |
| RICHARD F. ALLEN, Commissioner,     ) | |
| Alabama Department of Corrections,     ) | |
|     ) | |
|   Respondent.     ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY[1]

### STATEMENT OF FACTS

On the evening of May 28, 1996, Mrs. Annie Addy was shot and killed in Montgomery at

PikNik Products, where she worked with Richard Flowers. (Tr. C. 10.)  Several hours later, police

arrested Mr. Flowers for the murder. (Tr. C. 8-9.)

Robert Powers was appointed as Mr. Flowers' lead attorney, and Paul Sasser as second chair.

(Tr. C. 8; Tr. C. 11-12.)  On August 15, 1996, a preliminary hearing was held (Tr. C. 155), at which

---

[1]After an introductory statement of facts, this petition substantially follows the form dictated
by the model in the Appendix of Forms accompanying the Rules Governing Section 2254 Cases in
the United States District Courts, as amended effective December 1, 2004. *See* Rule 2(d), Rules
Governing Section 2254 Cases.  Paragraphs 1 through 11 state the history of prior court proceedings;
paragraphs 12(I) through 12(XIII) state the federal constitutional grounds upon which petitioner
claims that the judgment and sentence imposed upon him are unlawful; and paragraphs 13 through
contain required technical information.

Burnett Hawkins, the only alleged eyewitness, testified (Tr. C. 157-69). Mr. Powers conducted a limited cross-examination, concerning lighting in the parking lot and the distance between him and Mr. Flowers. (Tr. C. 162-67.)

On December 6, 1996, Mr. Flowers was indicted on two counts of capital murder: murder after a prior murder conviction,[2] Ala. Code 1975 § 13A-5-40(a)(13), and by firing into a vehicle, id. § 13A-5-40(a)(17). (Tr. C. 5-6.)

On August 21, 1997, the case was set for trial on February 9, 1998, with motions due December 15, 1997, and a motions hearing set for January 27, 1998. (Tr. C. 1641.)

From the day of the preliminary hearing on August 15, 1996, until January 29, 1998, the only motions filed by Mr. Flowers' defense counsel were motions to withdraw and substitute second-chair counsel (Tr. C. 23, 33), and a perfunctory motion for extraordinary expenses (not including funds for expert witnesses, investigators, or evaluations) (Tr. C. 26-27). Both the circuit court and the State expressed concern that no pretrial motions had been filed. *See* (Tr. R. 2-3) (court noting that it could not find any motions to continue and asking if any motions had been filed); (Tr. C. 267) (memorandum from prosecutor to trial judge expressing concern that there are "no motions to suppress, no independent investigations, no mental exam").

On January 27, 1998, attorney Mickey McDermott, who had never tried a capital case (Tr. R. 627), filed a motion to substitute counsel, to serve as Mr. Flowers's second-chair (Tr. C. 33), the third in Mr. Flowers' case. Once appointed, Mr. McDermott determined that no substantive motions had been filed. (Tr. R 629; Tr. C. 181-82.)

_____

[2]Mr. Flowers' previous conviction was for second degree murder for an incident that occurred when he was only sixteen. *Flowers v. State*, 402 So. 2d 1118, 1119 (Ala. Crim. App. 1981).

At the motions hearing on Tuesday, January 27, 1998, Mr. Flowers was arraigned. (Tr. R. 4-5.) Through Mr. Powers, Mr. Flowers entered a plea of not guilty, and "not guilty by reason of insanity, mental defect." (Tr. R. 5.) At the same hearing, less than two weeks before trial, the circuit court asked lead counsel Powers if it may have overlooked any defense motions because the court found none. (Tr. R. 2.) Mr. Powers assured the court that defense motions would be filed that same day (id.), but none were. Instead, on January 29, counsel filed a Motion for Issuance of Subpoena Duces Tecum (for a video of "Cops of Montgomery") (Tr. C. 41-42) and a Motion for Issuance of Subpoena Duces Tecum (for dispatcher's log or audio tape of 5/28/96 from 10pm to 12pm [sic]) (Tr. C. 43-44). Then, on Wednesday, February 4, counsel filed a Motion to Continue (Tr. C. 35-36), a Motion to Dismiss Indictment due to delay in arraignment (Tr. C. 37-38), and a Motion for Psychological Evaluation (Tr. C. 39-40).

At a motions hearing on Thursday, February 5, the court asked why counsel had not filed motions on the day of the last hearing. Mr. Powers incomprehensibly stated that counsel "went back and decided to work on filing our motions." (Tr. R. 6.) The court granted counsel's motions for subpoenas duces tecum but denied the rest. (Tr. R. 9.) The court also permitted a psychological examination as an "emergency type effort" because the request was filed late. (Id.)

On the first day of trial, Monday, February 9, 1998, the court denied defense counsel's motion for an independent psychological examination, filed on Friday, February 6. (Tr. C. 64-68; Tr. R. 34.) The court-ordered psychological evaluation, which was not a neuropsychological assessment and took less than forty minutes (Tr. R. 643), was furnished to the defense on February

10, the second day of trial (Tr. R. 286).[3]      At trial, defense counsel admitted being unprepared and moved for a continuance immediately after opening statements on February 10, 1998; Mr. McDermott stated, in the presence of the jury, "I do not feel there is an adequate defense having been prepared for Mr. Flowers." (Tr. R. 285.) He also argued that "[t]he single most critical factor here is the request for a psychiatric examination that's independent of the one [just received] minutes before [trial] began." (Tr. R. 286.) Nonetheless, the trial proceeded.

The State presented thirteen live witnesses at the guilt/innocence phase of the trial. (Tr. R. I-ii.) Testimony of the only alleged eyewitness, Mr. Hawkins, was presented over objection through the transcript of his prior testimony. (Tr. R. 338.) The State's theory of the case was that Mr. Flowers was upset because he had been switched from night shift to day shift. (Tr. R. 273.) Mr. Flowers was allegedly "concerned" that Mrs. Addy might have told management about conflicts they had in the past. (Tr. R. 274.) Because of this, the State contended, Mr. Flowers took a gun from his sister's house, where he lived, went to PikNik Products on the evening that he was transferred to the day shift, and shot and killed Ms. Addy while she was sitting in her car. (Tr. R. 274-75.) The State told the jury "to remember these exhibits. . . . These bullets are matches to the gun that . . . was identified by Marian Frazier [Mr. Flowers' 21-year-old niece], in the same house that the defendant lived at." (Tr. R. 512.) In closing, the State told the jury that "this was not the work of some crazed, disoriented person. This was a premeditated, well thought out murder." (Tr. R. 510.)

Mr. Flowers' counsel had no theory of defense, but merely told the jury that the State must "dot[] the I's and cross[] the T's" and the jury must ensure that the State did so. (Tr. R. 281.)

_____

[3]The court's expert, Dr. Glen King, examined Mr. Flowers for less than forty minutes as shown from jail logs. (Tr. R. 643.) In the Rule 32 proceedings, Dr. King, as the State's expert, evaluated Mr. Flowers on two occasions, spending six to eight hours with him. (R32 R. 317.)

4

Counsel later stated their strategy was to "cast credibility upon the State's witnesses" [*sic*]. (Tr. R. 674.)

Defense counsel presented only one witness during the guilt/innocence phase——Mr. Flowers's brother, Johnny Flowers, who testified that Mr. Flowers was incarcerated from about age 14 or 15 to 33, "knowed [*sic*] nothing about out here" (Tr. R. 496), and did not "have a clue," (Tr. R. 497). He told the jury that Mr. Flowers beat a 28-year-old man so badly that he "asphyxiated on his own blood and died." (Tr. R. 498.) Johnny testified for approximately eight pages but provided no information relevant to Mr. Flowers' defense. (Tr. R. 495-503.)

After only a day of testimony, the guilt/innocence phase of the trial ended on February 11, 1998. The jury deliberated for less than twelve minutes before finding Mr. Flowers guilty on both counts of capital murder. (Tr. R. 562.)

The penalty phase began the same afternoon. The State relied on the evidence from the previous phase to prove Mr. Flowers' juvenile conviction as the only aggravating circumstance. (Tr .R. 563.) The defense presented Johnny Flowers, again more damaging than helpful (Tr. R. 569-84), providing an incomplete family history in one page of testimony (Tr. R. 569). Rather than asking the jury for mercy, defense counsel stated, "I don't know if I am doing a favor asking for life without parole. I am putting him back in the same cesspool he came out of. He is a product for that cesspool." (Tr. R. 589.) The brief closing described Mr. Flowers as an animal: "When you treat a person with such degradation that you take away their human-beingness, you don't have much left other than an animal." (Tr. R. 590.) Even so, two jurors voted for life. (Tr. R. 611.)

At the sentencing hearing on March 9, 1998, counsel did not present any mitigating evidence,

but briefly asked the court to consider the fact that Mr. Flowers had been incarcerated since the "age of fourteen with adults." (Tr. R. 614-15.)[4] Mr. Flowers told the court that he did not kill Ms. Addy. (Tr. R. 617.) The court followed the jury's recommendation, sentencing Mr. Flowers to death. (Tr. R. 618.)

On the same day, both counsel moved to withdraw. (Tr. C. 180, 195.) In addition, Mr. McDermott filed a motion for a new trial, raising a claim of ineffective assistance of counsel against himself and lead counsel, Mr. Powers. (Tr. C. 181-82.) In the motion, Mr. McDermott asserted that counsel were unprepared for trial and "notif[ied] the Court of the lack of preparedness of the Defense." (*Id.*)

On March 27, 1996, Paul Copeland was appointed to represent Mr. Flowers in his post-trial motions and on appeal. (Tr. C. 197.) On May 8, 1998, Mr. Copeland argued to the court that he needed the trial transcript before he could proceed on the new trial motion. (Tr. R. 619-25.) He explained that he needed to review the record to determine if there were any "failure to raise objections or objections put in the wrong place, any number of ways in which counsel during a trial can make an error that might rise to the level of ineffective assistance." (Tr. R. 621-22.) He mentioned nothing about investigation, expert assistance or discovery needs. The court allowed sixty days for the transcript to be prepared and commented that it would set the hearing ninety days out, thus allowing Mr. Copeland thirty days to review the record. (Tr. R. 624-25.) The court set a hearing on August 20, 1998. (Tr. C. 199.) However, it was not until August 13, 1998, that the circuit court entered an order authorizing the court reporter to prepare the transcript in advance of appeal.

---

[4]Had Mr. Flowers' counsel obtained his prior court record they would have known that he was charged with murder at age sixteen and subsequently convicted and sent to prison at age seventeen. *See* (C. 1901, 1911, 2011).

6

(Tr. C. 202.) Upon request of Mr. Copeland, the court reset the hearing for ninety days from the time that the transcript was authorized.[5]  (Tr. C. 203.)

On October 15, 1998, less than 90 days from its prior order, the court conducted a hearing on the motion for new trial at which five witnesses testified, four called by Mr. Flowers (defense trial counsel and the prosecuting attorneys) and one called by the court.  (Tr. R. 625-93.)  No witnesses testified as to facts or mitigation that could and should have been presented on Mr. Flowers' behalf at trial.

During that hearing, second-chair McDermott testified that lead counsel Powers assumed that the trial would be delayed (Tr. R. 634), and that no preparation had occurred (Tr. R. 632, 635).  Mr. McDermott testified that there was no defense witness list in the file when he was appointed only a few days before trial (Tr. R. 632), that he never met with any defense witnesses (Tr. R. 635), and that there was no record that Mr. Powers had met with any (id.). Mr. McDermott had "about four hours of actual preparation time" (Tr. R. 628), even though he had never tried a capital case (Tr. R.627).

Mr. Powers testified that he and Mr. McDermott spent "somewhere between six and eight hours total between the two of [them]" preparing the case. (Tr.R. 673.)  He admitted he was "not as prepared as [he] could have been."  (Tr.R. 680.)

Despite the fact that counsel admitted to preparing no more than eight hours for a capital murder trial, the circuit court denied the motion for a new trial on October 19, 1998 (Tr. C. 204-12),

---

[5]There is no indication in the record when the transcript was prepared, but it is clear that Mr. Copeland received it no earlier than the court's order dated August 13, 1998 — leaving less than ninety days for the court reporter to prepare the transcript and for Mr. Copeland to review it and prepare for a hearing.

because it found that there is "not a reasonable probability that the jury would have had a reasonable doubt concerning the guilt of [Mr. Flowers]" (Tr. C. 211). The court's order did not discuss the impact of counsel's performance on the penalty phase of the trial.

Mr. Copeland filed an appeal for Mr. Flowers, but the brief was stricken from the record. (C. 1271) Beverly Howard was substituted and filed a new brief. (C. 1162-63.)

On October 29, 1999, the Court of Criminal Appeals issued an opinion remanding to the circuit court to determine whether the only alleged eyewitness, Burnett Hawkins, was in fact unavailable for trial——a key issue in determining whether the court properly admitted his prior testimony by transcript. *Flowers v. State*, 799 So. 2d 966 (Ala. Crim. App. 2000). On remand, the circuit court heard testimony from the State, including allegations that it could not locate Hawkins, who was living in California (Tr. Supp. C. 19), and that Hawkins had provided an incorrect Social Security number (Tr. Supp. C. 36-38). The circuit court determined that Hawkins was unavailable. (Tr. Supp. C. 19.)

On return to remand, this Court affirmed that the State used due diligence attempting to locate Hawkins and that he was unavailable. *Flowers*, 799 So. 2d at 981. This Court also reviewed the lower court's denial of Mr. Flowers' "general motion for a new trial based on a claim of ineffective assistance of counsel because of cocounsel's late appointment to the case." *Id.* at 991. This Court noted, "because this is a death-penalty case, we have reviewed the contentions even though our review is significantly hampered because these issues are sparsely developed in the record." *Id.* at 992 (emphasis added). Based on the "sparse" record, this Court affirmed, finding that counsel "did an admirable job, given the State's case against Flowers," and that "[n]o mitigation evidence, other than that presented to the jury, is contained in the record or even suggested in the

appellate brief." *Id.*

After exhausting his appeals, on September 20, 2002, Mr. Flowers filed a *pro se* Rule 32 petition in the Montgomery County Circuit Court. *Flowers v. State*, 888 So. 2d 612 (Ala. Crim. App. 2004). The State filed a motion to dismiss as untimely filed on October 25, 2002, id., eventually resolved by remand for further proceedings under *Ex parte Gardner*, 898 So. 2d 690 (Ala. 2004), *Flowers*, 888 So. 2d at 613.

On May 27, 2004, the State filed both a Motion For Summary Dismissal and an Answer to the [Second] Amended Petition. (R32 C. 203-373.) The court did not rule on the motion to dismiss. Subsequently, on December 7, 2005, the State filed another Motion for Summary Dismissal of the Procedurally Barred Claims in . . . Flowers's Second Amended Rule 32 Petition (R32 C. 705-25) and a Motion To Strike . . . Flowers's Third Amended Rule 32 Petition (R32C. 695-704). On December 30, 2005, Mr. Flowers filed responses. (R32 C. 740-51.) The court did not rule on the motion to dismiss.

On February 9, 2006, the circuit court set the final hearing for May 8, 2006, and scheduled a motions hearing for March 15, 2006. (R32 C. 772.) On March 2, 2006, Mr. Flowers filed his Fourth Amended Petition, which is the subject of the instant appeal. (R32 C. 775-951.) Because the circuit court had not ruled on the State's motion to dismiss certain claims, Mr. Flowers also filed a Motion for Clarification Regarding Which Issues Will Be Presented at the Rule 32 Hearing. (R32 C. 980-83.)

At the status conference/motions hearing held on March 15, 2006, the State asserted that the "most pressing motion . . . is [the State's] motion for summary dismissal of the procedurally barred claims." (R32 2d. Supp. C. 11.) The State argued that Mr. Flowers should be procedurally barred

from litigating his ineffective assistance of trial counsel claim because it was raised in the motion for new trial and on direct appeal. (R32 2d.Supp.C. 14-15.)  Mr. Flowers argued that the issue presented in the motion for new trial was only what could be "ascertain[ed] from the trial record. . . . [W]e have new information that was not raised or not available because it was outside the Record." (R32 2d. Supp. C. 15-16.)  After hearing both sides, the court determined that whether the claim was precluded was "anything but well-settled as it relates to capital cases" (R32 2d. Supp. C. 21) and denied the motion to dismiss (R32 2d.Supp.C. 23).  The court reset the final hearing for September 19, 2006 (R32 C. 980-94), subsequently continued on the State's motion to November 15, 2006 (R32 C. 1050).

On November 2, 2006, Mr. Flowers filed a Motion to Find Karen (Hardt) Robertson and Burnett Hawkins Material Witnesses so that subpoenas could be issued for these out-of-state witnesses to attend the hearing.  (R32 C. 1080-84.)  Ms. Robertson, a witness material to Mr. Flowers' *Brady* claim, provided the victim's personnel file to the police on the night of the shooting and that file was never turned over to the defense.  The circuit court found Mr. Hawkins a material witness, but not Ms. Robertson. (R32 C. 1086.)  Thus, Ms. Robertson was unavailable to testify. (R32 R. 300-04.)

The circuit court received evidence supporting Mr. Flowers' Fourth Amended Petition claims through courtroom testimony on November 15 and 17, 2007 (C. 1-363), through deposition testimony taken on November 16 and 29, 2006 (C. 1087-1323; C. 1356-1462), and through thirty exhibits, which included Mr. Flowers' school, mental health, and court records, affidavits from mitigation witnesses, and four depositions of witnesses taken during a civil suit against PikNik Products (R32 C. 1893-2507; R32 C. 1324-47; R32 Supp. C. 17-75).

10

The evidence presented supported Mr. Flowers' allegation that his trial counsel failed to conduct any investigation for either the guilt/innocence phase or the penalty phase of his trial, as not one witness had ever been contacted by Mr. Flowers' trial counsel.  Moreover, evidence was presented that undercut every aspect of the State's case, which the state courts had previously reviewed, determining that the "State had a virtually airtight case against Flowers" and that it had proven that Mr. Flowers had "the means, the motive, and the opportunity to kill Addy." *Flowers*, 799 So. 2d at 982-83.[6]

In addition to challenging every aspect of the State's guilt/innocence case against Mr. Flowers, these Rule 32 proceedings revealed an abundance of mitigating evidence never before considered by any court. *See id.* at 993 ("No mitigation evidence, other than that presented to the jury, is contained in the record or even suggested in the appellate brief").  Over twenty witnesses

---

[6]Mr. Flowers presented testimony from eight lay witnesses and two experts during these proceedings to undermine the State's case: (1) Patricianna White, owner of the gun allegedly available to Mr. Flowers, who did not testify at trial, who indicated that the gun in evidence (the murder weapon) was not her husband's gun and that her daughter Marian Frazier suffered from schizophrenia and bipolar disorder, had substance abuse problems, and was dating a police officer at the time of Mr. Flowers's trial; (2) Burnett Hawkins, the only alleged eyewitness who was "unavailable" at trial, admitted he was not sure if he saw Mr. Flowers shoot the victim, presented proof that his Social Security number was correct on the information sheet he provided to police, and acknowledged he was a convicted felon and registered sex-offender at the time of Mr. Flowers' trial; (3) Karen Hardt Robertson (by prior deposition), the human resources manager at PikNik Products who investigated the circumstances surrounding Mrs. Addy's death, found no evidence that Mr. Flowers threatened Mrs. Addy and no reason why he would have shot her; (4) Edward Windham (by prior deposition), Mr. Flowers' and Ms. Addy's supervisor at PikNik Products, testified that he never heard anyone say Mr. Flowers threatened Ms. Addy, that he did not have a problem with Mr. Flowers, and that when he told Mr. Flowers of the switch from night to day shift, only hours before Ms. Addy was shot, Mr. Flowers was receptive and happy; (5) Albert Love (by prior deposition), Mr. Flowers' and Ms. Addy's coworker at PikNik Products, saw Mr. Flowers minutes before Mrs. Addy was shot and he was happy-go-lucky and glad to start work in the morning; and (6) two experts who concluded that since he was a child Mr. Flowers has suffered from brain damage which interferes with his ability to adapt to complex situations and to tell the difference between right and wrong.

provided mitigating evidence that should have been presented at trial, including details of Mr.

Flowers' tragic childhood, information about his mental difficulties, and proof of residual doubt that

he committed the crime.   Also, two experts provided testimony that explained oddities of his

behavior due to brain damage.[7]   The State's expert, Dr. Glen King, also evaluated Mr. Flowers and

his opinion was consistent with the opinions of Mr. Flowers' experts, except in the degree of

impairment. *See, e.g.*, (R3 R. 352-53 *et passim*) ("My reading of what [Mr. Flowers' expert] wrote

in his opinion and also the kind of things I have been testifying to, I think there is fairly substantial

similarity").   The expert testimony was relevant both in mitigation and to the not-guilty-by-reason-

of-mental-disease-or-defect plea entered by Mr. Powers.

After the evidentiary hearing, the court ordered that each side file proposed orders and gave

the parties the option of filing a brief. (R32 R. 361.)  On May 22, 2007, Mr. Flowers filed a post-

hearing brief and a proposed order (R32 C. 1473-1610, 1704-1820); the State filed only what was

labeled as a Final Order. (R32 Supp. C. 76-139.)  Two weeks later, on June 6, 2007, the circuit court

adopted the State's Final Order verbatim.  (R32 C. 1642-1703.)

\* \* \* \* \* \* \*

---

[7]During the Rule 32 proceedings, mitigation evidence was presented through testimony of lay witnesses and experts, through affidavits of lay witnesses, and through school, medical, mental health, and court records.  This evidence came from six family members, six school teachers and personnel, three neighbors, a church member, a juvenile probation officer, four coworkers, a neuropsychologist specializing in childhood trauma and sexual abuse, and a neuropsychiatrist.  As a child, Mr. Flowers slept under the porch with dogs, and school personnel reported that he smelled of urine and feces from his filthy clothes.  As a child, Mr. Flowers experienced psychological, physical, and sexual trauma.  Mr. Flowers, as a mentally-impaired 17-year-old, testified at his first trial that the victim, Leroy Leverette, a grown man who molested Mr. Flowers' younger sister, attempted to sexually attack him.  Undisputed evidence showed that Mr. Flowers suffers from a brain impairment as a result of these traumas that reduces functioning to a level comparable to mentally retarded individuals when he is faced with chaotic, unpredictable, or changing circumstances.

1.    (a)     Petitioner, Richard Jerome Flowers, was convicted and sentenced in the Circuit Court of Montgomery County, Alabama.

       (b)     Case No. CC-97-20.

2.    (a)     Petitioner was convicted on February 11, 1998.

       (b)     Petitioner was sentenced on March 9, 1998.

3.    Petitioner was sentenced to death.

4.    Petitioner was convicted of two counts of capital murder.

5.    Petitioner was convicted of two counts of capital murder: Ala. Code § 13A-5-40(a)(13); (17).

6.    (a)     Petitioner pled not guilty, not guilty by reason of insanity, mental defect, to all charges.

       (b)     Not applicable.

       (c)     Petitioner was tried before a jury.

7.    Petitioner did not testify at trial or at any pre-trial or post-trial proceeding.

8.    Petitioner appealed from the judgment of conviction and sentence.

9.    (a)     Petitioner appealed directly to the Alabama Court of Criminal Appeals.

       (b)     Court of Criminal Appeals case number CR-97-1254.

       (c)     The Alabama Court of Criminal Appeals affirmed petitioner's convictions.

       (d)     The Alabama Court of Criminal Appeals' decision affirming the convictions and sentence was issued on October 27, 2000.

       (e)     *Flowers v. State,* 799 So. 2d 966 (Ala. Crim. App. 1999), opinion after remand (October 27, 2000).

       (f)     Petitioner raised the following grounds in his initial brief on direct appeal to the

Court of Criminal Appeals:[8]

1.    The trial court erred in denying appellant's *Batson* motion during jury questioning.

2.    In order to invoke the capital murder statute, the defendant must have intentionally as opposed to negligently, accidentally or recklessly, caused the death of another.

3.    When a defendant makes an equivocal or ambiguous request for an attorney during a custodial interrogation, further questioning thereafter must be limited to clarifying that request until it is clarified. Any statement taken by a police officer after the equivocal request for counsel is made, but before it is clarified as effective waiver of counsel, violates *Miranda v. Arizona*.

4.    The defendant accused of a greater offense has the right to have the court charge on lesser offenses included in the indictment when there is a reasonable theory based on the evidence supporting his position.

5.    The trial court erred in not granting a motion for continuance when trial counsel was appointed approximately 2 weeks prior to commencement of trial.

6.    The trial court erred in not granting the motion for new trial based on counsel's own effective of assistance [*sic*] admission. Trial counsel was ineffective in a number of ways which includes but is not limited to: failure to request an expert for mitigation purposes; failure to request an investigator in a timely fashion; failure to request a ballistics expert; failure to request [*sic*]; failure to interview and subpoena witnesses to trial; failure to request DNA evidence to be tested and other acts of ineffective assistance of counsel.

7.    The trial court erred in denying the appellant an additional psychological evaluation.

8.    The trial court erred in not excusing a juror from the jury pool.

The following claims were added in the reply brief:

1.1(a)  Trial court erred in admitting testimony from an alleged eye witness through

---

[8]The claims listed as "Issues for Review" were not all addressed in the section titled "Argument." Some of the claims in the Argument section are also misnumbered. The Argument section also included discussion of counsel's failure to obtain the assistance of an investigator.

out-of-court statement.

1.1(b)   The trial court erred in granting the prosecution's request for a deposition of Dr. James Lauridson.

Claim 3 from the initial brief was restated as:

3.   The trial court erred in allowing appellant's confession into evidence.

(g)   Petitioner sought further review by a higher state court.

(1)   Petitioner sought further review in the Alabama Supreme Court.

(2)   Alabama Supreme Court case number 1000577.

(3)   The Alabama Supreme Court denied certiorari with no opinion.

(4)   The Alabama Supreme Court issued its decision affirming the convictions and sentence on March 30, 2001.

(5)   *Ex parte Richard Jerome Flowers*, No. 1000577 (Ala. March 30, 2001) (Mem.).

(6)   Before the Alabama Supreme Court, Petitioner raised issues 1, 1.1(a), 2, 3, 4, and 5, which he had previously raised before the Alabama Court of Criminal Appeals. Petitioner did not raise issues 1.1(b), 6, 7, and 8.

(h)   Petitioner filed a petition for writ of certiorari in the United States Supreme Court.

(1)   United States Supreme Court case number 01-5082.

(2)   The United States Supreme Court denied the petition for writ of certiorari.

(3)   The United States Supreme Court's order denying the petition for writ of certiorari was entered on October 1, 2001.

(4)   *Flowers v. Alabama*, 534 U.S. 901 (2001).

15

10.     Other than a direct appeal from the judgment of conviction and sentence, petitioner has

previously filed one petition for post-conviction relief in the state courts of Alabama.

11.     (a)     (1)     Montgomery County Circuit Court.

        (2)     Case number CC-97-20.60.

        (3)     Petitioner filed his initial petition for post-conviction relief on September 20,

2002.

        (4)     Petitioner sought post-conviction relief by filing a petition for post-conviction

relief under Rule 32, Ala. R. Crim. P.

        (5)     Petitioner raised the following grounds in his petition for post-conviction

relief:

        I.      THE EXECUTION OF MR. FLOWERS WOULD VIOLATE THE
                EIGHTH AND FOURTEENTH AMENDMENTS' PROHIBITION
                AGAINST THE EXECUTION OF THE MENTALLY RETARDED.

        II.     TRIAL COUNSEL WERE INEFFECTIVE DURING BOTH
                STAGES OF MR. FLOWERS'S TRIAL, AND THEREBY
                DEPRIVED PETITIONER OF HIS RIGHTS UNDER THE
                FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
                AMENDMENTS TO THE FEDERAL CONSTITUTION, THE
                ALABAMA CONSTITUTION, AND ALABAMA LAW.

                A.      Trial Counsel Failed to Adequately Investigate and Prepare a
                        Theory of Defense in Advance of Trial.

                B.      Trial Counsel Failed to File Necessary and Timely Pretrial
                        Motions, or Otherwise Argue Motions Effectively.

                        i.      Counsel Failed to Adequately Argue for the
                                Suppression of Alleged Statements Made to the
                                Police.

                        ii.     Trial Counsel Did Not Timely File or Adequately
                                Argue the Motion for an Independent Psychological

16

Evaluation and Funds for a Private Assessment.

iii.    Trial Counsel Failed to Adequately Argue a Motion for a Continuance.

iv.    Trial Counsel's Failure to Adequately Object to the Introduction of Key Testimonial Evidence through Preliminary Hearing Testimony Deprived Mr. Flowers of His Rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Alabama Constitution, and Alabama Law.

v.    Trial Counsel Were Ineffective by Not Requesting Funds for Numerous Experts.

vi.    Counsel Were Ineffective for Failing to File Other Pretrial Motions for Funds to Investigate or Otherwise Present a Defense.

C.    Trial Counsel Were Ineffective for Failing to Investigate and Present Mitigation at Sentencing, Which Resulted in the Imposition of the Death Penalty.

D.    Trial Counsel Failed to Adequately Challenge the State's Investigation and Presentation of the Case by Failing to Make Appropriate Objections, Adequately Cross Examine Witnesses, Conduct an Adequate Direct Examination, or Challenge the Sole Aggravating Circumstance.

i.    Trial Counsel Were Ineffective for Failing to Make Appropriate Objections during Trial.

ii.    Trial Counsel Were Ineffective in Their Cross-Examination of the State's Witnesses.

iii.    Trial Counsel Were Ineffective for Failing to Conduct an Adequate Direct Examination of the Sole Defense Witness at Both the Innocence and Penalty Phase of the Trial.

iv.    Trial Counsel Were Ineffective for Failing to Challenge the Validity of Mr. Flowers's Underlying Conviction Which Served as the Only Lawful

17

Aggravating Circumstance.

    1.    The Juvenile Court Failed to Properly Transfer the Case for Adjudication in the Circuit Court by Failing to Include the Required Finding with Regard to Commitment to an Institution for Mental Illness or Mental Retardation.

    2.    The Circuit Court Was without Jurisdiction to Enter Judgment of Conviction, as the Juvenile Court's Transfer Order Fails to Include a Finding with Regard to the Best Interests of the Child.

    3.    The Juvenile Court's Order, Read in Light of the Accompanying Probation Report, Reflects Invalid Findings with Respect to Prior Conflicts with Law Enforcement and Prior Treatment Efforts, Resulting in an Invalid Exercise of Jurisdiction by the Circuit Court.

E.    Trial Counsel Were Ineffective at Jury Selection, Thereby Denying Mr. Flowers His Right to be Tried and Sentenced before a Fair and Impartial Jury.

    i.    Trial Counsel Were Ineffective for Failing to Sufficiently Question Jurors during Voir Dire.

    ii.    Trial Counsel Failed to Argue Adequately Challenges for Cause.

    iii.    Counsel Was Ineffective for Failing to Adequately Challenge the State's Impermissibly Discriminatory Juror Challenges.

F.    Trial Counsel Was Ineffective during Argument to the Court and the Jury.

    i.    Trial Counsel Was Ineffective during Opening Argument for Failing to Adequately Prepare and for Failing to Effectively Argue in Defense of Mr. Flowers.

      ii.     Trial Counsel Was Ineffective during Closing Argument in the Penalty Phase for Failing to Present Evidence Demonstrating the Existence of Mitigating Factors.

      iii.    Trial Counsel Were Ineffective for Appearing to Argue to the Jury That They Should Recommend Death as a Merciful Alternative to Life without Parole.

      iv.    Trial Counsel Were Ineffective for Failing to Argue That the Jury Could Consider Mercy as a Basis for Recommending a Sentence of Life without Parole.

      v.     Trial Counsel Were Ineffective for Making Only Perfunctory Arguments at the Trial Court's Sentencing of Mr. Flowers.

III.    APPELLATE AND MOTION FOR NEW TRIAL COUNSEL WERE INEFFECTIVE.

IV.    AN ESSENTIAL ELEMENT OF MR. FLOWERS'S SENTENCE AND CONVICTION IS BASED ON A JUVENILE ACT IN VIOLATION OF THE UNITED STATES CONSTITUTION AND ALABAMA LAW.

V.    THE STATE FAILED TO COMPLY WITH ITS DISCOVERY OBLIGATIONS UNDER *BRADY V. MARYLAND*.

VI.    JURORS FAILED TO DISCLOSE CRUCIAL EVIDENCE DURING VOIR DIRE, RELIED ON EXTRANEOUS EVIDENCE DENYING MR. FLOWERS HIS RIGHT TO A FAIR AND IMPARTIAL JURY.

VII.    STATEMENTS ALLEGEDLY MADE BY MR. FLOWERS WHILE IN CUSTODY WERE ERRONEOUSLY ADMITTED DURING HIS TRIAL.

VIII.    RACE AND GENDER DISCRIMINATION IN THE FORMATION OF THE GRAND AND PETIT JURIES DENIED MR. FLOWERS A FAIR TRIAL.

IX.    THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT WHICH DENIED MR. FLOWERS A FAIR TRIAL IN BOTH THE

INNOCENCE AND PENALTY PHASES.

X.      THE CAPITAL MURDER CONVICTION AND SENTENCE OF DEATH IS BASED ON AN INVALID PRIOR CONVICTION IN VIOLATION OF ALABAMA STATUTORY AND CONSTITUTIONAL LAW, AS WELL AS THE CONSTITUTION OF THE UNITED STATES.

XI.     THE TESTIMONY OF A CRITICAL PROSECUTION WITNESS BY MEANS OTHER THAN LIVE TESTIMONY DEPRIVED MR. FLOWERS OF HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION.

XII.    THE IMPOSITION OF THE DEATH PENALTY AGAINST THE MENTALLY ILL WHO CANNOT SUFFICIENTLY CONTROL THEIR CONDUCT VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES AND THE ALABAMA CONSTITUTION.

XIII.   THE COURT DENIED MR. FLOWERS HIS RIGHTS TO A FAIR TRIAL BY DENYING HIS PRETRIAL MOTIONS.

        A.      The Court Denied Mr. Flowers His Rights to a Fair Trial by Denying His Motion for an Independent Psychological Evaluation.

        B.      The Court Denied Mr. Flowers His Rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution by Denying His Motion for a Continuance.

XIV.    ALABAMA'S SENTENCING SCHEME IS UNCONSTITUTIONAL.

XV.     ALABAMA'S METHOD OF EXECUTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

(6)     Petitioner received an evidentiary hearing on his petition for post-conviction relief at which evidence was presented.  However, because the court denied Petitioner's motion to declare an out-of-state witness supporting his *Brady* claim material, he could not present evidence on that issue (Ground III

20

below).   Additionally, because certain witnesses were not allowed to testify or had their testimony truncated, the Rule 32 evidentiary hearing was not a full and fair hearing (Ground I).  Petitioner will discuss these matters under the appropriate Ground for Relief.

(7)  The Montgomery County Circuit Court denied petitioner's application for post-conviction relief by adopting verbatim a proposed order submitted by counsel for Respondent.

(8)  Judgment denying post-conviction relief was entered on June 6, 2007.

(b) & (c)  Petitioner has not filed any second or subsequent petitions for relief pursuant to Rule 32, Ala. R. Crim. P.

(d)  Petitioner appealed the denial of his application for post-conviction relief to the Alabama Court of Criminal Appeals and sought review by the Alabama Supreme Court via a petition for writ of certiorari.

(e)  Not applicable.

## 12.   GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF:

### I.   PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AT ALL STAGES OF TRIAL AND DIRECT APPEAL.

The Sixth Amendment guarantees all criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984); *see also (Terry) Williams v. Taylor*, 529 U.S. 362 (2000).  To establish his entitlement to relief on a claim that counsel rendered ineffective assistance, a prisoner must demonstrate that (1) his attorney's representation "fell below an objective

standard of reasonableness," and that (2) he was prejudiced as a result thereof. *Strickland*, 466 U.S. at 687-688; *see also*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland)* ("An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense").

"'To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins,* 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 687).   Under this standard, a reviewing court must "conduct an objective review of [counsel's] performance. measured for 'reasonableness under prevailing professional norms,' . . . which includes a context dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time[.]'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688).   Where counsel's challenged conduct is purportedly attributable to "tactical judgment," that judgment and the "investigations supporting" it must themselves be objectively reasonable. *Wiggins*, 539 U.S. at 521.

"[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 123 S. Ct. at 2542 (quoting *Strickland*, 466 U.S. at 694).   This standard requires a showing by less than a preponderance of the evidence.   "[A]"defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*   "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694.   Thus, a petitioner's burden of proof respecting prejudice is a lesser showing than "more probably than not."

The prejudice analysis does not depend on whether the outcome of the proceeding would have been different alone. "[T]he [outcome determinative] standard is not quite appropriate." *Id.* at 694. Rather, a petitioner must show "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

In assessing whether this reasonable probability can be shown, the aggregate harm flowing from all of counsel's individual errors must be considered cumulatively, rather than merely determining whether each individual error, standing alone, was prejudicial. *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider *the totality of the evidence* before the judge or jury") (emphasis added); *(Terry) Williams*, 529 U.S. at 397 (prejudice must be determined based on the "totality" of the evidence); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001).

In a capital case, defense counsel have a heightened duty of effective representation, under the Eighth Amendment, because of the severity of the penalty. *See, e.g., Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality opinion) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability").

Because the impact of counsel's deficiencies must be considered cumulatively, as well as for ease of organization, Petitioner's challenges to various aspects of trial counsel's performance, though presented individually, are all set forth herein as subdivisions of Ground I (i.e., Grounds I(A) through I(C). Additional relevant legal principles governing the particular ineffective assistance of counsel allegations are stated throughout, as applicable.

In stating the factual bases of counsel's deficient performance and the attendant prejudice in this case, Petitioner will, where appropriate, show how he was prohibited from fully developing the factual bases of his ineffective assistance of counsel claims in state court by, for example, the denial of Petitioner's request to have an out-of-state witness declared material in order for a subpoena to issue. Therefore, in stating the factual basis for each ineffective assistance of counsel claim below, Petitioner will also set forth, when pertinent, allegations and factual contentions that counsel believe would have been established in state court had Petitioner been afforded the opportunity to present all of his evidence. Petitioner believes these allegations will have evidentiary support upon a reasonable opportunity for further fact development.

A.   **Petitioner Was Denied the Effective Assistance of Counsel under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution during Both Phases of His Trial for Capital Murder.**

1.   *Trial counsel failed to investigate and prepare a theory of defense or to present a defense during the innocence/guilt phase of trial.*

(a)   Supporting facts.

i.   **Trial counsel were ineffective for failing to challenge the State's physical evidence, the alleged murder weapon.**

Mr. Flowers was charged with shooting Mrs. Annie Addy while she sat in her car in the parking lot of the factory where they both were employed. *Flowers v. State*, 799 So. 2d 966, 972-73 (2000). The alleged murder weapon, a blue steel .38 caliber revolver, serial number 3K1127, was recovered from a dumpster at the Subway Sandwich Shop located at 351 Air Base Boulevard, Montgomery, Alabama, the day after the shooting. (Tr. R. 391-92). The only evidence presented at trial linking Mr. Flowers to this gun was the testimony of his cousin, Marion Frazier. At trial, Ms.

24

Frazier testified that the blue steel revolver, which she described as "like a rusty black," with serial number 3K1127 was one that was owned by her parents, Patricianna and Robert White. (Tr. R. 377-78.)

Ms. Frazier's mother and Mr. Flowers' sister, Patricianna White, gave a statement to the police immediately following Mrs. Addy's death. *See* (R32 C. 2019-28 (Exh. 9). Ms. White described the gun that her husband kept in the house as a big gun that was silver with a wooden handle. She also stated that the serial number was missing from the gun because her husband had obtained the gun from someone in the neighborhood who owed him money. The State made no attempt to interview Robert White, the owner of the gun. The State did not call Mrs. White to the stand, nor did trial counsel.

At the Rule 32 hearing, Mrs. White[9] confirmed the details from her statement to the police.[10] Mrs. White testified that she was questioned by the police the night that Mr. Flowers was arrested for the murder, and she provided a statement to them. (R32 R. 72.) Mrs. White testified that the police questioned her about a firearm. (R32 R. 73.) She explained that her husband owned a gun; she described the gun as "silver." (R32 R. 74.) She also indicated that the serial number was "filed away when [her] husband got the gun." (*Id.*). In addition, Mrs. White testified that her husband was never questioned about the gun. (R32 R. 76.)

During the Rule 32 hearing, Mrs. White was shown the gun that was introduced into evidence at trial and that the State asserted was the gun used to fire the bullets that killed Mrs. Addy. (R32

---

[9]In the Rule 32 hearing transcript, Patricianna White is referred to as "Patricia Flowers."

[10]At the time of Mr. Flowers' Rule 32 hearing, Mr. White was deceased. He died on March 30, 1998, shortly after Mr. Flowers' trial. *See* Post-hearing Br., Exh. B.

R. 78) (State's Exh. 11 from the original trial). She noted that the pistol in evidence is black and that there was a serial number clearly marked on the gun. (R32 R. 79.) In fact, on cross-examination, she read the serial number into evidence. (R32 R. 86.) She emphatically restated that her recollection of the gun was silver. (R32 R. 78.) Her testimony was that the gun in evidence is different from the pistol she described as being owned by her husband. (*Id.*)

Trial counsel also failed to question Ms. Frazier regarding the discrepancy between her police statement, in which she indicated that the gun was kept in a black leather case, and her trial testimony, in which she indicated that the gun was kept in a purple and pink bag and identified State's Exhibit X as that bag. (Tr. R. 377).

Trial counsel's failure to interview Mrs. White also prevented them from introducing impeachment evidence related to the bullets. Ms. Frazier testified at trial that the bullets and the gun were kept in the same location. (Tr. R. 377.) Had trial counsel spoken with Mrs. White, and other members of her household, they would have determined that, in fact, the gun and bullets were always kept in separate locations. At the Rule 32 hearing, Mrs. White testified that she kept the bullets separate from where the gun was stored for safety reasons. (R32 R. 75.) The gun was kept in a bag in one closet and the bullets were kept in another location. (*Id.*) Such evidence could have been presented at trial to impeach Ms. Frazier's testimony.

Additionally, Burnett Hawkins, the only alleged eyewitness to the shooting, indicated in his statement to the police that the gun he saw in Mr. Flowers' hand was nickel-plated. (Police statement dated May 28, 1996.) Mr. Hawkins was allegedly unavailable to testify at trial, see below at Grounds I(A)(1)(a)(ii) and IV, and his prior testimony that was admitted into evidence at trial provided no physical description of the gun. At his Rule 32 deposition, Mr. Hawkins recalled the

26

gun as "chrome plated, meaning silver." (R32 Depo. 11/16/2006 R. 29.)

Had counsel engaged in investigation to discover impeachment evidence, counsel would have similarly found that witness Marion Frazier, the only witness to identify the murder weapon, had a sentence pending for charges related to possession and distribution of crack cocaine. Montgomery Co. CC-XXX. Counsel's failure to investigate this witness and any bias or motive for her damaging testimony prevented counsel from effectively developing and using this information during cross examination. Ms. Frazier admitted on at trial that she agreed to testify in an effort to help with her drug charges. She was then re-directed by the State and subsequently testified that she did not make any deals with the state. (Tr. R. 384.) Had counsel investigated this witness' background, counsel would have discovered that the State told her that she was facing up to twenty-five years in prison, but as a result of her testimony, she received a much more lenient sentence and was sentenced instead pursuant to a youthful offender arrangement. Montgomery Co. CC-XXX. If counsel were aware of this information, they could have used it to impeach Ms. Frazier effectively.

Had counsel engaged in investigation to discover impeachment evidence, they would have interviewed Ms. Frazier's mother, Mrs. White. They would then have learned, as Mrs. White testified at the Rule 32 hearing, that Ms. Frazier, has mental health problems and has been diagnosed as schizophrenic and bipolar (R32 R. 77); Ms. Frazier was being treated for her mental health problems at the time Mr. Flowers was arrested for capital murder (R32 R. 80); Ms. Frazier has also been a drug addict (R32. R. 77-78); and, during the time that Mr. Flowers was arrested for capital murder, Ms. Frazier was having a relationship with a police officer (R32 R. 78). Had Mrs. White testified to these facts at trial, Ms. Frazier's testimony would have been further undercut.

Finally, Mrs. White testified that no lawyers or investigators talked to her in connection with

27

capital murder charges on Mr. Flowers' behalf. (R32 R. 72.) She would have been willing to testify if she had been asked. (*Id.*) If she had been questioned by Mr. Flowers' attorneys, she would have told them everything she testified about at the Rule 32 hearing. (R32 R. 78.) Moreover, she stated that both she and her husband were available to testify on behalf of Mr. Flowers in this case. (*Id.*)

Had trial counsel introduced Mrs. White's testimony and prior statement and introduced Mr. Hawkins' statement describing the gun, the State would not have been able to connect the alleged murder weapon to Mr. Flowers.

Because of counsel's unprofessional failure to interview the owners of the gun Mr. Flowers allegedly used to shoot Mrs. Addy, Mr. Flowers was deprived of his constitutionally protected right to effective assistance of counsel and prejudiced by counsel's deficient performance. Had counsel called Mrs. White as a witness at trial, there is a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.

> **ii.    Trial counsel were ineffective for failing to challenge the State's eyewitness evidence, the preliminary hearing testimony of Burnett Hawkins.**

In addition to failing to investigate or challenge the State's physical evidence, trial counsel did not attempt to locate, meet, or interview any of the State witnesses who testified at trial. Trial counsel made no effort at all to locate and interview Burnett Hawkins, the only eyewitness to the shooting, either before the preliminary hearing or before trial. At the hearing on the State's motion to introduce the transcript of Mr. Hawkins' preliminary hearing testimony, trial counsel raised no objection. (Tr. R. 43-44.) Counsel made only a brief objection at the time Mr. Hawkins' prior testimony was introduced. (Tr. R. 338-39.) Mr. Hawkins testified at the preliminary hearing that

28

he saw Mr. Flowers shoot into Mrs. Addy's car. (Tr. C. 159.) He also testified that he saw Richard Flowers walk past him after the shooting with a gun in his hand. (*Id.* at 161.)

Mr. Hawkins' testimony at the Rule 32 hearing demonstrates what counsel lost by failing to locate this witness or to challenge admission of his prior preliminary hearing testimony. Mr. Hawkins testified that he currently lives in Santa Barbara, California, but that he resided in Montgomery, Alabama, in 1996. (R32 Depo. 11/16/06 R. 4-5.) He worked at PikNik Products in May 1996, and he recalls the shooting that occurred at that time. (*Id.* at R. 5.) Mr. Hawkins recalls providing a statement to police and testifying at a preliminary hearing. (*Id.* at R. 6.) When asked to recall what happened on the night that Mrs. Addy was shot, Mr. Hawkins stated that he was outside at his car when he heard shots. (*Id.* at R. 27.) Some people told him to get down, and he then saw Mr. Flowers walk past him. (*Id.* at R. 27-28.) He saw a gun in Mr. Flowers' hand and described it as "chrome plated, meaning silver." (*Id.* at R. 29.)

When asked if he actually saw anyone shoot the lady, Mr. Hawkins said, "No, I didn't." (*Id.*) When questioned why his testimony today differs from his testimony provided in the preliminary hearing, he said that he does not remember seeing Mr. Flowers shoot Mrs. Addy. (*Id.* at R. 30.)

Thus, had trial counsel made an effort to locate, investigate, and interview this witness, counsel would have discovered evidence which would have impeached Mr. Hawkins' credibility on cross-examination. Mr. Hawkins' statement to the police about the nickel-plated gun he saw in Mr. Flowers' hand does not correspond to the gun entered into evidence, which is black. This detail was not included in his preliminary hearing testimony. Had Mr. Hawkins been called as a witness at trial, this discrepancy could have been demonstrated to the jury.

Trial counsel would also have been able to present evidence regarding Mr. Hawkins'

statement that he was friendly with the victim, had exchanged phone numbers, and talked on the phone with her, all of which might demonstrate bias on the part of this witness. Additionally, trial counsel made no effort to investigate Mr. Hawkins' identity and background, including his criminal history.

Mr. Hawkins was allegedly "unavailable" at the time of Mr. Flowers' trial,[11] and his preliminary hearing testimony was read into the record (Tr. R. 340; Tr. C. 155-69). The State filed its motion to declare Mr. Hawkins unavailable and to introduce his preliminary hearing testimony into evidence on the morning trial began. (Tr. C. .) A hearing was held on the State's motion immediately following voir dire. (Tr. R. 43-44.) The State merely alleged that Mr. Hawkins was in California and could not be reached. (Tr. R. 43.) Trial counsel made no objection to the State's request to introduce this prior testimony. (Tr. R. 43-44.) Defense counsel did not even ask the State to explain exactly what steps had been taken to locate Mr. Hawkins.[12]

Under Rule 804(a)(5) and (b)(1), Ala. R. Evid., prior sworn testimony is admissible, but only if the witness is unavailable and the opposing party had a full opportunity to cross-examine the witness under oath. The rule requires that the "the party against whom the witness was offered [was afforded] an opportunity to test his or her credibility by cross-examination." Rule 804(b)(1)(C), Ala. R. Evid. The purpose of a preliminary hearing is to establish probable cause, not proof beyond a

---

[11]At the hearing on remand, Montgomery County District Attorney's Investigator Mike Thomas testified that he made one attempt to call a number in California provided to him by a friend of Mr. Hawkins, but got no answer (Tr. Supp. R. 42-43), and that he had run Mr. Hawkins' Social Security number through the worthless check unit's "credit machine" the Friday before trial began on Monday, but that the number was assigned to another person, (Tr. Supp. R. 36-38). See discussion below with respect to direct appeal counsel's ineffectiveness under Ground I(C).

[12]See further discussion below under Ground I(C), respecting direct appeal counsel's ineffectiveness on remand in challenging the insufficiency of the State's showing on this issue.

reasonable doubt.  It is not a discovery exercise.  Nor did the defense have discovery, in this case, including Mr. Hawkins' statement to the police, at the time of the preliminary hearing.  (Tr. R. 338-39.)  Therefore, a preliminary hearing does not provide the defense with a full opportunity to test credibility by vigorous cross-examination on all issues that can be raised at trial, as required by the Sixth Amendment Confrontation Clause. *See Harvey v. Kropp*, 458 F.2d 1054, 1056 (6th Cir. 1972) (explaining that the issues and motivations for cross-examination at a preliminary hearing and at trial are substantially different).

Had counsel challenged the admissibility of Mr. Hawkins' prior testimony on grounds of unavailability, the State would have been put to its proof, at the least, to demonstrate what efforts had been made to locate Mr. Hawkins.  Counsel would then have had the opportunity to challenge these efforts as not meeting the requirement of "reasonable means."  Rule 804(a)(5), Ala. R. Evid. The State's evidence was eventually put on the record at a hearing on remand from the Court of Criminal Appeals.[13]  District Attorney's Investigator Mike Thomas testified that he made one attempt, during business hours on the Friday before trial began, to contact Mr. Hawkins' cousin, Willie Charles Williams, the alternate contact Mr. Hawkins had named to police at the time he gave a statement.  (Tr. Supp. R. 35-36.)  Investigator Thomas stated he also ran Mr. Hawkins' Social Security number through a "credit machine" at the District Attorney's worthless check unit, but that the number came back as someone else's.  (Tr. Supp. 36-37.)  Investigator Thomas also obtained a phone number in California for Mr. Hawkins from a friend of Mr. Hawkins on the morning trial began.  (Tr. Supp. 40.)  He made one attempt to call this number, but no one answered.  (Tr. Supp. 42-43, 54-55.)  Such last-minute, one-shot efforts are not "reasonable means" when weighed against

---

[13]Direct appeal counsel raised the issue in her reply brief.

a capital defendant's right to confront the witnesses against him.

Mr. Hawkins testified at the Rule 32 hearing that he was not unavailable to testify at Mr. Flowers' trial. Mr. Hawkins is a convicted felon, with a prior conviction for child molestation. (*Id.* at R. 32-33.) Because of his prior record, he had to register as a sex offender and was registered in Alabama when he lived here in 1996. (*Id.* at R. 46.) He further testified that the Social Security number which Investigator Thomas allegedly ran through a credit check is correct. (*Id.* at R. X.) Additionally, he was the defendant in a child support case in Montgomery County Family Court.[14] (*Id.* at R. .) *See also* Montgomery Co. CS 1993-1300.02. He further testified that he had kept in touch with Willie Charles Williams and had called him several times after moving to California. (Id. at R. .) Mr. Hawkins stated that, if he had been contacted, he would have returned to Alabama to testify. (Id. at R. .) All of these points illustrate that Mr. Hawkins was not difficult to locate and that he would have been willing to testify. Had counsel made any efforts of their own to locate Mr. Hawkins, they could easily have demonstrated that he was, in fact, available and that the State's efforts were not "reasonable."

Mr. Hawkins testified that he was never contacted by anyone on Mr. Flowers' behalf before his trial. (R32 Depo. 11/16/06 at R. 49.) He was not contacted by anyone on Mr. Flowers' behalf until the Rule 32 proceedings. (*Id.* at R. 50.) Had counsel for Mr. Flowers located Mr. Hawkins at the time of trial, the State would not have been able to introduce his inaccurate preliminary hearing testimony in lieu of live testimony subject to cross-examination. Additionally, had counsel for Mr. Flowers interviewed Mr. Hawkins before trial, they would have discovered that his testimony at the

---

[14]Although Mr. Hawkins' California address is not included in the casefile, his ex-wife's name and city of residence is. Apparently, Investigator Thomas made no attempt to contact Tammy Hawkins.

preliminary hearing may have overstated what he recalled seeing, was questionable on details, and failed to include exculpatory details of the gun's description.

Because of counsel's unprofessional failure to locate and interview the only eyewitness to the shooting and failure to challenge his alleged "unavailability," Mr. Flowers was deprived of his constitutionally protected right to effective assistance of counsel and prejudiced by counsel's deficient performance. Had counsel called Mr. Hawkins as a witness at trial, there is a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.

              **iii.**     **Trial counsel were ineffective for failing to challenge the State's evidence supporting motive, an alleged dispute between Mr. Flowers and the victim, Mrs. Addy.**

Trial counsel failed to present any evidence to contradict the State's theory of the case: that Mr. Flowers was upset about being transferred from night shift to day shift and with the victim because he believed she was responsible for the transfer by telling management about conflicts between them, even though Mr. Flowers' coworkers, supervisors, and the human resources manager at Piknik Products could have contradicted this theory.

To support its theory at trial, the State presented the testimony of Herbert Anthony Jordan, III, and Latrice Williams. Mr. Jordan was a night-shift supervisor at PikNik Products and supervised both Mr. Flowers and Mrs. Addy. (Tr. R. 318-19.) He testified that Mr. Flowers was transferred to the day shift because of "some complaints." (Tr. R. 320.) Mr. Jordan was not aware of any confrontations between Mr. Flowers and Mrs. Addy. (Tr. R. 321.) Mr. Jordan's primary concern with Mr. Flowers was his use of profanity. (Tr. R. 321.) Mr. Jordan said that Mr. Flowers "always

did anything [Mr. Jordan] asked him to do," and he was a "good listener." (Tr. R. 322.)  As far as

Mr. Jordan knew, Mr. Flowers was accepting of the fact that he was being transferred to the day

shift. (Tr. R. 323.)  On cross-examination, Mr. Jordan testified that Mr. Flowers was an "excellent"

worker (Tr. R. 324), and that he would "help anybody out on the line as far as trying to get the job

done" (Tr. R. 325).  Mr. Jordan said that occasionally Mr. Flowers would get upset and provided an

example of when Mr. Flowers was hurt on the assembly line and demanded attention for his injury.

(Tr. R. 324-25.)  He stated that Mr. Flowers reaction to situations was a "normal reaction." (Tr. R.

327.)  Mr. Jordan's testimony, thus, served primarily to show that Mr. Flowers had been transferred

from one shift to another and nothing more.

   Latrice Williams testified that she worked at PikNik Products in May 1996, and she was a

"line leader," which meant she made sure that the assembly line was running smoothly. (Tr. R. 330-

31.)  She supervised the assembly line where both Mrs. Addy and Mr. Flowers worked. (Tr. R. 331.)

She testified that Mr. Flowers used to get into arguments with Mrs. Addy if "[h]e didn't like the way

she was running a machine or if something come out and it wasn't right." (Tr. R. 332.)  She also

testified that she saw Mr. Flowers the evening that Mrs. Addy was killed.  She said that he told her,

"I am going to get that bitch, Annie Bibb, Ms. Brown, and Eddie Windham." (Tr. R. 333.)  When

he said this, she said that she thought he was joking;  she never knew Mr. Flowers to hold a grudge.

(Tr. R. 333-34, 336-38.)  She described Mr. Flowers as "the type of person [who] would get upset

one minute, and then he would laugh in your face the next minute." (Tr. R. 337.)

   Had trial counsel conducted any investigation, they could have countered Ms. Williams

testimony and undercut her credibility with testimony from Karen (Hardt) Brandon, the human

resources manager; Edward Windham, the production manager; and Albert Love, a sanitation

employee; and they would have been able to bring out more helpful testimony from Mr. Jordan. All of these witnesses were deposed in a civil suit against PikNik Products and their depositions were admitted into evidence during Rule 32 proceedings. Although some of the depositions were taken after Mr. Flowers' trial, defense counsel could have interviewed these witnesses personally and called them to testify on Mr. Flowers' behalf.

On March 22, 1997, before Mr. Flowers was tried for capital murder, Karen (Hardt) Brandon provided a deposition in a civil suit against PikNik Products and her prior testimony was admitted into evidence at Mr. Flowers' Rule 32 proceedings. *See* R32 Pet.'s Exh.14 (Depo. of Karen Brandon, Mar. 22, 1997, *Inez Bibb v. PikNik Products Co.*, Montgomery Co. CV 96-206).[15] In that deposition, she testified that she was the human resources manager at PikNik Products (*id.* at 11) and had worked there since May 1991 (*id.* at 12). Ms. Brandon testified that she knew Mrs. Addy (*id.* at 27), and that Mrs. Addy complained about her coworkers (*id.* at 28). Mrs. Addy "would let [her] know any time that she thought something wasn't right." (*Id.* at 28.)

Ms. Brandon recounted an incident that occurred approximately one week prior to Mrs. Addy's death, which related directly to the theory developed by the State at Mr. Flowers' trial. Ms. Brandon said that she received a phone call from Mrs. Addy one week before she was killed. Mrs. Addy complained to Ms. Brandon that some people had a party at Latrice Williams' house, and their supervisor, Herb Jordan, showed partiality toward Ms. Williams and Ms. Williams' sister and temporary employee at PikNik Products, Michelle Brown. (*Id.* at 29-31.) She complained that someone else had clocked out Ms. Williams. (*Id.* at 29.) She further explained that she believed that

---

[15] For purposes of citing to the prior testimony of witnesses in the *Inez Bibb* case in this petition, Mr. Flowers will cite the exhibit number from state post-conviction proceedings, followed by the applicable page number or exhibit number of the deposition.

Mr. Jordan "was letting Latrice do whatever Latrice wanted to do." (*Id.* at 31.) Mrs. Addy told Ms. Brandon that the people who were at the party did not like her: "Everybody was asked to the party but her." (*Id.*) When Ms. Brandon asked who else did not like her (after she named Latrice, Michelle, and Herb), she mentioned Mr. Flowers and another employee named "General."[16] (*Id.* at 32.) The only thing she said about Mr. Flowers and "General" is that "they were in that little group of people" that did not like her. (*Id.*) This information was documented by Ms. Brandon in Mrs. Addy's personnel file. (*Id.* at 34-39; *id.* at Exh. 8-A, 8-B)

Ms. Brandon also testified that Mrs. Addy called her twice on the day that she was killed. (*Id.* at 67.) The first time Mrs. Addy called she wanted to know if her vacation time had been approved; Mrs. Addy wanted to take time off the following week because "she was hurting and didn't want to risk losing her baby . . . [due] in September or October." (*Id.* at 64.) Ms. Brandon indicated that her vacation request was approved because Mrs. Addy had already lost one baby to her knowledge[17] and she did not want Mrs. Addy to lose this one.[18] (*Id.* at 65.) Mrs. Addy called her again later that afternoon before her shift started. (*Id.* at 68.) Ms. Addy told Ms. Brandon that she was scared because she felt that "they were going to do something to her." (*Id.* at 66.) Ms.

---

[16]Ms. Brandon said that when Mrs. Addy complained about Mr. Flowers, she had never heard of him. (Exh.14 at 39.) It was only after Mrs. Addy was killed, and Ms. Brandon was at the police station that evening, that she realized that the Flowers whom Mrs. Addy complained of was the person accused of the homicide. (*Id.* at 46) ("[W]hen we went out to the police station I heard people talking about who did it . . . when they mentioned the last name, Flowers, it hit me as that's probably the same person that [Mrs. Addy] was talking about.")

[17] According to Ms. Addy's personnel records, her previous pregnancy was terminated early due to complications. (*Id.* at Exh. 8, Absence from Work dated 12/27/95-1/2/96.)

[18]As indicated by the medical examiner, Dr. Lauridson, Ms. Addy was not pregnant. *See* (R32 C. 1633-34).

Brandon asked her who she meant by "they," and Mrs. Addy said it was the "same little group." (*Id.*)
Ms. Brandon asked if she was speaking about the incident with Latrice and Michelle, and she said
yes (*id.*); Ms. Brandon did not mention Flowers or General because she did not know them. (*Id.* at
70.) Mrs. Addy told Ms. Brandon no one had made any threats against her. (*Id.* at 66) Ms. Brandon,
nevertheless, told her not to come to work if she was scared, and she stated that she probably would
not come to work. (*Id.* at 67.)

Ms. Brandon testified that she conducted an internal investigation after Mrs. Addy was killed
to "see if we could piece out what possibly happened here." (*Id.* at 73-74.) After speaking with
several supervisors and other coworkers, she said that there was nothing that she could put together.
(*Id.* at 74.) Her investigation revealed nothing regarding Mr. Flowers making threats against Mrs.
Addy. (*Id.* at 75.) There was no way that Mr. Flowers could have known that Mrs. Addy was the
person who complained about the people on his shift, including him, unless Latrice Williams told
him. (*Id.* at 76-77.) Ms. Williams denied that she ever told Mr. Flowers that Mrs. Addy complained.
(*Id.* at 77.) Ms. Brandon further testified that she was not able to determine that Mr. Flowers shot
Mrs. Addy "because he thought she had been somehow involved in getting him moved to the day
shift." (*Id.* at 107.) In fact, Ms. Brandon stated that she "didn't find any possible reason why . . .
[Mr. Flowers] shot her." (*Id.*)

Thus, the testimony of Ms. Brandon, if introduced at trial, could have shown that Mrs. Addy
frequently complained to her about many coworkers, creating multiple enemies, other than Mr.
Flowers, who might have had grudges against her and motives to wish her harm. This information
would have undermined the State's theory and created doubt in the jury's mind as to the testimony
of Latrice Williams—the State's witness who testified that Mr. Flowers argued with Mrs. Addy and

that he commented that he was going to get her on the night she was killed.  Moreover, it would have shown that Ms. Williams, as one of the only people who knew that Mrs. Addy was complaining about her and others, had a motive to lie.

On November 12, 1998, after Mr. Flowers was tried and sentenced to death for the murder of Ms. Addy, James Edward Windham provided a deposition in a civil suit against PikNik Products, and his prior testimony was admitted into evidence during Mr. Flowers' Rule 32 proceedings.. *See* R32 Pet.'s Exh. 15 (Depo. of James Edward Windham, Nov. 12, 1998, *Inez Bibb v. PikNik Products Co.*, Montgomery Co. CV 98-1345).  In that deposition, he testified that he worked at PikNik Products for over six years and left in March 1997. (*Id.* at 7-8.)  In May 1996, he was the production manager and had been so for the last five years he worked there. (*Id.* at 8.)

When Mr. Windham was asked whether he thought Mrs. Addy was a good employee, he said he had his "concerns at times." (*Id.* at 43.)  When asked whether Mrs. Addy complained to him about anything at work prior to her death, Mr. Windham responded, "She had an opinion on almost everything." (*Id.* at 43.)  He testified that he would generally allow Karen Brandon (misspelled as Branton) to handle the complaints he received from Mrs. Addy. (*Id.* at 44-45.)  He stated that prior to Ms. Addy's death, he had no knowledge as to whether she was being threatened or harassed at work. (*Id.* at 47-48.)  He did, however, say that he was "pretty sure" that Ms. Brandon told him about Mrs. Addy's complaints about second shift one week before she died. (*Id.* at 73.)  "[B]ut [Mrs. Addy] complained about everything." (*Id.*)  Mr. Windham provided further testimony:

> Q:   After this shooting has anyone told you that, in fact, [Mrs. Addy] was threatened at PikNik?
>
> A:   All I ever heard was rumors.  I never heard – you know, I never – I don't know of it being as being a factual, you know, it was all talk.

Q.      In other words, did anyone come up to you and say: I overheard Flowers make a threat to [Mrs. Addy]?

A:      Never.

Q:      Did anyone come up to you after the shooting and say: I overheard [Mrs. Addy] tell a supervisor, or [Mrs. Addy] tell me that she was afraid to come to work because of Mr. Flowers?

A:      I never heard that.

Q:      But you did hear before [Mrs. Addy's] shooting that Mr. Flowers had been a problem at work?

A:      I didn't think he was a problem.

(*Id.* at 48-49.) Mr. Windham stated that the day after Ms. Addy was killed, all the employees at PikNik Products were talking about what happened. (*Id.* at 74.)

Mr. Windham explained the incident that led to Mr. Flowers' shift change. (*Id.* at 57.) He indicated that Mr. Flowers injured his shin one night the week before Mrs. Addy was killed. (*Id.*) The day after the injury, Herb Jordan, Mr. Flowers' immediate supervisor, informed Mr. Windham that Mr. Flowers started "expressing himself." (*Id.*) Mr. Flowers was not at work the following day due to the "injury or the holidays or whatever."[19] (*Id.* at 58.) Mr. Jordan and Mr. Windham thought that Mr. Flowers was doing a good job and decided to bring Mr. Flowers "to the first shift where there's more supervision." (*Id.*) Mr. Windham expressly stated that Mr. Flowers was not terminated.[20] (*Id.* at 59.)

---

[19] Ms. Addy was shot on Tuesday, May 28, 1996, which was the day after Memorial day.

[20] Mr. Windham testified that he gave a statement to the police either the night that Mrs. Addy was killed or the following day. (*Id.* at 11.) Mr. Windham's statement to the police, attached as Exhibit 1 to his deposition, indicated that he had informed the temporary department to take him off the schedule until he could investigate and talk with his supervisor. (*Id.* at Exh. 1.) That

Mr. Windham said that on Tuesday, May 28, the day that Mrs. Addy was shot, he spoke with Mr. Flowers. (*Id.* at 54.) He believes that it was right before Mr. Flowers' shift was supposed to start at 3:00 p.m. that day. (*Id.*) He told Mr. Flowers to report to work the following morning at 6:00 a.m.; he told Mr. Flowers that he would have the "[s]ame job, just different time. That's what made him *happy*." (*Id.* at 55) (emphasis added). He emphasized that Mr. Flowers was "receptive" to switching to the day shift, and that he did not express any anger. (*Id.* at 61-62.) In fact, Mr. Windham said that he was always polite and calm; if he was not, Mr. Windham would not have been willing to give him another chance. (*Id.* at 62.)

Mr. Windham also testified that PikNik Products had security cameras in the plant. (*Id.* at 37.) He stated that the videos were not monitored, but "[i]f a problem arose the tape could be re-played and viewed." (*Id.* at 38.) Mr. Windham, however, had no knowledge of whether anyone reviewed the tapes after Mrs. Addy was shot. (*Id.*) To his knowledge, the cameras were operational at that time. (*Id.*)

Had trial counsel interviewed and presented testimony from Mr. Windham, his testimony, like Ms. Brandon's, would have served to undermine the State's theory of motive. Mr. Windham indicated that Mr. Flowers was not upset about the shift change and that he knew of no antagonism between Mr. Flowers and Mrs. Addy. Mr. Windham would also have informed the jury that Mr. Flowers' shift change was not the result of Mrs. Addy's complaints, but rather an opportunity to provide Mr. Flowers with some supervision to dampen his proclivity to use profanity. Mr. Windham would have explained that he and Mr. Jordan thought Mr. Flowers was doing a good job so they

---

statement also indicates that Mr. Flowers was injured either on Wednesday or Thursday the week before Mrs. Addy was shot. (*Id.*) In that statement, he indicated that after he told Mr. Flowers on May 28, 1996, that he was being switched to the day shift that "everything was lovely." (*Id.*)

transferred him to first shift where he could be more easily supervised. Mr. Windham would have

told the jury that Mr. Flowers was happy about his shift change.[21]

On November 12, 1998, after Mr. Flowers was tried and sentenced to death for the murder

of Ms. Addy, Albert Love provided a deposition in a civil suit against PikNik Products; his prior

testimony was admitted into evidence during Mr. Flowers' Rule 32 proceedings. *See* R32 Pet.'s

Exh. 13 (Depo. of Albert Love, Nov. 12, 1998, *Inez Bibb v. PikNik Products Co.*, Montgomery Co.

CV 98-1345). In that deposition, Mr. Love testified that he currently worked at PikNik Products and

had been there for almost eight years in the Sanitation Department. (*Id.* at 8.) He explained that he

was the "lead man" and that he worked under the supervision of Robert Taylor. (*Id.* at 9.)

Mr. Love testified that he knew Mrs. Addy for several years before she was killed because

they worked together. (*Id.* at 20.) He did not have any relationship with her outside of work. (*Id.*

at 21.) Mr. Love never heard Mrs. Addy say anything to anyone about having any problems with Mr.

Flowers prior to her death. (*Id.* at 22.) In fact, Mr. Love stated that he never saw Mr. Flowers have

a confrontation with another employee, never saw Mr. Flowers lose his temper or make threats, and

never heard anyone complain about Mr. Flowers. (*Id.* at 30.) Mr. Love also testified that after Ms.

Addy died, no one ever told him that they had problems with Mr. Flowers. (*Id.* at 33.)

Mr. Love was working the night that Mrs. Addy was shot. (*Id.* at 34-35.) He saw Mr.

Flowers that evening, prior to her death. (*Id.* at 36.) Mr. Flowers came up to him and said that he

was going to start working first shift and that he did not have any problem with anyone. (*Id.* at 37.)

He told Mr. Love that "he came up there to tell folks that he had no beef or whatever"; he

---

[21] Had trial counsel interviewed Mr. Windham, they would have learned that PikNik Products
maintained a video security camera. Had counsel conducted a timely investigation, they could have
asked to review the tape and possibly found evidence of another culprit.

appreciated working the "night shift with folks" and "had no hard feelings with no one." (*Id.* at 41.) Mr. Flowers then shook Mr. Love's hand, and he was not carrying anything. (*Id.* at 40, 41.)   Mr. Flowers appeared to be in a "happy-go-lucky" mood as if he was "glad to start working in the morning." (*Id.* at 44.)  When asked who was present during this exchange, Mr. Love said that there were two other maintenance men, but Latrice Williams was not present. (*Id.* at 43.)

Mr. Love further stated that while Mr. Flowers was standing there talking with the maintenance crew, as he was "fixing to go" (*id.* at 47), Mrs. Addy walked past them toward the ramp that led to the parking lot (*id.* at 45). Mr. Flowers did not follow her outside; he left a different way back through the main part of the plant. (*Id.* at 45-46.)   In fact, Mr. Love did not see Mr. Flowers go outside, rather he only heard Mr. Flowers say, "I'm gone.  I'll holler at you all." (*Id.* at 46.)

Thus, had trial counsel spoken with Mr. Love, they would have been able to present evidence to the jury of Mr. Flowers' state-of-mind immediately prior to Mrs. Addy's death. Mr. Love would have told the jury that he saw Mr. Flowers several minutes before Mrs. Addy was shot; Mr. Flowers was in a good mood and appeared to be happy to start working in the morning. Mr. Flowers told Mr. Love that he appreciated working on the night shift and he had no hard feelings.  Moreover, Mr. Love would have told the jury that Mr. Flowers was saying goodbye as Mrs. Addy walked by them. Mrs. Addy exited the building and Mr. Flowers went the opposite way back through the plant. This testimony would greatly undermine the State's theory that Mr. Flowers was upset at Mrs. Addy for being switched to the day shift, and would cast further doubt on Ms. Williams' credibility.

On November 5, 1997, before Mr. Flowers was tried for capital murder, Herbert Anthony Jordan, III ("Herb Jordan"), provided a deposition in a civil suit against PikNik Products, and his

42

prior testimony was admitted into evidence during Mr. Flowers' Rule 32 proceedings. *See* R32

Pet.'s Exh. 16 (Depo. of Herb Jordan, Nov. 5, 1997, *Inez Bibb v. PikNik Products Co.*, Montgomery

Co. CV 96-206). In that deposition, Mr. Jordan testified that he was currently working at PikNik

Products and had worked there since December 15, 1995; prior to working at PikNik Products, he

served as an officer in the army for twenty-one years. (*Id.* at 8.) At PikNik, he served as the second-

shift production supervisor. (*Id.* at 10.)

Mr. Jordan testified that he supervised both Mr. Flowers and Mrs. Addy. (*Id.* at 20.) Mr.

Flowers began working at PikNik Products in March 1996 and was sent from a temporary agency.

(*Id.* at 21.) Mr. Jordan indicated that Mr. Flowers started out working "boxes," but he was a hard

worker, showed promise, and had good attendance, so he was moved to "case packer." (*Id.* at 23.)

Mr. Jordan said that Mr. Flowers was a "very good" employee. (*Id.* at 24.)

Mr. Jordan testified that he had to counsel Mr. Flowers on only two occasions. (*Id.* at 24,

27.) He testified that when Mr. Flowers had just started to work at PikNik Products, he had to tell

Mr. Flowers not to use overt profanity and yell at Mrs. Addy. (*Id.* at 24-25.) Mr. Jordan said that

Mr. Flowers yelled at Mrs. Addy because she was not "doing her fair share of the work." (*Id.* at 25.)

Mr. Jordan pulled Mr. Flowers from the assembly line and explained to him "that those types of

outbursts would not be tolerated." (*Id.* at 26.) He further told Mr. Flowers that Mrs. Addy was

pregnant and she was restricted from lifting heavy objects. (*Id.*) Mr. Jordan said that he knew she

was pregnant because Mrs. Addy told him that she was pregnant and when she was due. (*Id.*) This

was the only time that Mr. Jordan ever heard Mr. Flowers yell at Mrs. Addy. (*Id.* at 30.)

Mr. Jordan explained that the only other occasion that he discussed Mr. Flowers' behavior

with him was when Mr. Flowers hurt himself on the line. (*Id.* at 27.) He hit his leg while he was

working, and when Mr. Jordan asked him to fill out the accident report form, he responded in a loud and boisterous manner, using profanity. (*Id.* at 27-28.) Mr. Flowers, however, did not threaten Mr. Jordan. (*Id.* at 28.) In fact, Mr. Jordan never heard Mr. Flowers threaten anyone at PikNik Products, including Mrs. Addy. (*Id.* at 32-33.)

Mr. Jordan also testified that after Mr. Flowers was injured and became upset, he notified Mr. Windham and told him that Mr. Flowers' behavior related to the incident was unacceptable. (*Id.* at 33.) At some point after he hurt his leg, Mr. Flowers was switched from the night shift to the day shift. (*Id.* at 35.) Mr. Jordan could not recall how long after his leg was injured that he was switched, but he did recall there was a holiday and a weekend prior to coming back to work. (*Id.* at 36.) Mr. Jordan testified that he did not make the switch; it was someone in upper management. (*Id.*)

Mr. Jordan was not aware that Mrs. Addy had made a complaint about Mr. Flowers. (*Id.* at 34.) He did indicate, however, that he heard rumors in the break room, but he did not put any faith in rumors. (*Id.*) It was not his understanding, however, from these rumors that Mr. Flowers had ill feelings toward Ms. Addy. (*Id.* at 35.) He also indicated that he never heard Mr. Flowers threaten to kill Mrs. Addy. (*Id.* at 41.) He never discussed with Latrice Williams whether she heard Mr. Flowers make any threats against Mrs. Addy. (*Id.* at 41-42.)

Had trial counsel interviewed Mr. Jordan, they would have been able to elicit testimony from him to show that Mr. Flowers was a good worker and that the only time he saw Mr. Flowers get upset with Mrs. Addy was when Mr. Flowers first started because he felt that she was not doing her share of the work. After Mr. Jordan explained that Mrs. Addy was pregnant, Mr. Flowers had no other outbursts towards her. Mr. Jordan could also have corroborated Mr. Windham's testimony

that the decision to switch Mr. Flowers to the day shift was made after he reported Mr. Flowers' outburst when he was injured on the job, not because of complaints from Mrs. Addy.  Mr. Jordan, like Mr. Windham, indicated that there were a lot of rumors circulating at PikNik Products, but that none of them led him to believe that Mr. Flowers bore any animosity to Mrs. Addy.  All of these points would have served to further undercut the State's theory.

At the Rule 32 hearing, Burnett Hawkins also testified that he heard that Mrs. Addy was having problems with people at work with "certain people." (R32 C. 1117.)  Although Mr. Hawkins thought that Mr. Flowers had problems communicating with others (JR32 C. 1118), he never saw him get into altercations with anyone (R32 C. 1129).  In his statement to police at the time of the crime, Mr. Hawkins described himself as a friend of Mrs. Addy and, therefore, could be expected to know something about any enemies she might have at their mutual place of employment.  Nonetheless, defense counsel did not locate or interview him and, so, could not present his testimony to oppose the State's.

Had counsel interviewed the above witnesses and presented their testimony at trial, the testimony of Latrice Williams, the one witness called by the State to show motive, would have been seriously undermined, and she, herself, would have been shown to be a person with motive to wish Mrs. Addy harm.  Because of counsel's unprofessional failure to locate and interview Mr. Flowers' coworkers and supervisors, Mr. Flowers was deprived of his constitutionally protected right to effective assistance of counsel and prejudiced by counsel's deficient performance.  Had counsel called these witnesses at trial, there is a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.

        **iv.**      **Trial counsel were ineffective for failing to**

45

                         **challenge the State's evidence supporting intent,**
                         **statements allegedly made to Latrice Williams and**
                         **Marion Frazier.**

To prove the element of specific intent to kill, Ala. Code 1975 § 13A-5-40(b), the State relied

on the testimony of two witnesses, Latrice Williams and Marion Frazier. As recounted above, Ms.

Latrice Williams testified that she heard Mr. Flowers say that he was going to "get" the victim the

day of the shooting. (Tr. R. 333.) The questionable veracity of Ms. Latrice Williams and the failure

of counsel to demonstrate it has been discussed above in Ground I(A)(1)(a)(iii) and is here

incorporated by reference.

Mr. Flowers was also prejudiced by counsel's failure to investigate the factual circumstances

surrounding the incident recounted in the testimony of Marion Frazier. Ms. Frazier testified that Mr.

Flowers had made impromptu statements in anger about someone at work, that he said, "I'm going

to kill me a bitch," while playing in the front yard with the neighborhood children. (Tr. R. 372.) She

stated that he repeated this threat six or seven times (Tr. R. 373), but that she did not take it seriously

(Tr. R. 379). This testimony provided the jury with important evidence of the requisite mental state

of intent for murder. Had counsel investigated and questioned the neighbors to whom the statement

was allegedly made, they could have challenged this accusation. Counsel could have developed this

on cross examination and impeached Ms. Frazier's statement through contradictory testimony, as

well as elicited Ms. Frazier's incentive to testify on behalf of the prosecution. If counsel had

conducted minimal investigation, they could have undercut Ms. Frazier's story and her credibility

during cross examination, thereby diminishing proof of Mr. Flowers' requisite intent. Thus trial

counsel's failure to investigate in this regard prejudiced Mr. Flowers.

Two witnesses who could have provided a different account were Elijah Trammel and

Jacqueline Williams. These witnesses both testified during Mr. Flowers' Rule 32 proceedings. Mr. Trammel and Ms. Williams lived next door to Mr. Flowers when he was living with his sister Patricianna White and when he was arrested for capital murder. (Depo. 11/16/06 R. 218-233.) Mr. Trammel testified that he was around ten years old when he knew Mr. Flowers. (Depo. 11/16/06 R. 218.) Mr. Tramell called Mr. Flowers "uncle Ricky" (*id.*) and recalls Mr. Flowers as a "fun, cheerful, joyful" man (Depo. 11/16/06 R. 220). Mr. Flowers would hang out with Mr. Trammel a lot, as well as with the other children. (*Id.*) Mr. Trammel said that Mr. Flowers always played with him and took a liking toward him. (Depo. 11/16/06 R. 226.)

Ms. Jacqueline Williams, Mr. Tramell's mother, testified that she knew Mr. Flowers because he lived next door with his sister, Ms. White. (Depo. 11/16/06 R. 228.) She said that Mr. Flowers would play basketball with her children (*id.*), and one time he even built them a goal in the backyard (Depo. 11/16/06 R. 229). Mr. Flowers would play with 10-, 11-, and 12-year-olds and acted more like a child. (Depo. 11/16/06 R. 229.)

Ms. Jacqueline Williams testified that Mr. Flowers did not use profanity around her children, because she did not permit it. (Depo. 11/16/06 R. 228.) Likewise, Mr. Tramell said that he never heard Mr. Flowers use profanity around the children after his mother scolded Mr. Flowers for it. (Depo. 11/16/06 R. 221.) Mr. Tramell stated that he never heard Mr. Flowers say, "I'm going to kill me a bitch. (*Id.*) Both Ms. Williams and Mr. Trammel said that no one from either the State or Mr. Flowers' defense interviewed them; they would have both been willing to talk to Mr. Flowers' attorneys and would have been willing to testify on his behalf. (Depo. 11/16/06 R. 222-23, 230.)

Had counsel interviewed the above witnesses and presented their testimony at trial, the testimony of Latrice Williams and Marion Frazier, the only witnesses called by the State to show

47

intent, would have been seriously undermined.  Because of counsel's unprofessional failure to locate and interview Mr. Flowers' neighbors, Mr. Flowers was deprived of his constitutionally protected right to effective assistance of counsel and prejudiced by counsel's deficient performance.  Had counsel called these witnesses at trial, there is a reasonable probability that the outcome of the proceedings would have been different.  *Strickland*, 466 U.S. at 694.

          **v.**      **Trial counsel were ineffective for failing to adequately support a challenge to Mr. Flowers' alleged statement to the police.**

          (a)      *Counsel were ineffective for failing to challenge the voluntariness of Mr. Flowers' purported statement.*

Trial counsel should have adequately challenged Mr. Flowers' alleged confession to Detective Cunningham both in the motion to suppress and at trial.  For a confession to be admissible, the State must show that the defendant made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him.  *Moran v. Burbine,* 475 U.S. 412, 421 (1986).  "Only if the 'totality of the circumstances' surrounding the interrogation," including the background, experience, and conduct of the accused, "reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* at 421.  Based on lay and expert testimony presented in the Rule 32 proceedings, trial counsel could have presented evidence to show that Mr. Flowers' confession, if made, was not voluntary, because of his cognitive impairments and limited adaptive skills when environmental conditions change.

To begin, the circumstances of Mr. Flowers' alleged confession are suspect.  According to the testimony of Detective Cunningham, the arresting officer, at the suppression hearing, Mr.

Flowers had difficulty reading back the portion of the *Miranda* waiver that he was asked to read. (Tr. R. 48.) After struggling through the waiver, Mr. Flowers refused to sign. (*Id.*) When asked if he understood his rights and wanted to talk without an attorney, he stated he "might want" an attorney." (*Id.*) At this point, questioning allegedly stopped, but the officers present instead began to ask "booking questions." (*Id.*) Counsel for Mr. Flowers failed to ask Detective Cunningham what those questions were. During this questioning, Mr. Flowers allegedly expressed a change of mind, grabbed the waiver form and signed it. (Tr. R. 48-49.) He then made a statement about what had occurred. (Tr. R. 49.) Not until he stopped talking did Detective Cunningham ask whether he wanted an attorney or not. (Tr. R. 51.) Unlike every other interview taken that night in the very same interrogation room, Room 210, Mr. Flowers' was not taped.. *See* Exh. 10 (Burnett Hawkins' statement taken at 2320 hours on May 28, 1996, in Room 210); Exh. 9 (Patricianna White's statement taken at 0450 hours on May 29, 1996, in Room 210). Detective Cunningham reduced Mr. Flowers' purported story to writing, but Mr. Flowers never signed the statement. (Tr. R. 434.)

Had counsel obtained the benefit of expert assistance, as detailed below in Ground I(A)(1)(a)(vi), here incorporated by reference, they would have been apprised of Mr. Flowers' brain impairment and could have argued that his condition impaired his ability to give a voluntary confession. Instead, trial counsel filed a motion that argued only, and without support, that Mr. Flowers' statement was not voluntary because he was not feeling well and "his head was not functioning properly." (Tr. C. 78-80.) Because of counsel's failure to investigate, this argument could not be proven. If, however, counsel had reviewed the records from Mr. Flowers' prior conviction, where they would have discovered Mr. Flowers' mental health background, they could have retained an expert to discover Mr. Flowers' brain impairment. Those documents themselves

include the comment that Mr. Flowers had difficulty distinguishing between fantasy and reality. (R32 Exh. 17, Probation Services Report, noting Mr. Flowers was "unable to come to grips with what constitutes reality.")  Under Supreme Court law, counsel could have argued that due to his mental deficiencies, Mr. Flowers could not have voluntarily provided  the alleged confession.

Because of counsel's deficient performance in challenging the voluntariness of Mr. Flowers' confession, that confession was admitted into evidence at his trial.  Without the confession, the State's evidence against Mr. Flowers would have consisted of an unavailable eyewitness' identification made in a darkened parking lot, and the statements reported by two unreliable witnesses: Latrice Williams, who had her own motives to wish the victim harm, and Marion Frazier, a mentally ill woman with drug charges pending against her.  Had counsel challenged the voluntariness of Mr. Flowers' confession with expert testimony, there is a reasonable probability that the confession would have been suppressed and that the outcome of Mr. Flowers' trial would have been different.  *Strickland*, 466 U.S. at 694.  For these reasons, counsel's deficient performance prejudiced Mr. Flowers and deprived him of his Sixth Amendment right to the effective assistance of counsel.

      (b)     *Counsel were ineffective for failing to demonstrate the unreliability of Mr. Flowers' purported statement.*

Counsel should also have challenged the reliability of the statement attributed to Mr. Flowers, because of the factual circumstances surrounding Detective Cunningham's version of the story, including his assertion that he could not have taped the statement. (Tr. R. 458.) Mr. Flowers was interviewed in Room 210 of the Detective Division. (Tr. R. 455.) That is the same room that had been used for interviewing witnesses regarding this case that evening and early morning, and those

50

statements were taped. *See* Exh. 10 (Burnett Hawkins' statement taken at 2320 hours on May 28,

1996, in Room 210); Exh. 9 (Patricianna White's statement taken at 0450 hours on May 29, 1996,

in Room 210). This contradicts Detective Cunningham's excuse that a taped confession could not

have been obtained because they were not in the videotape room. (Tr. R. 458.)

 Moreover, Mr. Flowers' statement to police is inconsistent in a number of ways. First, it is

inconsistent with the testimony presented by the supervisors and the human resources manager at

PikNik Products. According to Detective Cunningham, Mr. Flowers stated that Mrs. Addy was

telling on him because he partied too much on the line. (Tr. R. 436.) This, however, is inconsistent

with what the supervisors testified to. In fact, Mr. Jordan and Mr. Windham both indicated that Mr.

Flowers was a great worker and that they wanted to keep him, which is why they switched him to

the day shift. (Tr. R. XXX) There is no evidence that any of the supervisors or the human resources

manager could produce to support that Mr. Flowers was upset with Mrs. Addy for telling on him

because he partied too much. Detective Cunningham also stated that Mr. Flowers allegedly told him

that on the Wednesday before Mrs. Addy died, Mr. Flowers got into a shouting argument with her.

(Tr. R. 437.) Mr. Jordan, however, the line supervisor for both employees, indicated that he only

counseled Mr. Flowers one time at the beginning of his employment about yelling at Mrs. Addy.

(Tr. R. XXX) He indicated that there were no incidents after that time. (Tr. R. XXX) The incident

on the Wednesday before Mrs. Addy was shot actually involved Mr. Flowers "getting into it" with

a supervisor after he injured himself at work and was reprimanded for swearing. (Tr. R. XXX)

 The "facts" recounted in Mr. Flowers' statement in fact appear to derive from the statement

given to police by Latrice Williams several hours before Mr. Flowers was arrested and questioned.

In her statement, taken at 11:45 p.m. (Statement of Latrice Williams at 1, recording time of "2345

hours."), Ms. Latrice Williams stated that Mr. Flowers was upset about Mrs. Addy complaining about both of them "partying" instead of working (Statement of Latrice Williams at 5). Ms. Latrice Williams was the primary target of Mrs. Addy's complaint, not Mr. Flowers. And Mr. Flowers could only have known about Mrs. Addy's complaint if Ms. Williams had informed him about it. Mrs. Addy's allegation was that Ms. Latrice Williams clocked out early on the day she was giving a party, not that Ms. Williams and Mr. Flowers were partying at work. Ms. Hardt, the human resources manager, spoke to Mr. Jordan, Ms. Williams' supervisor, about the allegation. Ms. Williams presumably heard about the complaint when Mr. Jordan questioned her about clocking out early. Mr. Flowers would have heard about it only if Ms. Williams complained to him. Ms. Latrice Williams' statement to the police is itself suspect, both because she herself had animosity towards Mrs. Addy, which she would have wanted to deflect attention from, and because all of the PikNik employees who were called down to the police station to give information were herded into a single room where they had plenty of time to cross-reference and get their stories straight. See Statement of Karen Hardt (stating that she had heard from Ms. Williams at the police station that Mr. Flowers had threatened to "get" Mrs. Addy and several other employees).

As detailed below under Ground I(A)(1)(a)(vi), Mr. Flowers suffers from brain impairment. As the records from his prior conviction show, he sometimes has trouble distinguishing fantasy from reality.  (R32 Exh. 17, Probation Services Report.)   Such a defect would make Mr. Flowers susceptible to suggestion. Thus, if Detective Cunningham questioned Mr. Flowers about the "facts" contained in Ms. Latrice Williams' statement, Mr. Flowers might agree that those facts were true, when, in fact, they were not.

Mr. Flowers' alleged confession also indicates that a so-called girlfriend, Mary McCord,

would "always" give Mr. Flowers a ride to work.  Mr. Flowers's sister, Ms. White, however, indicated in her police statement that she would give her brother a ride to work.  *See* Exh. 9.  Marion Frazier, Mr. Flowers' niece, also indicated in her police statement that she drove him to work on occasion.  *See* Statement of Marion Frazier at X.

Finally, Mr. Flowers denied the confession in open court prior to being sentenced.  He told the court, "I didn't kill that lady.  She never did anything to me."  (Tr. R. 617.)

Had trial counsel prepared and properly investigated, they could have challenged the inconsistencies in the statement attributed to Mr. Flowers and undermined its reliability at trial. Because they failed to do so, the statement was introduced uncontested.  As detailed above in the preceding section, without the confession, the State's evidence diminishes considerably in persuasiveness, particularly when the unreliability of the three remaining witnesses is factored in. Because of counsel's deficient performance in failing to put before the jury the unreliability of the confession, Mr. Flowers was greatly prejudiced.  Had counsel acted in accordance with their constitutional duties, there is a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.  For these reasons, counsel's deficient performance prejudiced Mr. Flowers and deprived him of his Sixth Amendment right to the effective assistance of counsel.

      **vi.**    **Trial counsel were ineffective for failing to present evidence in support of a "not guilty by reason of mental disease or defect" defense.**

Trial counsel failed to investigate or present any evidence in support of—or otherwise prepare a defense for—the plea of not guilty by reason of mental disease or defect.  Mr. Flowers entered a plea of not guilty by reason of mental disease or defect.  (Tr. C. 1.)  Yet counsel failed to

present any evidence in support of this plea, even though psychological reports in connection with

Mr. Flowers' underlying conviction, substantiating it, were readily available.   Rather, counsel

attempted to raise some other defense that even the court could not discern the meaning of and, so,

declined to give instructions on any lesser included offenses.   (Tr. R. 560-61).   Had Mr. Flowers'

counsel adequately investigated, prepared, and litigated this defense, counsel could have presented

evidence that would have demonstrated that Mr. Flowers, because of mental illness, was "unable to

appreciate the nature and quality . . . of his acts." Ala. Code § 13A-3-1(a).   Had counsel effectively

litigated this claim, there is a reasonable probability that the jury would have found Mr. Flowers not

guilty by reason of mental disease or defect.   As a result, trial counsel's failure to present any of the

evidence available in support of the plea was deficient and prejudiced Mr. Flowers.   *See Strickland*,

466 U.S. at 686; *Williams*, 529 U.S 398-99.

    Trial counsel's failure to support this plea included a failure to timely file and adequately

argue a motion for an independent psychological examination.   Counsel filed a motion for a

psychological examination to be conducted by the State on February 4, 1998, only five days prior

to trial. (Tr. C. 39-40.)  The court granted this motion. (Tr. C. 39, notation.)  Counsel then filed a

motion for an independent evaluation on February 6, 1998, the Friday before a Monday trial.  (Tr.

C. 64-68.)  On February 9, the first day of trial, the court denied this motion.  (Tr. R. 34.)  The

untimely filing of the second motion and the unpersuasive argument made in support of it prejudiced

Mr. Flowers, as the jury was provided with little to no evidence in support of his defense.

    Records of Mr. Flowers' long history of mental, behavioral, environmental, and emotional

problems, contained in the file for his previous conviction, were sufficient to serve notice to

competent counsel that an independent psychological evaluation was necessary.  Had counsel

retrieved records from Mr. Flowers' prior conviction, counsel would have known that Mr. Flowers was in special education classes and at age fifteen had been diagnosed with mild mental retardation and latent schizophrenia and possible organicity (i.e., brain impairment). *See* Exh. 6 (Psychological Evaluation Report completed July 23, 1979, Children's Services). Given the plea of not guilty by reason of mental disease or defect, counsel should have argued that Mr. Flowers was entitled to an independent examination. *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) (setting aside conviction where sanity in issue and defendant not provided with competent psychiatrist to conduct appropriate examination and assist in evaluation, preparation and presentation of defense). While trial counsel eventually filed a motion for an independent evaluation, counsel did so only one business day before trial, and well past the court ordered deadline for filing. (C. 39-40; R. 34).

In addition, trial counsel failed to provide the court with the factual basis for this motion, even though minimal contact with Mr. Flowers and a review of his prior conviction file would have revealed it. (C. 39-40; R. 34). Trial counsel failed to inform the court of Mr. Flowers' long history of mental, behavioral, environmental, and emotional problems--including his hallucinatory episodes, diagnoses of mental retardation and schizophrenia, emotional disturbances, and evidence of organic brain damage. (R32 Exh. 6.) Nor did trial counsel provide the court with information showing that Mr. Flowers had suffered severe abuse, neglect, and malnutrition throughout childhood. This information was also readily available in Mr. Flowers' mental health record from his prior conviction. (*Id.*) Such pervasive and persistent trauma has been connected with severe psychological problems and mental retardation. Competent trial counsel would have investigated Mr. Flowers' background and asserted the factual circumstances as support for the motion.

Trial counsel failed to set forth adequate support for the motion for an independent psychological evaluation because they had not conducted any relevant investigation. In Dr. Glen D. King's competency evaluation, which was submitted to the court on the day that trial began, it is noted that Mr. Flowers had seen his attorney only once in the approximately two years leading up to trial. (C. 118). Counsel also failed to collect any records relevant to Mr. Flowers' mental health, even though they were readily available. Had counsel taken the simple step of opening the clerk's record from Mr. Flowers' underlying conviction in Coffee County, that served as the sole aggravating circumstance for the capital charge, counsel would have found copies of psychological reports and evaluations that diagnosed Mr. Flowers with mental illness and mental retardation and that discussed environmental problems germane to presenting a mental disease or defect defense. Had counsel properly supported the motion, there is a reasonable probability that the court would have granted it. This evidence would have provided powerful mitigation at the sentencing phase of the trial as well. *See Wiggins v. Smith*, 539 U.S. 510, 524-26 (2003); *Rompilla v. Beard*, 125 S. Ct. 2456 (2005).

Thus, by failing to adequately support and litigate the motion, trial counsel's performance was deficient and prejudiced Mr. Flowers by depriving him of expert assistance critical to his defense. *See Strickland*, 466 U.S. at 686; *Ake v. Oklahoma*, 470 U.S. 68 (1985).

Trial counsel were ineffective for failing to make a motion for funds to hire an expert child psychologist to testify concerning the impact on Mr. Flowers of living in an abusive, alcoholic, neglectful environment, of the tragic death of his father when Mr. Flowers was five, and of being placed in an adult prison at age sixteen, after defending himself from an attempted rape by a male adult in his own bedroom. Such an expert could have given insight into how the circumstances of

Mr. Flowers' life affected him, how his mental illness, brain damage, exposure to alcohol as a fetus, and mental retardation worked in tragic synergy with his environmental shortcomings, and why this evidence was mitigating.   Such an expert could have testified about the cognitive, emotional, psychological, physiological, and neurological impact of such pervasive deprivation and trauma from before his birth forward.  By failing to investigate the case and failing to make a motion for funds to hire a child psychologist to explain the psychological effect of Mr. Flowers' upbringing to the jury, trial counsel's performance fell beneath the standard of a reasonably competent attorney.  *See Wiggins*, 539 U.S. at 533.  If counsel had obtained the assistance of such an expert, the jury would have had a basis for finding Mr. Flowers not guilty by reason of mental disease or defect.  If the jury had the benefit of such testimony at the penalty phase, there is a reasonable probability the jury would have recommended a sentence of life without parole.  As a result, Mr. Flowers was severely prejudiced at his capital trial and sentencing.  *See Strickland*, 466 U.S. at 686.

At the Rule 32 hearing, testimony was presented from Dr. Kenneth B. Benedict and Dr. George W. Woods, Jr., to prove that Mr. Flowers suffers from a brain impairment.  Both doctors were accepted as expert witnesses by the Rule 32 court, without objection from the State.  Dr. Benedict is a licensed psychologist,[22] with a concentration in neuropsychology.  (R32 R. 150-52.) Dr. Benedict also has experience in assessing neurodevelopmental problems, and has evaluated and conducted research regarding victims of child trauma, including physical, sexual, and psychological

---

[22]Dr. Benedict received his A.B. in Psychology from Dartmouth College; an M.A. in Clinical Psychology in 1990 from the University of North Carolina at Chapel Hill; his Ph.D. in Clinical Psychology in 1992 from University of North Carolina at Chapel Hill; completed an internship in Child and Adult Clinical Psychology in 1992 at Harvard Medical School/Massachusetts General Hospital in Boston, MA; and completed Postdoctoral Fellowship in Child and Adolescent Clinical Psychology, and Neuropsychology in 1993 at Harvard Medical School/Massachusetts General Hospital in Boston, MA.  (Exh. 26.)

abuse. (R32 R. 154-56.)  After receiving his Ph.D., he completed a fellowship at Massachusetts General Hospital where he focused on neuropsychological assessment of children, adolescents, and adults. (R32 R. 151.)  He then served on staff at the training hospital for approximately three years before he went on to spend approximately four years with the North Carolina Neuropsychiatry practice. (R32 R. 152.)  Since 2004, he has been the director (and founder) of the Center for Psychology and Education, PLLC, which is a multidisciplinary group practice focusing on the intersection of psychology and education. (Exh. 26.)[23]  He has provided expert assistance in at least fourteen cases. (*Id.*)  He was qualified as an expert in psychology and neuropsychology without objection by the State. (R32 R. 156.)

Dr. Woods is a physician specializing in neuropsychiatry. (Depo. 11/29/06 R. 6.)  He is licensed to practice in the State of California and has been since 1979. (Exh. 27.)[24]  He is board certified in psychiatry by the American College of Psychiatry and Neurology. (Depo. 11/29/06 R. 6.)  He has been in private clinical practice since 1983 and worked in various capacities, including, but not limited to: conducting psychotherapy; running a program for people that have psychiatric disorders and chemical dependency disorders; consulting with a company working with people who

---

[23]Dr. Benedict's areas of expertise and current interests include: psychological, psychoeducational, and neuropsychological evaluation of children, adolescents, and adults; evaluation and psychotherapy of children, adolescents, adults, couples, and families; parent and school consultations; disability documentation reviews; legal evaluations; and research consultation. He has also been a clinical assistant professor at the University of North Carolina at Chapel Hill, Department of Psychology since 2004. (Exh. 26.)

[24] He graduated from Westminster College, in Salt Lake City, Utah, in 1969; he received his medical degree from the University of Utah, in Salt Lake City, Utah, in 1977.  He completed a medical/surgical internship at Highland Hospital in Oakland, California from July 1977-June 1978. He completed his residency (psychiatric) at Pacific Medical Center, San Francisco, California, and was chief resident his last year.  He completed a fellowship with APA/NIMH Pacific Medical Center, San Francisco, California. *See* Depo. 11/29/06 R. 7; Exh. 27.

have traumatic brain injuries; consulting with intensive care unit regarding pharmacological issues and psychiatric manifestations of neurological conditions; and teaching at several universities in the department of psychiatry, including forensic psychiatry. (Depo. 11/29/06 R. 8-11.) He indicated that he has a clinical practice and a forensic practice; in his clinical practice, he sees patients without specific legal problems who have "either medical or neurological problems with psychiatric manifestations." (Depo. 11/29/06 R. 14.) The majority of his forensic practice is civil in nature and generally in employment law. (Depo. 11/29/06 R. 15-16.)   He has testified as an expert approximately 80-100 times. (Depo. 11/29/06 R. 16.)

Both doctors testified that they evaluated Mr. Flowers and reviewed relevant data to conclude that Mr. Flowers suffers from brain impairment; they diagnosed him under the DSM-IV-TR with a cognitive disorder not otherwise specified. (R32 R. 197; Depo. 11/29/06 R. 56; Exh. 30.) Both doctors agreed that this was a mental disease, defect, or disorder. (*Id.*) And both doctors agreed that this brain impairment and cognitive deficit was evident prior to Mr. Flowers' first incarceration in 1979. *See* (Depo. 11/29/06 R. 36-37) (stating that "from an early age [Mr. Flowers] [ha]s problems with ability to effectively weigh and deliberate" and that, when he jumped out of a church window at age fifteen, it was a response to cognitive problems and hearing voices); (R32 R. 250) ("there is evidence of the brain impairment at age 15"); Exh. 30, at 9.

In summarizing how Mr. Flowers' brain impairment impacts his functioning, Dr. Benedict explained that when Mr. Flowers "is faced with anything out of the ordinary, unpredictable or something he is not used to, same thing, his level of functioning in the area of judgment, interpersonal relating, complex decision-making, is likely to fall to very maladaptive levels or impaired levels of function. . . . So when environmental conditions change, his level of adaptive

functioning would be predictively poor." (R32 R. 198-99.) Dr. Benedict indicated that his findings

would lead him to believe that "Mr. Flowers could not appreciate the criminality of his behavior or

tell the difference between right and wrong." (R32 R. 293-94.) In his written report, Dr. Benedict

concluded:

> The most important functional limitations associated with this pattern of
> neuropsychological deficits include: the ability to adapt to changing or novel
> conditions; complex social cognition affecting interpersonal functioning; the
> integration of component brain functions related to cognition and emotion; the ability
> to use areas of strength in an adaptive manner (e.g. a tendency to be concrete in
> reflecting on behavior despite relatively well developed language systems), and an
> inability to learn effectively from experience. Hence, under structured and routine
> conditions, individuals with this profile pattern may be expected to function at
> reasonably high levels, while under unpredictable, changing, or chaotic
> environmental conditions the level of adaptive functioning predictably falls to levels
> that compare to individuals who are deemed to be more generally impaired in the
> form of mental retardation.

(Exh. 30, at 9.) See further discussion of Dr. Benedict's testimony below in Ground I(2)(a)(i)(f),

here incorporated by reference. His testimony presented in support of mitigation would also be

applicable to a plea of "not guilty by reason of mental disease or defect."

Dr. Woods testified that the neuropsychological evaluations conducted by both Dr. Benedict

and the State's expert Dr. Glen D. King, as well as a prior evaluation conducted when Mr. Flowers

was fifteen, led him to conclude that "the neuropsychological deficits impair Mr. Flowers from being

able to adapt or change in complex social situations." (Depo. 11/29/06 R. 59.) Dr. Woods

concluded that Mr. Flowers' brain is impaired in such a way that "his ability to effectively follow

and particularly in stressful situations being able to follow and attend to tasks can be impaired, and

that's very, very important." (Depo. 11/29/06 R. 43.) He further explained:

> When we look at his testing, we really see someone that has what we call problems
> with fluid reasoning with working memory. What we mean by that is someone that's

>really able to kind of figure things out, that's really able to work through things. We
>see that he often has problems with complex attention, and he has problems with
>what we call mental flexibility. He gets stuck. . . . Those kind of neurological
>impairments are directly relevant to being able to effectively weigh and deliberate.

(*Id.*)  When asked by the attorney for the State whether "something else outside of [Mr. Flowers]

made him get a gun, plan to kill Ms. Addy, walk up to Ms. Addy, shoot her five times?" Dr. Woods

explained, "No.  There's nothing outside of him.  First of all, what we're talking about is a person

whose brain does not work, whose brain in terms of mental flexibility, being able to switch, being

able to understand complex and read properly complex relationships doesn't work."  (Depo.

11/29/06 R. 100.)

    Dr. Benedict's opinion at the Rule 32 hearing was not contradicted by the opinion of the

State's psychological expert, Dr. King, with respect to diagnosis. *See, e.g.*, (R32 R. 346) (Dr. King,

on direct examination, stating, "I know [Mr. Flowers'] expert talked about having a cognitive

disorder.  I think that it certainly would fall within the realm of consideration."); (R32 R. 342) (Dr.

King, on direct examination, stating that the results of one test conducted on Mr. Flowers "is

indicative of some impairment in cognitive functioning"); (R32 R. 349) (Dr. King stating, on direct

examination, "I think [Mr. Flowers] does have some impairment in certain specific areas.  Again,

I think [Dr. Benedict's] and my results are really consistent in that regard."); (R32 R. 352) (Dr. King,

when asked on cross-examination whether his scores and data are somewhat the same as those

generated by Dr. Benedict,  responding, "[i]n my way of looking at the data, they are very similar").

In fact, when Dr. King was asked if his opinion differed "on occasion" from Dr. Benedict's opinion,

he responded, "I am not sure how exactly, but there may be difference between the two of us.  My

reading of what he wrote in his opinion and also the kind of things I have been testifying to, I think

61

there is fairly substantial similarity." (R32 R. 352-53.)  In essence, Mr. Flowers presented evidence

of his brain impairment that was unrefuted by the State at his Rule 32 hearing.  The only

disagreement between Dr. Benedict's and Dr. King's opinions was in the degree of impairment.  Dr.

King stated that he did not believe that Mr. Flowers is unable to appreciate the wrongfulness of his

behavior.  (R32 R. 347.)  This difference in expert opinion presents a jury question.  Because of the

greater detail in Dr. Benedict's evaluation and testimony, there is a reasonable probability that, had

his opinion been presented to the jury, the outcome of the proceedings would have been different.

*Strickland*, 466 U.S. at 694.

Had defense counsel, further, elicited from Johnny Flowers,[25] Mr. Flowers' oldest brother,

during the innocence/guilt phase the more complete testimony he gave during the penalty phase at

trial and had that testimony been put into context with the above expert opinions, the jury would

have understood that Mr. Flowers' propensity to "click" or "snap" was something beyond his

control.  Johnny Flowers testified at trial that Mr. Flowers has a tendency to act impulsively, but

regret his actions immediately after (Tr. R. 571) ("I'll say to you today that my brother don't have

– I don't believe he realizes what he done.  I just don't believe it, because this minute about anything

he snaps, and it is just so horrible . . .");  that Mr. Flowers leapt out of a church window at around age

fourteen because "the devil made [me] do it" (Tr. R. 577));  that Mr. Flowers' cries for help went

unheeded (Tr. R. 497-98) ("the day before he committed that crime, he had went to the Police

Department, and it is on record, and asked for them to lock him up because he felt like he was going

---

[25]Johnny Flowers was the only witness called by the defense at both the innocence/guilt and
penalty phases of trial.  (Tr. R. ii-iii, trial witness index.)  As witnesses at the Rule 32 hearing
testified, Johnny Flowers was in special education.  (Depo. 11/16/06 R. 65; R32 R. 20.)  Johnny
Flowers was deceased at the time of the Rule 32 proceedings.  (R32 104.)

to hurt himself or maybe somebody else"). All of these facts support a not guilty by reason of mental disease or defect defense.

### vii. Trial counsel were ineffective for inadequately arguing a motion for a continuance.

Trial counsel were ineffective when presenting two motions for continuance, both of which were filed after the court-mandated motions deadline and one that was filed on the first day of trial. Especially in a capital case under the Eighth Amendment, Mr. Flowers' right to due process under the United States Constitution was violated absent a continuance. *See United States v. Verderame*, 51 F.3d 249, 252 (11th Cir. 1995). By waiting until only days before the trial to request a continuance, after trial counsel sat motionless on the case for almost two years, counsel acted with inexcusable neglect and rendered Mr. Flowers unconstitutionally ineffective assistance under *Strickland*.

Upon his appointment as co-counsel, Mickey McDermott immediately discovered that no investigation or attempts at investigation had been completed, that no motions had been filed, and that lead trial counsel had done no preparation or developed any plan for defending Mr. Flowers in his capital charges. (Tr. R. 628-638, 639-641, 645). As a result, less than one week before trial and over one month past the motions deadline, for the first time counsel filed a motion to continue. (Tr. C. 35-36.) The motion was filed on the following grounds: recently appointed substitute counsel; pendency of motions for dismissal, funds for investigators, and independent psychological evaluation; efforts to locate and interview defense witnesses; and counsel's prior scheduled matter before the court in the following two weeks. (*Id.*). This motion does not appear to have been formally ruled on, but the case proceeded to trial as scheduled.

On the morning of trial, after selection of the jury, co-counsel Mickey McDermott again moved for a continuance (Tr. R. 284-87), which was again denied (Tr. R. 288). He did so after learning that lead counsel, Robert Powers, had not prepared an opening argument and had not prepared the cross-examination of the State's witnesses, requesting instead that the inexperienced McDermott create an impromptu and extemporaneous defense of Mr. Flowers. (Tr. R. 638, 644-45). Knowing of the consequences of going forward unprepared, Mr. McDermott again made an oral motion for a continuance. (Tr. R. 285-286). This recently appointed second-chair attorney had been thrust into a position of acting as lead counsel in a capital case—a position for which he was grossly unqualified, having never before tried a capital case, and for which he had no time to prepare. (Tr. R. 626-30). McDermott argued to the court that he had insufficient time to prepare and could not adequately defend Mr. Flowers. (Tr. R. 285-288). McDermott's untimely petition to the court was denied, and the court queried whether defense counsel was attempting to create error for the record. (Tr. R. 288).

Trial counsel's inept performance greatly prejudiced Mr. Flowers; had counsel adequately argued for a continuance in a timely fashion, counsel would have had time to adequately prepare for the cross-examination of the State's witnesses; to gather, prepare, and present adequate evidence in support of the plea of not guilty by reason of mental disease or defect; and to collect and present mitigating evidence at sentencing. Because counsel delayed in requesting and, as a result, lost the motion to continue, counsel had no time to present the case that should have been before the jury, i.e., all of the evidence presented to the court during Rule 32 proceedings.

Trial counsel were likewise ineffective for failing to move for continuance on the grounds that the court-ordered, state-conducted competency evaluation, that was produced on the first day

of trial (Tr. R. 286, 636), did not meet the constitutionally mandated requirement of "access to a competent psychiatrist who will conduct an *appropriate* examination." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (emphasis added).   Trial counsel relied on Dr. King's perfunctory competency evaluation, prepared after meeting with Mr. Flowers for approximately forty-minutes, to analyze Mr. Flowers' medical, social, and mental health history, even though other mental health evaluations that were readily available from the record of his prior conviction conflicted with the State's evaluation.

Moreover, trial counsel should have adequately argued for an independent evaluation by a defense expert instead of settling on the report provided by a court-mandated state evaluator, thus providing the court with yet another reason that the trial should have been continued. *See Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) ("when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and *assist in evaluation, preparation, and presentation of the defense*") (emphasis added); American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Commentary to Guideline 4.1 (2003) (stating that "unless counsel agrees otherwise, the defendant is entitled to experts independent of the government; the jurisdiction may not meet its obligations by relegating him to the state mental hospital or the state crime laboratory") (hereafter "ABA Guidelines"); *see also Rompilla*, 125 S.Ct. at 2459 (indicating that American Bar Association Standards for Criminal Justice are "guides to determining what is reasonable") (citing *Wiggins*, 539 U.S. at 524).   Had trial counsel obtained the continuance and conducted a complete investigation of Mr. Flowers' social, medical, and mental health history with an independent psychologist, they could have developed not only proof to support the not guilty by reason of mental defect plea, but also

mitigating evidence to present at the penalty phase of trial.

Because of trial counsel's deficient performance in failing to request a continuance on these grounds, Mr. Flowers was prejudiced as counsel was unable to present information concerning his traumatic childhood and mental illness. *See Strickland*, 466 U.S. at 686; *Williams*, 529 U.S. at 397. Thus, trial counsel's inability to adequately argue a motion for continuance violated Mr. Flowers' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**viii.   Trial counsel were ineffective for failing to object to improper closing argument by the prosecution.**

Trial counsel were ineffective for failing to object to inflammatory statements requesting that the jury find guilt because the victim was not there to testify. (Tr. R. 510, 534-35). This encouraged the jury to find guilt on the basis of their sense of outrage that someone had been killed, regardless of whether the facts and law supported each element of conviction. *See South Carolina v. Gathers*, 490 U.S. 1 (1994). Counsel also failed to object to the State's assertion that Mr. Flowers was looking for more people to kill. (Tr. R. 528). This statement encouraged the jury to find guilt based on the suggestion that, regardless of whether the facts and law supported each element of the offense, only Mr. Flowers' conviction and sentence of death would prevent him from killing anyone in the future. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). Individually and cumulatively, then, counsel's failure to object to these statements led the jury to find guilt based upon their emotional outrage and speculative fear, rather than the facts and law before them. Thus, counsel's failure to object greatly prejudiced Mr. Flowers. *See Strickland*, 466 U.S. at 686.

**ix.   All of trial counsel's above-enumerated failures were constitutionally deficient and prejudicial.**

a.   *Counsel's   failures   constituted   deficient*

66

*performance.*

Trial counsel for Mr. Flowers conducted no independent investigation of the State's case or of the defense of "not guilty by reason of mental disease or defect." They interviewed no witnesses, other than Mr. Flowers' oldest brother, Johnny Flowers; they obtained no records; they obtained no assistance from experts. Thus, they failed to discover abundant evidence to challenge the State's case or to support the defense they had raised. Mr. Flowers' trial counsel acted in manner that was outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). Because counsel failed to act within professional norms—which require a defense attorney at a minimum to conduct an adequate and independent investigation into the State's case—they were completely unprepared to subject the State's case to that constitutionally required crucible. Instead, Mr. Powers as lead counsel and his revolving second-chair counsel did little to prepare in advance of defending Mr. Flowers at his trial for his life. As a result, the scant and very late motions that were filed contained little information to assist Mr. Flowers or the court and contained uninformed arguments not supported by factual circumstances; the cross-examination of the State's witnesses failed in truly challenging the State's case against Mr. Flowers; the only evidence presented on behalf of the defense—Mr. Flowers' brother, who knew nothing factual about the crime and whose testimony respecting Mr. Flowers' history of bizarre behavior was presented with no context—did nothing to create reasonable doubt in the mind of the jury; and the argument to the jury was ill-informed and inconsistent with the case presented by the defense. Because of trial counsel's substandard performance, the jury heard a one-sided version of events—the State's case.

67

"[B]ut for counsel's unprofessional errors," as detailed above, both individually and collectively, there is a reasonable probability that "the result of the proceeding would have been different." *Strickland*, 466 U.S. 694.

The United States Supreme Court has determined that the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") are "guides to determining what is reasonable." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (recognizing the American Bar Association ("ABA") Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) as "well-defined norms"); *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (describing the American Bar Association standards as "[p]revailing norms of practice").

The 1989 edition of the ABA Guidelines, which had been in place for seven years when Mr. Powers was appointed as trial counsel, instruct that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should *begin immediately upon counsel's entry into the case and should be pursued expeditiously*." ABA Guideline 11.4.1.A (1989) (emphasis added). Counsel may not "sit idly by, thinking that investigation would be futile." Commentary to ABA Guideline 11.4.1 (1989). The Guidelines further instruct counsel to "consider interviewing potential witnesses, including: A. eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself." ABA Guideline 11.4.1.A.3 (1989). Indeed, conducting an adequate investigation is key to defending one accused of a crime—from the initial stage of filing pretrial motions to the final stage of presenting closing argument at trial.

"In assessing counsel's investigation, we must conduct an objective review of their

performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688-89). "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S. at 381 (citations omitted); *see also Wiggins*, 539 U.S. at 533 (finding that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (citations omitted). When this Court reviews "the reasonableness of an attorney's investigation . . . [it] must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. However, it will be unreasonable when counsel's "failure to investigate thoroughly stemmed from inattention, not strategic judgment." *Wiggins*, 539 U.S. at 512.

In preparing for Mr. Flowers' trial, lead counsel Mr. Powers conducted little–if any–investigation. Mr. Powers' testified at the motion-for-new-trial hearing that he spent a total of six to eight hours preparing Mr. Flowers' case for trial. (Tr. R. 673.) Although Mr. Powers indicated that there were "no witnesses for the defense that we could subpoena" (Tr. R. 675), and that he initially made preliminary contacts with individuals asking if he could "call [them] in the future and have a discussion" regarding Mr. Flowers' case (Tr. R. 676), there is overwhelming evidence to the contrary. The first of three second-chair attorneys, Paul Christian Sasser, stated during Rule 32 proceedings that the only things Mr. Powers asked him to do while he was involved

in the case for the first six months were to visit Mr. Flowers and to file a motion for the transcript of the preliminary hearing. (Depo. 11/16/06 R. 117.) At no time while he was assigned to the case did he or Mr. Powers divide up duties between them (*id.* at 114) or develop a theory of the case (*id.* at 116). Motion-for-new-trial attorney Paul Copeland stated, also during Rule 32 proceedings, that trial counsel's file contained no notes on independent investigation. (Depo. 11/16/06 R. 178-79.) The file also contained no evidence that any strategy had been developed. (Id. at 200-1.) All of the lay witnesses (excluding prior counsel) who testified at the Rule 32 hearing indicated that they were never contacted by Mr. Flowers' attorney, *see infra* Ground I(A)(2)(a). Based on the overwhelming amount of evidence that could have been presented at trial, and based on Mr. Powers' own testimony that he spent a total of six to eight hours preparing this case, it stretches credulity to believe that he conducted any interviews with potential witnesses.[26]

Second-chair counsel appointed two weeks before trial, Mr. McDermott, also failed to conduct adequate investigation, testifying at the motion-for-new-trial hearing that he had never met with the defense witnesses nor were there any "records of Mr. Powers having met with the defense witnesses." (Tr. R. 635.) Indeed, he testified that Mr. Powers' file contained no defense witness list. (Tr. R. 632.) He also testified that he did not have adequate time to interview the State's witnesses.

---

[26] Mr. Powers also testified that "[i]nitially [Mr. Flowers] talked about some people that said they saw him there, but then we had other discussions that negated those particular ones, and the people whose names he gave me, most of them had been called by the State." (Tr. R. 675.) Mr. Powers implies that he determined not to investigate potential witnesses based on the fact that the State might call them as a witness and based on his discussions only with Mr. Flowers—not based on any independent investigation. Regardless of what Mr. Flowers told Mr. Powers, he still had an obligation to conduct investigation. *See, e.g.*, *Rompilla*, 545 U.S. at 387 ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty" (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)).

(Tr. R. 633.) Mr. McDermott spent the majority of his time preparing and filing pretrial motions that had not already been filed. (Tr. R. 631.)  Mr. McDermott testified that he spent "about four hours of actual preparation time" on this case. (Tr. R. 628.)

In addition to failing to interview potential witnesses, counsel failed to collect any background information on Mr. Flowers.  As required in capital cases, in anticipation of the penalty phase, counsel should collect records, including but not limited to: medical history, educational history, special educational needs, family and social history, prior adult and juvenile record,  prior correctional experience, and religious and cultural influences. ABA Guideline 11.4.1.D.2.C (1989). The same applies where a "not guilty by reason of mental disease or defect" defense is raised. Counsel were certainly aware that Mr. Flowers had a previous record, as that was an element of one count of capital murder and the only aggravating circumstance making Mr. Flowers eligible for the death penalty.  Had counsel retrieved records from Mr. Flowers prior conviction, counsel would have known that Mr. Flowers was in special education classes and at age fifteen had been diagnosed with mild mental retardation and latent schizophrenia and possible organicity (i.e., brain impairment). *See* Exh. 6 (Psychological Evaluation Report completed July 23, 1979, Children's Services).  Mr. Powers, instead, came to the uninformed conclusion, after conversations with Mr. Flowers only, that he could not "in fairness" put on the defense of self defense or mental disease or defect. (Tr. R. 674.) This decision was completely unreasonable and could not be considered "strategic" in the absence of conducting even a minimal investigation. *See Wiggins*, 539 U.S. at 533.  Furthermore, Mr. Powers' assertion that the mental disease or defect defense had been abandoned is belied by his questioning of several witnesses at trial.  He asked Mr. Jordan whether he had ever witnessed Mr. Flowers going "berserk." (Tr. R. 324.) He also elicited from Johnny Flowers information about Mr.

Flowers' and his family's attempts to get him mental health treatment. (Tr. R. 496-98.) These

questions make no sense unless they were an attempt, albeit feeble, to demonstrate insanity.[27]

The ABA Guidelines clearly state, "Without investigation, counsel's evaluation and advice

amount to little more than a guess." Commentary to ABA Guideline 11.4.1 (1989). In this case, that

is exactly what Mr. Powers' performance amounted to–a guess.  He failed to conduct any

independent investigation.  His testimony is clear that he spoke only to his client and reviewed the

State's evidence against his client:

> I read all the discovery.  I went through everything they had. . . . I was hounding [the
> prosecutor] to try to see if we couldn't do something on a plea bargain.  I had gone
> over everything with Mr. Flowers, where the weapon came from, the whole nine
> yards. . . . I had read [detective] Cunningham's statements.  I read all those police
> reports straight down the line.  I got a copy of the preliminary report where the
> gentleman said he saw him walking in such a manner after all the information that
> was listed in there, what the police report said.

(Tr. R. 683-84.)[28]  If he, in fact, made "preliminary" contact with any witnesses as he testified, there

is no evidence of this either in his file or based on witness testimony at the Rule 32 hearing.[29]  Even

---

[27]The State certainly thought this was the tenor of such questioning.  At the conclusion of the
penalty phase, the State argued that Mr. Flowers should be sentenced to death because he was *not*
"crazy." (Tr. R. 585-86.)

[28] It should be noted that the ABA Guidelines instruct, "The existence of ongoing plea
negotiations with the prosecution does not relieve counsel of the obligation to take steps necessary
to prepare a defense."  ABA Guideline 11.6.1.E. (1989).

[29] Patricianna White, the person with whom Mr. Flowers lived and the wife of the owner of
the supposed murder weapon, testified that no one ever contacted her on Mr. Flowers' behalf in
advance of his trial. (R32 R. 72, 78.) Burnett Hawkins, the State's only alleged eyewitness, testified
that no one ever contacted him on Mr. Flowers' behalf in advance of his trial.  (Depo. 11/16/06 R.
49-50.) Mr. Flowers' neighbors–Elijah Trammel and Jacqueline Williams–testified that no one ever
contacted them on Mr. Flowers' behalf in advance of his trial. (Depo. 11/16/06 R. 222-23, 230.)
The testimony of Karen Brandon, Edward Windham, Herbert Jordan, and Albert Love were
presented through prior depositions; based on their testimony, it would be surprising for defense
counsel to have spoken with them and chosen not to use them as witnesses.

if he had, such preliminary contact is not sufficient for an adequate investigation. Asking witnesses if he could "call [them] in the future and have a discussion" regarding Mr. Flowers' case (Tr. R. 676), without ever having that follow-up discussion is not an investigation.

Mr. Powers and Mr. McDermott also alleged that the defense "strategy" was that, because Mr. Flowers had not been arraigned, the case would be continued. (Tr. R. 634; Tr. R. 679-80.) Mr. Powers explained that this was his reason for not filing any pretrial motions. (Tr. R. 680.) This strategy is not reasonable under professional norms, especially in a death penalty case. Speedy trial rights are not likely to be enforced where the defendant himself deliberately fails to assert them. *Barker v. Wingo*, 407 U.S. 514, 529 (1972) (instructing that courts may "attach a different [i.e., lesser] weight to a situation in which the defendant knowingly fails to object"). Even if it were, however, a reasonable excuse as to why no pretrial motions had been filed, this cannot excuse the failure to conduct any independent investigation.

The accepted norms and Supreme Court precedent support the proposition that "[m]inimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for noncapital cases, should not be adopted as sufficient for death penalty cases." ABA Guideline 11.2.A; *see also Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (noting a "special 'need for reliability in the determination that death is the appropriate punishment' in any capital case"); *Gardner v. Florida*, 430 U.S. 349, 363-64 (1977); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Moreover, "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." *Rompilla*, 545 U.S. at 387 (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). Thus, there can be no "strategic"

73

reason to fail to investigate. The failure to investigate in this case, in turn, resulted in trial counsel's failure to provide Mr. Flowers with a defense during the guilt/innocence phase, which would include, at a minimum, adequate and thorough pretrial motions, proper objections throughout trial, a well-reasoned opening and closing statement, effective cross-examination of State's witnesses, and defense witnesses to refute the State's theory of the case. In this case, the performance of Mr. Flowers' trial counsel fell below all minimally accepted norms. As such, Mr. Flowers' counsel were deficient.

b.      *Counsel's failures were prejudicial.*

By failing to act in accordance with prevailing professional norms, trial counsel left the jury to hear the State's evidence largely unchallenged. "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). Trial counsel's deficiencies, enumerated above in each individual subsection, both individually and cumulatively resulted in prejudice to Mr. Flowers. (Those discussions of prejudice arising from each individual error are incorporated here by reference.) Because counsel presented nothing to counter the State's version of events, when abundant evidence was available to contest the State's case, confidence in the outcome of the trial is seriously undermined.

As demonstrated above, every aspect of the State's case was subject to challenge, had counsel obtained even minimal assistance and conducted even minimal investigation. The State avoided calling the supposed owners of the gun introduced as the murder weapon and relied instead on Marion Frazier, a mentally ill woman under pressure to help herself out of legal difficulties. Had

those owners been called, they would have repudiated the identification made by Ms. Frazier. Mrs. White's description of the gun can hardly be questioned as legitimate, since she gave her statement to police at a time when she had no idea what the supposed murder weapon looked like. The easy inference that Mr. Flowers simply lifted the gun from his sister's house would then have evaporated and some other explanation would have to be found to connect Mr. Flowers to the gun.

The State also avoided subjecting its "eyewitness" to cross-examination before the jury by delaying attempts to locate him and stopping after a single phone call to his California number. Had defense counsel called Mr. Hawkins as a witness, they could have elicited his contrary description of the gun he saw in Mr. Flowers' hand and attacked the certainty of his observation of the shooting.

The State relied on Latrice Williams to testify to motive, when Ms. Williams herself had a grudge against the victim. Had defense counsel interviewed personnel at Piknik, they would have discovered that Mrs. Addy had a long record of complaints, but that those complaints were not directed primarily at Mr. Flowers.

The same questionable witnesses, Ms. Latrice Williams and Ms. Frazier, provided the State's testimony on intent. Had defense counsel interviewed other coworkers of Mr. Flowers, they would have discovered contrary statements about Mr. Flowers' mood on the night in question. Additionally, neighbors could have testified that Mr. Flowers never made the comments alleged by Ms. Frazier.

Given Mrs. Addy's propensity to complain to Ms. Brandon about every little slight (e.g., not being invited to a party attended by other coworkers), had she gotten into an altercation with Mr. Flowers, as he allegedly confessed, she would, more likely than not have reported that, too, especially since she called Ms. Brandon on the day she was shot to report feeling threatened by

persons other than Mr. Flowers.

On the affirmative side, abundant evidence was readily available to support the defense of "not guilty by reason of mental disease or defect." Had counsel reviewed the record of Mr. Flowers' prior conviction and collected the mental health documents contained therein, had they then followed up on the information contained in those records by securing the assistance of a qualified psychologist for testing and document review, they could have presented the jury with a compelling account of Mr. Flowers' history of mental illness, instead of the random insinuations drawn from Mr. Jordan and Mr. Johnny Flowers. Multiple other lay witnesses could have provided specific details to flesh out the portrait of a sadly deprived and cognitively impaired young man, subject to unexpected and uncontrollable impulses, who, nonetheless, had sought out help for his own condition, but never received it.

(b)     Petitioner did exhaust his state remedies with respect to this Ground.

(c)     Direct appeal:

(1)     Petitioner did raise this issue on direct appeal to the Court of Criminal Appeals. *Flowers v. State*, 799 So. 2d 966 (2000). Petitioner omitted the separately numbered issue alleging ineffective assistance of counsel in his petition for writ of certiorari to the Alabama Supreme Court; however, Issue 5 (incorrectly numbered 6) addresses ineffective assistance of counsel for failure to investigate, citing

76

*Goodwin v. Balkcom*, 684 F.2d 794, 805 (11 th Cir. 1982), and the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.  Petitioner also has alleged ineffective assistance of direct appeal counsel throughout post-conviction proceedings and relies on that claim as cause to excuse any default.

(2)     Not applicable.

(d)     Post-Conviction Proceedings:

     (1)     Petitioner also raised this issue through a post-conviction relief petition in the Montgomery County Circuit Court.

     (2)     Petitioner raised this issue in a petition for post-conviction relief under Rule 32, Ala. R. Crim. P., submitted to the Montgomery County Circuit Court, CC-97-20.60-EWR. None of Petitioner's claims were dismissed before the evidentiary hearing and evidence was presented in support of all of them.  In its Final Order Denying Petitioner Richard Jerome Flowers's Fourth Amended Rule 32 Petition for Post-Conviction Relief, however, the court dismissed this claim as procedurally barred because it had been raised on

77

direct appeal. Dismissal on this ground was affirmed by the Court of Criminal Appeals. *Flowers v. State*, No. CR-06-1819, at *10 and 20 (Ala. Crim. App. Sept. 26, 2008) (mem. op.)

(3)     Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented on this claim. Some of Petitioner's witnesses were not permitted to testify or had their testimony limited on objection by the State.

(4)     Petitioner appealed the denial of his petition for post-conviction relief.

(5)     Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)     Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-06-1819. That court affirmed the denial of relief on September 26, 2008, *Flowers v. State*, No. CR-06-1819 (Ala. Crim. App. Sept. 26, 2008) (mem op.). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. The petition was initially granted, but the writ was ultimately quashed without opinion. *Ex parte Richard*

78

*Jerome Flowers*, No. 1080340 (Ala. June 25, 2010) (mem.).  The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  In the alternative, it was an unreasonable determination of the facts in light of the evidence presented.

(7)   Not applicable.

(e)   Not applicable.

**2.**   ***Trial counsel were ineffective for failing to prepare and present evidence to the jury and the judge in support of a sentence less than death.***

(a)   Supporting facts.

i.   **Trial counsel were ineffective for failing to investigate and present abundant mitigation evidence in support of a sentence less than death.**

Trial counsel were ineffective at the penalty phase of the trial and sentencing by failing to investigate and present abundant and readily available mitigating evidence.  *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 125 S.Ct. at 2466 (noting that, as part of mitigation investigation in capital cases, "defense counsel must obtain information that the State has and will use against" the defendant from a prior conviction).

Mr. Flowers' trial counsel were ineffective for failing to contact numerous individuals with compelling and relevant information about Mr. Flowers' tragic childhood, emotional difficulties, and the mitigating circumstances surrounding the events of his underlying conviction.  Many relatives

and acquaintances were available and willing to assist in providing information about the pervasive and chronic abuse Mr. Flowers suffered at the hands of his alcoholic father, and his alcoholic mother's inability to provide her children with the basic necessities of life, such as food and shelter, or to protect them from abuse. They could have provided information about his malnutrition—having to beg for food from neighbors, his developmentally slow adaptive skills, and his mental health. These individuals could have testified to the beatings that Mr. Flowers and his siblings received from infancy onward, the beatings his mother endured while pregnant with Mr. Flowers and his siblings, and the overwhelming amount of alcohol consumed by his mother throughout her life. They would have reported the chronic abandonment of Mr. Flowers and his siblings—his mother's frequent and extended absences from the home in the throes of alcoholic binges—and the frightening and inhumane living conditions in which Mr. Flowers was forced to fend for himself. They could have told how, during Mr. Flowers' childhood, his family were so poor that they lived without running water, waste disposal, gas, or electricity. These individuals would also have provided information concerning the impact of Mr. Flowers' involvement as a young teenager with a cult-like religious organization. They would have detailed instances in which Mr. Flowers hallucinated during church services and the highly restrictive rules of the church which sought to isolate members from those outside it.

Witnesses were available who could also have corroborated Mr. Flowers' mental illness and cognitive limitations. Teachers would have testified that Mr. Flowers was in special education classes and functioned below average. Others would have testified that Mr. Flowers' adaptive skills were below average and that he reached developmental milestones much later than other children. They would have willingly detailed their personal observations of Mr. Flowers' impaired mental and

80

intellectual functioning, but overwhelming response to any positive attention and his successful adaptation to structure and positive reinforcement. They would also have recounted specific instances of breaks from reality, as well as observations concerning Mr. Flowers' demeanor and ability to relate to others as a child. This would have provided support for other evidence concerning Mr. Flowers' mental health.

Teachers and school officials could also have provided information about Mr. Flowers sleeping under the porch with the dogs to escape the conflict and overcrowding within indoors. They could have told the jury that they provided him with his only clean clothes because what he otherwise wore to school was saturated in urine and feces and that school personnel often provided him the only food he would have all day. They would have reported the ostracization and mistreatment he suffered at the hands of other children as a result of this extreme neglect at home, his poverty, and his mental limitations. These individuals would also have confirmed the extent of his mother's alcoholism and her complete lack of support, attention, and presence. They would have reported that, because of this extreme neglect and abuse, Mr. Flowers and his siblings moved in and out of a number of formal and informal foster care settings.

These teachers and school officials would also have provided information that would have mitigated the circumstances surrounding the underlying conviction used as an aggravator, including the fact that members of the community tried to prevent Mr. Flowers from being tried and convicted as an adult and that the circumstances of the offense were that Mr. Flowers was defending himself from a sexual assault. Other witnesses would have provided detailed and reliable information about the victim of the underlying conviction that would have supported this explanation.

In addition to defense counsel's failure to contact any person who could offer useful

mitigation evidence, counsel failed to procure any necessary records documenting Mr. Flowers' life. These records include school records, physical and mental health records, correctional records, and court records of Mr. Flowers, his parents, and his siblings. Counsel could have easily obtained valuable information, including a prior mental health evaluation, from his prior conviction record—a publicly available file.

If counsel had obtained these records and interviewed even a portion of the potential witnesses who were willing to testify for Mr. Flowers, counsel could have established that Mr. Flowers had a history of mental, emotional, and neurological problems, that he had an unstable, abusive, and neglectful home life, that he was left alone while his mother was absent for days at a time drinking, that Mr. Flowers was subjected to physical, sexual, and emotional abuse, and that the circumstances surrounding the underlying conviction mitigated its effect as a basis for imposing a sentence of death.

Upon conviction of a capital offense, a defendant is constitutionally entitled to present, and the trial court and jury must consider, "as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976). Any allegedly strategic decision to terminate investigation must be reviewed for reasonableness. *Wiggins*, 539 U.S. at 533. Counsel cannot make a strategic decision without conducting any investigation. *See Rompilla*, 125 S. Ct. at 2471 (finding counsel ineffective where "failure to obtain the crucial file [of prior conviction] 'was the result of inattention, not reasoned strategic judgment'") (citation omitted). Thus, Mr. Flowers was entitled to have all aspects of his background, including family life, medical history, school history and records, mitigating

82

circumstances surrounding the prior conviction used as an aggravating circumstance, and any other life-experience that may be considered mitigating evidence presented to the jury and judge at the penalty phase of his capital trial.

Counsel will be ineffective if he proceeds to trial having "acquired only rudimentary knowledge [of a client's life history] from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Counsel in Mr. Flowers' case failed to meet the minimum requirements of an adequate investigation. "At the heart of effective representation is the independent duty to investigate and prepare [the client's case]" *Goodwin v Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982). Counsel is under a clear duty to thoroughly investigate a client's background in preparation for a capital penalty phase, and the failure to do so precludes a finding that the absence of penalty phase evidence was strategic. *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) (counsel ineffective for failing to request State hospital records, school records, social service records, and failure to contact the defendant's sister, neighbor, or social worker); *see also Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992) (complete failure to investigate and prepare for the penalty phase renders counsel's assistance ineffective and requires a new penalty phase); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991) (failure to put on evidence of disadvantaged background, fact that defendant's father died when the defendant was six, and evidence of mild retardation deprived the defendant of the constitutionally mandated individual sentence determination); *Thomas v. Kemp*, 796 F. 2d 1322 (11th Cir. 1986) (ineffective assistance of counsel where little effort was made to investigate possible sources of mitigation evidence); *Douglas v. Wainwright*, 714 F.2d 1532, 1556 (11th Cir. 1983) ("permissible trial strategy can never include the failure to conduct a reasonably substantial investigation."); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) (counsel did not attempt to contact family members or

prepare for the penalty phase until the trial was underway, and failed to put on any mental health mitigating evidence); *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995) (failure of counsel to investigate family history and background of client is inexplicable, cannot be considered strategic, and requires reversal); *Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) (presumption of prejudice where trial counsel made no effort to prepare for the penalty phase of a capital trial). The "mitigating evidence counsel failed to discover and present in this case is powerful." *Wiggins*, 539 U.S. at 534. Had trial counsel investigated and prepared a case for the penalty phase and sentencing, the jury and trial court would have learned of an abundance of existing mitigating evidence of Mr. Flowers' abusive (sexual, physical, and emotional) and neglectful upbringing, as well as his mental illnesses, cognitive limitations, brain damage, extreme poverty, malnutrition, and the ameliorative circumstances surrounding the underlying offense that served as the only statutory aggravating circumstance.

At the penalty phase of trial, the State relied on one aggravating circumstance, that Mr. Flowers had previously been convicted of murder within the past twenty years. (Tr. R. 564-65.) The State put on no additional evidence (Tr. R. 563); the proof of prior conviction had been introduced during the innocence/guilt phase to support Count 1 of the indictment. Instead, the State argued that the prior conviction and the circumstances surrounding it as incompletely testified to by Mr. Flowers' older brother, Johnny Flowers, warranted a sentence of death. (Tr. R. 565-66; 585-86.)

The defense put on one witness, Johnny Flowers, the same witness who had testified unhelpfully during the innocence/guilt phase. Johnny Flowers testified briefly to the family history of tragedy–father deceased when Mr. Flowers was four or five; mother's death when Mr. Flowers was nineteen and in prison on his previous conviction; brother James' death in a car wreck; one sister

killed by another in a fight. (Tr. R. 569-70.) He did not, however, testify to the abuse Mr. Flowers
suffered, the alcoholism of both Flowers parents, the neglect and poverty at home, the poor
performance and taunting at school. Johnny Flowers testified to incidents and circumstances that
would have supported a mental defect defense at the innocence/guilt phase and the statutory
mitigating circumstance of diminished capacity at the penalty phase (Mr. Flowers' tendency to act
impulsively, but regret his actions immediately after (Tr. R. 571) ("I'll say to you today that my
brother don't have – I don't believe he realizes what he done. I just don't believe it, because this
minute about anything he snaps, and it is just so horrible . . ."); his leap out of a church window at
around age fourteen because "the devil made [me] do it" (Tr. R. 577)); his cries for help (Tr. R. 497-
98) ("the day before he committed that crime, he had went to the Police Department, and it is on
record, and asked for them to lock him up because he felt like he was going to hurt himself or maybe
somebody else"), but defense counsel failed to put this evidence into context through the assessment
and testimony of a psychiatric expert. The State highlighted this deficiency in closing:

> Now, the death penalty is reserved for special cases. This man is unusual in that he
> has killed once and within a short period of time and given the opportunity again he
> killed again. There is a pattern here. It is an extreme aggravator. It outweighs any
> of his personal problems or the rest of it. There has been no professional opinion
> come from this stand that he is in any way insane, out of his mind, crazy, or anything
> else. He is just plain mean.

(Tr. R. 586.)

Evidence presented at the Rule 32 hearing painted a far different story of Mr. Flowers'
"character and background" than was presented to the jury at trial.

a. Testimony of Family Members

During the Rule 32 proceedings, Mr. Flowers presented evidence from his two older sisters

Patricianna White and Gracie Flowers; his younger sister Sandra Flowers; his older brother Horace Flowers; and his cousins Milton Harris, Donald Ray Stinson, and Tommy Harris.[30] Mr. Flowers also attempted to present the testimony of his older sister Janice Bivens, but the Rule 32 court did not allow her testimony into evidence because she had listened to prior testimony during a deposition.[31]

Ms. **Patricianna White** testified that she is Mr. Flowers' sister and that she and Mr. Flowers had the same parents. (R32 R. 66.) Their mother was Julie Griffin Flowers and their father was Cecil James Flowers. (*Id.*) Ms. White was raised by her grandmother, but she knew that her "dad drank and fought [her] mom a lot." (R32 R. 67.)

She also testified that both parents drank alcohol. (R32 R. 67.) Their father Cecil died on February 25, 1969 (R32 R. 68), when Mr. Flowers was five years old. Ms. White said that after their father died, their mother became an alcoholic. (*Id.*) When asked whether their mother was able to care for Mr. Flowers, Ms. White said that she "wasn't able to do some of the things like keep the house up in order and probably pay the bills properly and keep them properly dressed the way they should have been." (*Id.*) The home usually was not clean. (R32 R. 69.)

Ms. White testified that Mr. Flowers did some unusual things; "he was quite a large child, maybe up in age, and he was still bed wetting. He carried a security blanket and sucked his thumb for a long, long time, way beyond the years a child should do that." (*Id.*)

---

[30] Testimony of Mr. Tommy Harris was submitted through a declaration. (Exh. 21.)

[31] Mr. Flowers offered a proffer as to Ms. Bivens' testimony, which would include that she was sexually molested by her father and that on one such occasion Mr. Flowers (at less than five years of age) assisted in stopping him. (R32 R. 299.) Ms. Bivens also would testify that her father would line up the children and throw knives at them, and that she was bruised and beaten by her father. (*Id.*) Finally, she would testify that Mr. Flowers told her that he was molested by Mr. Fleming. (R32 R. 299-300.)

Ms. White said that Mr. Flowers lived with her when he was 32 years old, while he was on parole. (R32 R. 69-70.) At that time, he acted like "a carefree teenager." (R32 R. 70.) She said that "[w]hen he got out of jail, he seemed to be the same age that he was when he went in. . . . He took up with the teenagers, and he was like one of the teenagers." (*Id.*) Mr. Flowers was able to obtain a job because she helped him fill out the application; after he was employed, she would help him manage his money because he could not do it himself. (R32 R. 71.)

When Mr. Flowers lived with her, Ms. White never saw him get into a fight; he would get into verbal arguments with others but "nothing violent." (R32 R. 82.)

Ms. **Gracie Flowers** testified that she currently lives in Columbus, Ohio, and works as a medical representative for the State. (R32 R. 96.) Ms. Flowers said that her biological parents are Julie and Cecil Flowers, but she was raised by a family friend in Michigan. (R32 R. 96.) She was born prematurely while her mother was in Michigan for a funeral; she had medical complications so her parents left her there in the care of a friend. (R32 R. 97.) Mr. Flowers is her brother. (R32 R.97.)

Ms. Gracie Flowers said that she went to visit her family in Enterprise, Alabama, in 1973. (R32 R. 97.) At the time she came to visit, her father was deceased. (R32 R. 98.) The Flowers were living in a trailer. (*Id.*) "They had no running water. They were using kerosene lanterns, just propane gas. But they were living in the city limits." (*Id.*) They also had "very little food." (*Id.*) She assumed that the mother paid the bills, "[b]ut they were living pretty roughly." (R32 R. 99.) "The children were not in school." (*Id.*) Her mother excessively consumed alcohol. (*Id.*) The children "didn't have the things that [she] thought children should have, a clean home, clean clothes. . . . And they weren't in school." (R32 R. 100.)

When Ms. Gracie Flowers was at the Flowers home, she tried to help out with cleaning, cooking, and getting the children back in school. (*Id.*) She stayed for six months, but then she "couldn't take it any longer." (R32 R. 100-01.) As she explained, "The living conditions weren't exactly something I was used to. You know, I was used to running water, electricity, gas, that type of thing, and food being plentiful, which it was a little scarce, because it was only one income." (R32 R. 101.)

Ms. **Sandra Flowers** testified that she is Mr. Flowers' younger sister. (R32 R. 135.) Ms. Sandra Flowers recalls that their father "was mean. He used to fight a lot. . . . He used to fight and throw knives and stuff." (R32 R. 136.) She remembers that when her dad would throw knives, she would run from him and hide. (R32 R. 147.) She said that Mr. Flowers witnessed the violence. (R32 R. 147.) She was four years old when her father died. (R32 R. 135.) After his death, she lived in the house with Mr. Flowers and their mother. (R32 R. 135.)

Ms. Sandra Flowers was in special education classes in school. (R32 R. 136.) She did not have enough clothes to wear to school, but the school helped them. (*Id.*) "They used to get clothes for us, and we used to take showers and stuff at school because we didn't have a lot of money. We didn't have water sometimes. . . ." (*Id.*) She said that the children at school would pick on the Flowers children. (R32 R. 136-37.)

She also testified that after her father died, they lived with Joe Berry, whom she called her stepfather. (R32 R. 137.) "He hollered a lot. He drank. He would fight with mama. Him and [Mr. Flowers] used to get into it because he used to fight mama. He didn't like [Mr. Flowers]. . . . He would fight [Mr. Flowers] too." (*Id.*) She recalls that Mr. Berry chased Mr. Flowers with an axe. (*Id.*)

She testified that, when she and Mr. Flowers were children, a Mr. Fleming would come around the house and drink. (R32 R. 138.) She testified:

> [Mr. Fleming] didn't like [Mr. Flowers] either. He used to make [Mr. Flowers] cry and stuff. I don't know what he do to [Mr. Flowers], but I remember he used to stay and make Ricky cry.

(*Id.*) When asked what he would do to make Mr. Flowers cry, she said she did not "really know" because she and her sister were never in the same room, but Mr. Fleming would "mess[] with" Mr. Flowers. (*Id.*) She knew that he was "messing" with her brother because "[Mr. Flowers] would say 'stop' and [would] be crying." (*Id.*)

Ms. Sandra Flowers also knew LeRoy Bojay Leverette, who was the victim in the incident resulting to Mr. Flowers' first conviction. (*Id.*) She described him as "a man who used to come down to the house and used to be drinking." (R32 R. 139.) Mr. Leverette would "touch [her] and feel on [her] and bother [her], molest [her]." (*Id.*) Ms. Flowers also said that she would go over to her aunt's house because her "step-brother and them was molesting [her]." (R32 R. 148.) She did not want to tell anyone. (*Id.*) At the time that all of this occurred, she and Mr. Flowers were children and Mr. Leverett, Mr. Joe Berry, and Mr. Fleming were all grown men. (R32 R. 149.)

Ms. Sandra Flowers admitted that she has had problems with drugs and alcohol. (R32 R. 141.) In fact, she explained, "I get off for months and years, and I still go back because that's how I always know how to cope in life." (*Id.*) She started drinking when she was 5 or 6. (R32 R. 142.)

She recalled a time when she, her mother, Joe, and her baby sister went to a police station to get help for Mr. Flowers because he set his hair on fire. (R32 R. 139.) She testified that "Mama used to try to go get help for him, but they wouldn't ever help him." (*Id.*) She believed that her mother wanted to get help for Mr. Flowers because he "seemed to have mental problems." (*Id.*) She

said that they "didn't know what was wrong with [Mr. Flowers]" (id.),   but that he "did a lot of unusual things" (R32 R. 140). For example, one time he jumped out of a church window. (*Id.*) She also said that he would "go out in the woods and stay." (*Id.*)

On cross-examination, Ms. Sandra Flowers said that Mr. Flowers would get into fights with his little sisters. (R32 R. 143.) She explained that he would do things to aggravate them like "pull [their] hair, just take off running, doing silly things. . . ." (*Id.*) This occurred when he was between ages 10 and 14. (Id.) When asked more about Mr. Flowers' "picking" on her and her sister, she responded, "Ricky just had a problem, sir. I couldn't say picking, because he loved us, but he just did things out of the ordinary." (R32 R. 144.) He would give the girls "knuckle sandwiches." (R32 R. 148.) He would pull the girls' hair, but he never beat them. (*Id.*)

She saw Mr. Flowers get into only one fight on the school bus. (R32 R. 144.) "He used to get mad a lot. He used to get angry, but I don't guess his intention was to hurt anybody, because he wouldn't fight. He would just let them know he didn't like nobody messing with us." (Id.) She admitted that Mr. Flowers would get upset, but he never hurt her. (*Id.*) Again, she emphasized that "[Mr. Flowers] just had kind of a mental problem." (*Id.*) She testified that Mr. Flowers would mostly get "into it" with Mr. Berry because he was fighting their mother. (*Id.*) In her words, "Mr. Joe, he would be bad about grabbing. He would fight his own sons. . . . Ricky was always trying to stop him from beating on my mama." (R32 R. 45-146.) When this occurred, Mr. Flowers was around twelve or fourteen years old. (R32 R. 146.)

Mr. **Horace Flowers** testified[32] that he is the oldest brother of Mr. Flowers and is currently

---

[32] Mr. Horace Flowers testified in court during the Rule 32 hearing; an affidavit of Horace Flowers was also admitted into evidence. (Exh. 25.)

forty-seven-years-old. (R32 R. 112.) He testified that he was currently in prison on a parole revocation; he has prior convictions for robbery. (R32 R. 125-26.) He said that he has five sisters: Patricia [*sic*] White, Janice Bivens, Gracie Flowers, and Vernisa [*sic*] Jenette Flowers (who is deceased). (*Id.*) He said that he has three brothers: Johnny and James Flowers (who are both deceased), and Richard Flowers. (*Id.*) Mr. Flowers is the youngest. Their mother was Julie Flowers and their father was Cecil Flowers. (R32 R. 113.) His father died in the peanut factory where he worked in 1969. (Exh. 25.)

Mr. Horace Flowers grew up in Enterprise, Alabama, and lived with his parents and siblings. (R32 R. 113.) He testified that his father drank and became very violent. (R32 R. 114.) He testified, "[My father] would beat us and beat our mom. . . . He got [Mr. Flowers] too." (*Id.*) When asked what their father used to beat them, he responded that he would use "belts, extension cord, water hose, whatever he could find. He didn't care." (*Id.*) He remembers his father beating his mother; he can remember him beating her while she was pregnant. (R32 R. 115.) Mr. Flowers was present a lot of times when the father would whip the children. (R32 R. 127.)

Mr. Horace Flowers also said that his father forced his mother to drink alcohol; he would "hold her and force her down and make her drink it." (R32 R. 116.) After their father died, their mother continued to drink. (R32 R. 127.) He recalls that his mother had a boyfriend named Joe Berry, who was mean. (*Id.*) One time, Joe Berry "hit [his] mom's hand with an ax." (R32 R. 117.) This happened while Mr. Flowers was living at home. (*Id.*)

Mr. Horace Flowers testified that his mother tried to provide food, but went on to state, "a lot of times, we wouldn't have enough to get by with from day to day or week to week, month to month. We suffered a lot." (*Id.*) Although the children had clothes, they were not "sufficient" to

91

wear. (*Id.*)  The house where they lived was not clean.  There was "debris and stuff all over the floor." (R32 R. 117-18.)  In fact, "[the children] weren't taught to keep things neat . . . ." (R32 R. 118.)  "[S]ometimes the roof would be caving in and leaking, but [they still] stayed there." (*Id.*)  Sometimes the children had beds; other times they would "pile up on the sofas, chairs, beds, sleep together." (*Id.*)  If they slept in the bed, "all four [boys] used to sleep in one bed, two at the head, two at the foot." (R32 R. 119.)  At times they had running water; at times they didn't. (*Id.*)  They had bathrooms outside. (R32 R. 120.)

Mr. Horace Flowers explained that in his mother and father's home, no one ever taught him to brush his teeth, take a bath, tie his shoes, wash his clothes, and clean the house. (R32 R. 120.)  To his recollection, no one in the house taught Mr. Flowers to do those things either. (*Id.*)  Mr. Horace Flowers learned how to take care of himself and have a clean home when he moved into the home of another family around age eleven. (Exh. 25.)

Mr. Horace Flowers testified that his brother was "different somehow" from the others. (R32 R. 121.)  Mr. Flowers was "slow about doing things," and "[h]e stayed to himself." (*Id.*)  Mr. Horace Flowers said that his brother would get upset at the way people treated him, when they were "picking at him, making fun of him." (R32 R. 128-29.)  Mr. Flowers would argue with people, but he never saw his brother get in a fight. (R32 R. 129.)  He did, however have a bad temper. (R32 R. 130.)  When he was upset, he would "go off a lot of times by himself." (R32 R. 133.)

Mr. Flowers did a lot of unusual things. (R32 R. 123.)  For example, when he was under six years old, he would bang his head on the floor or wall; Mr. Horace Flowers did not know why he did this. (R32 R. 123-34.)  Mr. Flowers also fell a lot when he was walking; he would trip and fall down. (*Id.*)  Mr. Flowers also ate dirt. (R32 R. 124.)  He would go up under the house and stay with

the dogs.  (R32 R. 122.)

When Mr. Flowers was small, "he would take his clothes off a lot." (R32 R. 120.) As with many aspects of Mr. Flowers' behavior, his brother could not explain why.  (*Id.*)  Mr. Horace Flowers could not remember if their parents ever took any of the children, including Mr. Flowers, to the doctor.  (R32 R. 121.)  He said that they might have gone to the doctor "one or twice" to be treated for lice or to have something lanced.  (*Id.*)

Mr. **Milton Harris** testified that he currently lives in Coffee County (R32 R. 145), and that he is Mr. Flowers' first cousin (R32 R. 146).  Mr. Harris' mother was the sister of Mr. Flowers' father.  (R32 R. 146.)  Mr. Harris is approximately ten years older than Mr. Flowers. (*Id.*)  Mr. Harris knew his uncle—Mr. Flowers father—"very well."  (*Id.*)

Mr. Harris testified that Mr. Flowers' father was abusive towards his family, "[n]ot just verbally abusive, but physically violent."  (R32 R. 147.)  He went on to testify that Mr. Flowers' father drank excessively.  He was an "imposing man," "quite large and powerful."  (R32 R. 147.) He was a boxer and a strong man.  (R32 R. 147-48.)  Mr. Flowers' father would threaten Mr. Flowers' mother quite often. (R32 R. 148.) Mr. Flowers' mother, Julie, was abused by her husband, Cecil; she would come over to Mr. Harris' house, "crying or suffering from some blows. . . . [Y]ou could see some physical damage where he maybe had hit her or struck her in some way."  (R32 R. 149.)

After Mr. Flowers' father died, the Flowers family moved around to several different dilapidated houses; the houses "didn't even have . . . indoor plumbing."  (R32 R. 150.)  "[A]s bad as things were when – when my uncle was alive, it got even worse because of the financial situation after he died."  (*Id.*)  He indicated that one would not "be allowed to live in [Mr. Flowers' home]

by today's standards." (R32 R. 155.) "[E]ven among the bad houses, [Mr. Flowers' home] was substandard." (*Id.*)

Mr. Harris testified that Mr. Flowers was a "strange" or "different" child. (R32 R. 151.) He never received any counseling to cope with the death of his father or the abuse he suffered and witnessed. (*Id.*) There were no positive male role models in his life. (R32 R. 152.) Mr. Harris never witnessed Mr. Flowers' temper. (R32 R. 158.)

Mr. **Donald Ray Stinson** testified that he is Mr. Flowers' cousin and currently lives in Enterprise, Alabama. (R32 R. 202.) Mr. Flowers' mother and Mr. Stinson' mother were sisters. (R32 R. 203.) He is forty-six years old (R32 R. 202), four years older than Mr. Flowers (R32 R. 203).

When Mr. Stinson was growing up, he was around Mr. Flowers at least two or three times a week. (*Id.*) When he would go to Mr. Flowers' house, it was messy; the beds were not clean; there was trash on the floor; there were bugs everywhere. (R32 R. 204.) He recalls that Mr. Flowers slept on the floor when he would stay the night. (*Id.*)

He knew Mr. Flowers' father, Cecil Flowers. (*Id.*) Mr. Stinson said that Cecil was nice to him, but he was an abusive man; Mr. Stinson saw Cecil hit Mr. Flowers' mother, Julie. (R32 R. 205.) Although he does not recall whether Cecil was abusive toward Mr. Flowers, he saw Cecil hit Mr. Flowers' brother, Johnny. (*Id.*) He also saw Cecil twist Julie's foot; on another occasion she ran up under the house to hide from him. (*Id.*) After that incident, Mr. Stinson stopped going to the house because he was afraid. (R32 R. 206.) Mr. Stinson also knew that Mr. Flowers' mother drank alcohol to excess. (R32 R. 207.)

Mr. Stinson recalls that Mr. Flowers loved to laugh and sing. (R32 R. 207.) He never knew

94

Mr. Flowers to start trouble; he generally kept to himself. (*Id.*) Mr. Stinson said that children would

call Mr. Flowers names; they called him "waterhead." (R32 R. 208-09.) Mr. Flowers also had a

problem with controlling his bladder and he would wet the bed; children would make fun of him

because of the urine smell. (R32 R. 209.) Although Mr. Flowers would be upset when other

children made fun of him, Mr. Stinson never saw him get violent; Mr. Flowers would just pout. (*Id.*)

He does not recall Mr. Flowers ever attacking anyone. (R32 R. 214.)

Mr. **Tommy Harris** provided testimony through a signed declaration.[33] (Exh. 21.) Mr.

Harris testified that he is the first cousin of Mr. Flowers. His mother and Mr. Flowers' father were

brother and sister. He is five years older than Mr. Flowers, and he knew him growing up. (*Id.* at 1.)

He testified that as far back as he can remember, Mr. Flowers has always been different from

other people. He always seemed like he was lost. He did not know how to act around people and

never had friends as a child. (*Id.* at 1.)

He knew that Mr. Flowers' father, Cecil, drank alcohol to excess. (*Id.* at 1.) As soon as Cecil

was paid on Friday, he would go out drinking until Sunday night; Mr. Harris remembers that Cecil

Flowers came to his home many times when he was drunk. (*Id.*) On one occasion, Cecil Flowers

returned from a drinking binge; he called all of his sons: Johnny Frank, James Frederick, Horace,

and Mr. Flowers together. (*Id.*) He made all three (3) of the boys jump on Horace and beat him

because Horace was the smallest. (*Id.*) Mr. Harris testified that he was present many times when

Cecil beat Mr. Flowers' mother, Julie. (*Id.*) Cecil beat her with his fists, and he was a very big man.

(*Id.*) Mr. Harris also witnessed Cecil beating Mr. Flowers and his siblings. (*Id.*) When Cecil was

---

[33] Mr. Harris was incarcerated during the Rule 32 proceedings and the Rule 32 court denied
Mr. Flowers' petition for writ of habeas corpus ad testificandum. The Court allowed the declaration
of Mr. Harris into evidence because Dr. Benedict reviewed it when reaching his opinion.

mad at one of the children, he beat them all.  Mr. Harris stated that Cecil Flowers was a mean man. (*Id.* at 2.)

Mr. Harris stated that Mr. Flowers' father would come to Mr. Harris' house to eat and leave his children at home with nothing to eat.  (*Id.*)  Mr. Harris testified that he and his mother would take food to the Flowers children.  (*Id.*)

Mr. Harris was not allowed to spend the night at the Flowers' home because of the filthy conditions.  (*Id.*)  Mr. Harris did not recall a time when the Flowers' house had electricity and water at the same time.  (*Id.*)  The houses where the family lived were in terrible conditions and were nothing more than shacks.  (*Id.*)

Mr. Harris testified that Mr. Flowers' mother, Julie, also drank alcohol.  (*Id.*)  It is his opinion that Julie was an alcoholic.  (*Id.*)  Mr. Harris stated that Julie drank all of the time; it was easy for men to take advantage of her.  (*Id.*)  Mr. Harris saw men come and go from the Flowers' home.  (*Id.*)  He recalled that Julie lived with a man by the name of Joe Berry who was also a drunk. (*Id.*)

Mr. Harris testified that, in the early 1980s, he was incarcerated with Mr. Flowers at Draper for approximately eight months.  (*Id.*)  Mr. Harris stated that on the day he arrived at Draper, he saw Mr. Flowers with a hand-truck.  (*Id.*)  Mr. Flowers was running up and down the hall pushing the truck and making noises as if it was a real truck.  (*Id.*)  Mr. Harris said, "He was acting like a young child.  Everyone around [him] was making comments about the 'nut.'" (*Id.* at 3.)

Mr. Harris said that Mr. Flowers was frequently in trouble at Draper and was beaten by the guards on numerous occasions.  (*Id.*)  He testified that Mr. Flowers was beaten with leather straps with metal pieces on the end.  (*Id.*)  Despite this beating, the next day, he was acting out again.  (*Id.*)  Mr. Harris recounted another incident that occurred while he was at Draper: all of the guys were

watching the Superbowl, and Mr. Flowers turned the television. (*Id.*) One of the inmates came after

Mr. Flowers with a shank. (*Id.*) Mr. Flowers had no idea why this person was upset with him; he

did not know any better and did not think about the consequences of his actions. (*Id.*)

Mr. Harris testified that Mr. Flowers told him that he heard voices and could see people

hovering over him. (*Id.*) During these spells, Mr. Harris would notice that Mr. Flowers was talking

to himself. (*Id.*)

Mr. Harris testified that people have made fun of Mr. Flowers for his entire life; he was the

source of people's jokes. (*Id.*) Mr. Flowers was teased constantly by other children. (*Id.*) Mr.

Harris testified that the Flowers family was the poorest family in town. (*Id.*) They would receive

food such as bread, cheese, powdered eggs and milk from the commodity truck. (*Id.*) The whole

family would line up to get food. (*Id.*)

At the end of his declaration, Mr. Harris stated, "If I were permitted to attend Ricky's Rule

32 Evidentiary Hearing, I would have provided the same information on the witness stand that I have

provided in this affidavit." (*Id.* at 4.)

Each and every one of these family members testified that they were never contacted by Mr.

Flowers' defense counsel when he was charged with capital murder in 1996; they also all testified

that they would have been willing and able to testify to the same information that they provided to

the Rule 32 Court. (See R32 R. 72, 78, 101-02, 140-41, 122-23; Depo. 11/16/06 R. 152-53, 210;

Exh. 21, at 4.) Ms. Brenda Flowers Wallace, the widow of Mr. Flowers' deceased brother Johnny,

also testified that neither she nor her husband were contacted by Mr. Flowers' attorneys. (R32 R.

105.)[34]

    b.     <u>Testimony of School Teachers and Personnel</u>

During the Rule 32 proceedings, Mr. Flowers presented evidence from: Marcia Tomberlin,[35] former special education teacher for Enterprise City School System; Mary Griffin, school psychometrist for Enterprise City School System; Vernetta Deramus, visiting counselor and attendance supervisor for Enterprise City School System; Karen Bowden, former special education teacher for Enterprise City School System; Richard Lamar DeVaughn, former special education teacher for Enterprise City School System; and James Crawford, history teacher at Enterprise Junior High School.[36]

**Marcia Tomberlin** testified that she is currently a special education secretary with Enterprise City Board of Education and has been since 1980. (R32 R. 9.) Prior to that position, she "worked in the classroom with special education students." (*Id.*) For five years, she worked "as a life skills trainer for children that were mentally retarded or special education students teaching them how to take care of themselves." (R32 R. 10.) Students had to have an Intelligence Quotient (IQ) of 80 or below to be in the program. (R32 R. 11.) The class was a special classroom, separate from regular classrooms. (R32 R. 12.) Children in her class would generally have two classes per day with other children. (R32 R. 13.)

---

[34] Mr. Flowers attempted to offer a statement by her deceased husband that he attempted to contact Mr. Flowers' attorney, but never received a return call. (R32 R. 107.) The Rule 32 Court would not allow the testimony, finding it was hearsay.

[35] Ms. Tomberlin's name is misspelled as "Tumberlin" in the record.

[36] Testimony of Mr. Richard DeVaughn and Mr. James Crawford was submitted through declarations. (Exh. 19, Exh. 21.)

She testified that she knew Mr. Flowers because he was in her class in junior high.  (R32 R. 13.)  He was fifteen years old when he was in her class;  he was in special education. (R32 R. 14.) Ms. Tomberlin taught him life skills, such as cooking, sewing, repairing clothes, cleaning house, and filling out job applications.  (R32 R. 14-15.)  She testified that he did "wonderfully fine" in her classroom.  (R32 R. 16.)

Ms. Tomberlin testified that Mr. Flowers came to school "filthy." (*Id.*)  He would take off his "filthy clothes, and [she] would wash them in the washer and dryer." (R32 R. 17.)  She further testified that "[Mr. Flowers] would come to school with clothes that had been wet. He would have wet himself. He smelled of urine. Sometimes he smelled of animals like he had slept with the dogs or something." (*Id.*)  She said that there was "so much sand in his head that we had to lean him over and brush the sand out of his hair and head before we could even put him in the shower." (*Id.*) "There were days when he smelled like feces. His underwear sometimes was so dirty that [she] just threw them away." (R32 R. 17-18.)  She stated, "It was just a horrible thing that that sweet child had to go through." (R32 R. 17.)

Mr. Flowers' "mother and father had a reputation of not taking care of their children." (R32 R. 20.)  Ms. Tomberlin stated, "I know from my year's experience with [Mr. Flowers] that he was not provided adequate clothing by a parent." (R32 R. 20.)  Although she did not visit Mr. Flowers' home herself, she knew that Mr. Flowers' mother "was responsible for sending him to school clean and fed every day and that did not happen at the time he still lived at home under the care of a parent." (R32 R. 35.)

Ms. Tomberlin made sure that Mr. Flowers and his brothers had "anything and everything they needed to eat [at lunch] because we knew they were not going to eat until they came back to

school the next day." (R32 R. 18-19.) She met Mr. Flowers mother "[n]ot very many times" (R32 R. 19), but on one of these occasions his mother came to school "in an inebriated state. . . . The alcohol smell on her was extremely strong, and she came to school that way. It was not a good meeting with her." (*Id.*)

Ms. Tomberlin testified that "[p]eople picked on [Mr. Flowers], aggravated him, made fun of him, and he didn't handle that well." (R32 R. 21.) Specifically, she recalled that "[t]hey would make fun of the way that his father died. His father died a tragic death in a peanut mill in our town. He fell into a vat and was ground to death. The children would say things like your dad is hamburger meat." (R32 R. 22.) The children also "made fun of the way that he walked. . . . He would walk on his tiptoes and they would pick at him for walking on his tiptoes." (*Id.*) "They would make fun of him for smelling like urine and for wetting his pants, and the things that they knew about him that were upsetting to him." (*Id.*) Ms. Tomberlin said that the children were "unmerciful" (*id.*), and that "[t]hey would upset him just to see him have an upset fit," (R32 R. 23).

Mr. Flowers had outbursts in class, but from what Ms. Tomberlin witnessed, it was always when he was picked on first. (R32 R. 37.) The "violent" behavior she saw in Mr. Flowers included stomping his feet, banging his fists on the wall, and one time throwing a desk across the room – not hitting anyone. (R32 R. 39.) Mr. Flowers would let her correct him without striking out at her. (*Id.*) She compared his behavior to a child's temper tantrum, but stated that he did not hurt anyone at school." (R32 R. 40.) Moreover, Ms. Tomberlin testified that her father, George Jones, "was the special education coordinator for our school system." (R32 R. 23.) Mr. Flowers and Mr. Jones had a close relationship. (*Id.*) She would send Mr. Flowers to see her father if Mr. Flowers had a very bad day or a very upsetting incident, and her father "could calm [Mr. Flowers] down when nobody

else could seem to reach the point that would help this child to be able to make it through the school day." (R32 R. 23-24.)

Ms. Tomberlin testified that she was aware that Mr. Flowers was charged with murder in 1979. (R32 R. 24.) She attempted to offer to testify at the 1979 trial; she and her then-husband Buddy DeVaughn contacted Mr. Flowers' attorney, Mr. Weatherford. (R32 R. 25.) She was "concerned that there would be nobody else who would intervene on his behalf and make sure that he was okay, so we contacted his lawyer." (R32 R. 26.) However, Mr. Weatherford never contacted them. (*Id.*)

In response to the question of what stands out about Mr. Flowers, she stated:

> The most uncared for child that I ever worked with, and I worked with lots of children who had very, very serious home lifes [*sic*] and very deprived disadvantaged backgrounds, and that was the nature of what we did. . . . If I had to pick a child out of my five years that I actually was working in a classroom involved with children, the child that I would pick for you today as my child who was the most unloved, uncared for, unseen about child, it would be [Mr. Flowers].

(R32 R. 28-29.) This would even be in comparison to his other siblings with whom she worked; they were treated better at home. (R32 R. 29.)

On cross-examination, Ms. Tomberlin explained to the State that his grades, which included some A's and B's, were in special education classes. (R32 R. 33.) "He would have been instructed on a grade level that was much lower than the grade he was in." (*Id.*) Further on cross-examination, the State asked whether she should have called the Department of Human Resources herself, instead of following the reporting system in place; she replied, "I certainly should have. And in retrospect, you are absolutely right. I should have done it myself to make sure that it got done. . . . I am absolutely sitting here today telling you that I could kick myself for not calling them myself." (R32

101

R. 34-35.)

**Mary Griffin** testified that she is retired from Enterprise City School System; she served as the school psychometrist from 1976-1994. (R32 R. 53.) Her job consisted mainly of administering IQ tests. (*Id.*) Teachers would refer a child to her for testing, obtain the parent's permission, and then she would test the child. (R32 R. 54.) Ms. Griffin testified that to be referred to special education, a child's IQ had to be 80 or below. (R32 R. 55.)

Ms. Griffin recalls that she administered an IQ test to Mr. Flowers; she gave him the Wechsler Intelligence Scale for Children ("WISC"). (*Id.*) She testified that he was referred to special education. (*Id.*)

She testified that on the first IQ test, which placed him in special education, he received a verbal score of 82, a performance score of 67, and a full-scale score of 73.[37] (R32 R. 58.) She testified that his IQ was retested in 1977; at that time, he scored a full-scale IQ of 87, with a verbal score of 91, a performance score of 85. (R32 R. 60.) She testified that he would not have qualified for special education with that score, but he was already in special education and "[h]e was way down below grade level." (*Id.*) He could not "all of a sudden" be transferred to a regular class. (*Id.*) In fact, she testified that Mr. Flowers could not have been mainstreamed. (*Id.*)

**Vernetta Deramus** testified that she is currently retired, but worked previously as a "visiting counselor and attendan[ce] supervisor for the Enterprise City School System." (R32 R. 87-88.) She testified that she provided "counseling, (unintelligible), clothing" and she "directed a family

---

[37]During Ms. Griffin's testimony, his cumulative school records, Exhibit 1, were admitted into evidence. Those records indicate that the first WISC test was administered in 1972. (Exh. 1.) She also testified that the cumulative record would probably be the only school record that still exists; records are destroyed after five years. (R32 R. 63.)

community center that would fulfill those needs." (R32 R. 88.)

Ms. Deramus testified that she knew Mr. Flowers because he was referred to her for "special needs, clothing, books, and just to go out and visit the parents in the home." (*Id.*) She would deliver clothes to the children. (R32 R. 90.) She visited the Flowers home as needed; some weeks she would go there two or three times a week. (R32 R. 88-89.) She stated that Mr. Flowers' home "was very dilapidated. The floors as you walk in had holes in the floors, and the home was not heated or lighted sometimes. It was just in disarray." (R32 R. 89.) She described that "[m]any times the lights were off" (*id.*), there were mattresses on the floor (R32 R. 90), and there was "[v]ery little" food in the home (R32 R. 91). She also explained that "[i]t was very hard for the children, because there was no running water. It was an unsurmountable poverty." (R32 R. 90.) In her opinion, "[t]hey didn't have the basic quality of life needed to be successful." (R32 R. 89-90.) Compared to other homes that she visited, Mr. Flowers' home "was the worst." (R32 R. 93.)

Ms. Deramus stated that Mr. Flowers' mother was "always depressed. She had no hope, no inspiration, no direction in life." (R32 R. 92.) Julie Flowers did not have any parenting skills. (*Id.*) Ms. Deramus also saw evidence of alcohol abuse in the home. (*Id.*)

Ms. Deramus also testified that she referred Mr. Flowers to juvenile court for not attending school; she would pick up Mr. Flowers and his mother and take them to court. (R32 R. 91.) Ms. Deramus said she wanted to "give them an incentive to offer everything in the home that was needed for [Mr. Flowers] to get to school." (Id.)

Ms. Deramus knew Mr. Flowers and his family for several years. (R32 R. 94.) During her time knowing Mr. Flowers, he was "never belligerent or disrespectful." (R32 R. 92.)

Ms. **Karen Bowden** testified that she is a retired special education teacher from Enterprise,

103

Alabama. (Depo. 11/16/06 R. 52.) She knows Mr. Flowers because she taught him around 1974-75 (Depo. 11/16/06 R. 53), for a year and a half (Depo. 11/16/06 R. 54). He would have been around 12 or 13 years of age when she taught him. (Depo. 11/16/06 R. 54.)

Ms. Bowden testified that Mr. Flowers is "from a very, very poor family . . . he sort of stood out in [her] classroom as one who needed some extra special attention." (Depo. 11/16/06 R. 54.) She said that he would come to school dirty so she would "wash [his] hands and face and try to primp up a little bit and make him look a little better." (Depo. 11/16/06 R. 54-55.) She testified that he came to school with "actual sand and dirt in the top of his head." (Depo. 11/16/06 R. 55.) Mr. Flowers told her he "slept under the house with the dogs." (Depo. 11/16/06 R. 55.) He said he slept under the porch because inside "there was screaming and hollering, and it was quiet and peaceful under [the porch]. . . . [H]e would have to sleep in a bed with a bunch of other people." (Depo. 11/16/06 R. 72.) Ms. Bowden also testified that his clothes were dirty (Depo. 11/16/06 R. 55), and he smelled bad so the other children did not want to sit next to him (Depo. 11/16/06 R. 56).

Ms. Bowden said that Mr. Flowers did not know how to handle other children making fun of him, so he would argue with them; she "never had any fighting problems" with him. (Depo. 11/16/06 R. 57.) Mr. Flowers' temper was "usually fueled by other children making fun of him." (Depo. 11/16/06 R. 67.)

Ms. Bowden let Mr. Flowers work at her house doing her yard so he could earn some money. (Depo. 11/16/06 R. 56.) She was never afraid of him. In fact, she stated, "He would have never harmed me. He would have never harmed my husband. We had a baby at that time, and I was not scared for him to be around her." (Depo. 11/16/06 R. 56-57.) Ms. Bowden would sometimes give Mr. Flowers a ride to or from his house. (Depo. 11/16/06 R. 57.) She never went inside but there

were always "lots of children" who were not taken care of either. (Depo. 11/16/06 R. 58.)

Ms. Bowden testified that the Flowers family had a reputation in the community – the children "were not cared for by the parents." (Depo. 11/16/06 R. 59.) Ms. Bowden heard that Mr. Flowers' mother was an alcoholic. (Depo. 11/16/06 R. 60.)

Ms. Bowden testified that his grades in her class, a B-plus and a B, are not scored the same as regular students and are based on his placement in special education. (Depo. 11/16/06 R. 66, 71.)

When Mr. Flowers was charged with murder in 1979, Ms. Bowden went to Mr. Flowers' attorney; she offered to testify and brought clothing and shaving supplies for Mr. Flowers. (Depo. 11/16/06 R. 62.). She also was never contacted by Mr. Flowers' attorney at the time.

Ms. Bowden taught special education for twenty-nine years; Mr. Flowers stood out. (Depo. 11/16/06 R. 60.) Mr. Flowers is "[o]ne of the worst" cases she has seen of a child who is filthy. (Depo. 11/16/06 R. 71-72.) She stated, "He didn't have a prayer from the day he was born. . . . He didn't have all the head start things that most young children do." (Depo. 11/16/06 R. 61.)

Mr. **Richard DeVaughn** provided testimony through a signed declaration. (Exh. 19.) Mr. Richard DeVaughn testified that he was previously employed as a special education teacher with the Enterprise City Schools in Enterprise, Alabama. He was a special education teacher in Enterprise from 1973 until he retired in 1998. (*Id.* at 1.) Mr. DeVaughn testified that Mr. Flowers was in his social studies and shop class during the 1978-79 school year. (*Id.* at 1.) Mr. Flowers was in the ninth grade, but Mr. DeVaughn said that he was actually functioning on a sixth or seventh grade level. (*Id.* at 1.)

Mr. DeVaughn explained that it was his responsibility to conduct a home visit with the family of special education students to complete questionnaires to qualify children to receive funds

from the State for the vocational program. (*Id.* at 1.) Mr. DeVaughn testified that he "vividly recall[ed] visiting the Flowers home, as I had never seen a more filthy home." (*Id.* at 1.) He believes that the house should not have been occupied by anyone. (*Id.* at 1.) After he visited the home, he reported the conditions to the assistant principal, George Howard Jones, who was also his father-in-law. Mr. DeVaughn has no knowledge of whether a report was subsequently made to the Department of Human Resources. (*Id.* at 2.) The Flowers home was not heated; Mr. DeVaughn was not sure if it had running water. The family used a fireplace when the weather became extremely cold, despite the danger. (*Id.* at 2.)

Mr. DeVaughn testified that Mr. Flowers was a "good student" and was "eager to learn." (*Id.* at 2.) Mr. Flowers was not a trouble maker; although he would defend himself if he was picked on, he was not the type to start a fight. (*Id.* at 2.) Mr. Flowers appeared to be a happy person in spite of his surroundings. Mr. DeVaughn found him to be well-behaved and polite. (*Id.* at 2.) Mr. DeVaughn enjoyed teaching Mr. Flowers because he tried so hard; he really wanted to work and be something. (*Id.* at 2.)

Mr. DeVaughn stated that Mr. Flowers did not have the facilities to bathe at home. Mr. DeVaughn's ex-wife, Marcia Tomberlin, and her father, George Jones, allowed Mr. Flowers to bathe and wash his clothes at school. Mr. Flowers always seemed proud when he was clean. (*Id.* at 2.)

When Mr. Flowers, at age sixteen, was arrested and charged with murder in Coffee County, Mr. DeVaughn contacted his lawyer, offering to help however he could, but he never heard back. (*Id.* at 2.)

Mr. **James Crawford** provided testimony through a signed declaration. (Exh. 23.) Mr.

Crawford testified that he is currently employed at Enterprise Junior High School, in Enterprise, Alabama. He teaches History and has taught History at this school since 1971. (*Id.* at 1.) Mr. Crawford testified that he taught Mr. Flowers History during the 1977-78 school year. (*Id.* at 1.)

Mr. Crawford indicated that Mr. Flowers was a quiet student who seemed withdrawn from the other children. He came from a very poor family and did not dress well. (*Id.* at 1.) He was a "loner," sitting in the back of the classroom declining to participate in group activities. When Mr. Crawford would play History games and divide the class into teams, Mr. Flowers was hardly ever chosen. (*Id.* at 1.) Mr. Crawford could not recall Mr. Flowers ever getting into a fist fight in his classroom. (*Id.* at 1.) Mr. Flowers was not a good student, but rather, he "just got by." (*Id.* at 1.)

Mr. Crawford, who is also a football coach, testified that one time Mr. Flowers came out for football tryouts. Mr. Flowers came to practice in combat boots; Mr. Crawford thought that it was odd. However, students had to buy their own shoes in order to participate. (*Id.* at 2.) Mr. Flowers quit football. (*Id.* at 2.)

Each and every one of these school teachers and school personnel testified that they were never contacted by Mr. Flowers' defense when he was charged with capital murder in 1996; they all also testified that they would have been willing and able to testify to the same information that they have provided to the Rule 32 court. *See* (R32 R. 26-27, 62, 94; Depo. 11/16/06 R. 63; Exh. 19, at 2; Exh. 23, at 2.) Ms. Tomberlin also testified that her father, George Jones, died in March 2005, but she is certain he would have testified on Mr. Flowers' behalf. (R32 R. 27.)

c.    Testimony of Neighbors

During the Rule 32 proceedings, Mr. Flowers presented evidence from: Elijah Trammel and Jacqueline Williams, neighbors who lived next door to Mr. Flowers when he was arrested for capital

murder; and Gladys Neal, neighbor to Mr. Flowers for six years when he was a young boy.[38]

Mr. Trammel and Ms. Williams lived next door to Mr. Flowers when he was living with his sister, Patricianna White, and when he was arrested for capital murder. (Depo. 11/16/06 R. 218-233.) Mr. Trammel testified that he was around ten back when he knew Mr. Flowers. (Depo. 11/16/06 R. 218.) Mr. Tramell called Mr. Flowers "uncle Ricky" (id.), and recalled Mr. Flowers as a "fun, cheerful, joyful" man (Depo. 11/16/06 R. 220). Mr. Flowers would hang out with Mr. Trammel a lot, as well as with the other children. (Id.) Mr. Trammel said that Mr. Flowers always played with him and took a liking toward him. (Depo. 11/16/06 R. 226.) Mr. Trammel also testified that he never saw Mr. Flowers drink in front of him, and he never saw Mr. Flowers get mad at anyone or have any temper problems. (Depo. 11/16/06 R. 225.)

Ms. Williams testified that she knew Mr. Flowers because he lived next door with his sister, Ms. White. (Depo. 11/16/06 R. 228.) She said that Mr. Flowers would play basketball with her children (id.), and one time he even built them a goal in the backyard (Depo. 11/16/06 R. 229). Mr. Flowers would play with 10-, 11-, and 12-year-olds and acted more like a child. (Depo. 11/16/06 R. 229.) Ms. Williams said that she did not see Mr. Flowers consume alcohol in front of her children, she never saw him use any kind of drug, and she never saw him show a temper. (Depo. 11/16/06 R. 233.)

Both Ms. Williams and Mr. Trammel said that no one from Mr. Flowers' defense team interviewed them; they would both have been willing to talk to Mr. Flowers' attorneys and would have been willing to testify on his behalf. (Depo. 11/16/06 R. 222-23, 230.)

Ms. Neal testified that she knew Mr. Flowers and his family because they lived across the

---

[38]Testimony of Ms. Gladys Neal was submitted through a declaration. (Exh. 22.)

street from her in the 1970s for approximately six years.  (Exh. 22, at 1.)  She knew Mr. Flowers'

mother, Julie, who provided no guidance to her children.  (*Id.*)  Julie drank a lot and did not feed her

children, so Ms. Neal would sometimes feed Mr. Flowers and his siblings at her home.  (*Id.*)  Ms.

Neal stated that Mr. Flowers and his siblings had a horrible life; the house where they lived was "the

pits."  (*Id.* at 2.)  She further stated, "Pigs lived better than they did.  I would not want a dog to live

that way.  No children in the world should live that way."  (*Id.*)  Ms. Neal said the Flowers children

would sometimes sleep under the porch; she was not sure if it was for punishment.  (*Id.*)  Ms. Neal

also stated that she knew Leroy Leverett, the victim in Mr. Flowers' underlying conviction.  (*Id.*)

She described him as a "mean man."  (*Id.*)

Ms. Neal said that no attorneys or investigators had ever contacted her in the past regarding

Mr. Flowers in either the Coffee County or the Montgomery County case.  (*Id.*)  She would have

been willing to speak with anyone.  (*Id.*)

d.    Testimony of Church Member

Mr. Samuel McErvin provided testimony through a signed declaration.[39]  (Exh. 20.)  Mr.

McErvin testified that he was born in Enterprise, Alabama, in 1968, and lived there until 1987.  (*Id.*

at 1.)  He stated that he was currently incarcerated serving time for a robbery conviction.  (*Id.* at 1.)

Mr. McErvin testified that he knew Mr. Flowers from church.  (*Id.* at 2.)  In 1977, Mr. McErvin

became involved with the Church of Jesus Christ Association, Inc., and attended this church until

1982.  (*Id.* at 1.)

Mr. McErvin testified that the church had very strict rules.  "For example, church members

---

[39] Mr. McErvin was incarcerated during the Rule 32 proceedings, and the Rule 32 court
denied Mr. Flowers' petition for writ of habeas corpus ad testificandum.

could not watch television, they could not wear shorts or short-sleeve shirts, they could not visit other churches, and they could only associate with church members. If someone broke the rules, the church would punish the rule-breaker by doing things such as beating that person with extension cords or not allowing that person to attend church functions." (*Id.* at 2.) Mr. McErvin witnessed the evangelists punishing children who disobeyed the church rules. (*Id.* at 2.)

Mr. McErvin lived with evangelists who would give Mr. Flowers a ride to and from church. He would ride along in the car when Mr. Flowers was taken home; he stated that his house looked abandoned and he did not think it had electricity. (*Id.* at 2.) Mr. Flowers would also frequently come to Mr. McErvin's house to eat. (*Id.* at 2.)

Mr. McErvin stated that one night at church, he and Mr. Flowers were "sitting in the back of the church during the service." Mr. Flowers was looking over at the window and talking to himself, for approximately a half hour. "Then, all of the sudden, [Mr. Flowers] stood up and ran straight through the church window breaking the glass." Mr. McErvin does not know why Mr. Flowers did this. (*Id.* at 2.)

Mr. McErvin recalls that his foster mother gave Mr. Flowers a ride home after making sure he was not hurt. Mr. McErvin testified that he sat in the back seat of the car with Mr. Flowers, who was talking to himself during the drive home. (*Id.* at 2-3.)

Mr. McErvin testified that Mr. Flowers was "a little different than the other children." "He just wasn't normal." (*Id.* at 3.)

Mr. McErvin testified that until 2006, he had not been contacted by any of Mr. Flowers' attorneys or investigators. He further stated that if he were "interviewed in preparation for trial, [he] would have provided the same information" to which he has testified. (*Id.* at 3.)