IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RICHARD FLOWERS,<br>ADOC # 0000Z632, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:10-CV-579-WKW |
| | ) | [WO] |
| JEFFERSON S. DUNN,<br>Commissioner, Alabama Department<br>of Corrections, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

## I.  INTRODUCTION

Richard Jerome Flowers[1] was raised inhumanely.  Ricky was reared in rural South Alabama with as many as eight siblings in a series of filthy homes with no indoor plumbing and intermittent heat and electricity.  There were too few beds, forcing multiple bodies in beds or onto the floor.  Ricky sometimes slept with the family dogs under the house.  He was a bed-wetter who often went to school unbathed, wearing dirty clothes that smelled of urine, even into his early teens.  Both his parents (and a series of step-fathers) were alcoholics who ignored and otherwise

---

[1]  Mr. Flowers will be referred to as "Ricky" (his family name for him) or "Jerome" (his teachers' name for him) in all text referring to his childhood.

mistreated him, as did his older siblings.  He was in special education classes.  At age fourteen, he jumped through a church plate-glass window during a service, cutting himself in the process.  He alternately said an angel or the devil made him do it.  Later that year, he was alone in his home with a twenty-eight-year-old male neighbor who allegedly appeared in Ricky's room while Ricky slept.  The man was dressed only in his underwear and was holding a knife.  This neighbor had sexually abused Ricky's sister.  An altercation broke out, and the man chased Ricky with a knife through the house. The front door was locked, so Ricky beat the man with a shovel he found by the fireplace.  The man soon died.   Thus, at age fourteen, Ricky was sent to jail and, at age seventeen, to state prison to be housed with adult offenders for sixteen years on a ninety-nine-year sentence for murder in the second degree.

He was released on parole in 1996.  According to his older brother, "He came right back out to the streets, big man body, but still fourteen." (5 SCR R-573.)[2] Within six months, Mr. Flowers was charged with the murder of a co-worker in Montgomery, and in 1998 was convicted of capital murder and sentenced to death. He has spent approximately forty-three of his fifty-seven years incarcerated.  His

---

[2] When referring to the State Court Record, the court will utilize the following citation conventions.  The State Court Record will be identified as "SCR."  The citation will first identify the Volume of the SCR, such as "(1 SCR)," followed by the page number of that Volume, such as "(1 SCR 43)."

only criminal history is itself deadly:  two murder convictions, one of them capital. The capital murder is the subject of this case.

The circumstances of his upbringing, very briefly recounted above, and so much more mitigating evidence, was never made known to the jury that convicted Mr. Flowers, after a mere *twelve minutes* of deliberation, and that recommended a death sentence by a vote of ten to two *later the same day*.  Nor were most of these mitigating circumstances made known to the sentencing court at the sentencing hearing held a few weeks later.

Pretrial proceedings were a calamity of cumulative errors.  Mr. Flowers was represented by a cascade of unprepared trial attorneys, with his second-chair counsel becoming the *de facto* lead counsel a mere sixteen days after his appointment and thirty minutes prior to opening argument.  Defense counsel failed to conduct any meaningful investigation—and no investigation of mitigating evidence—and failed to file routine pretrial motions until in the shadow of a jury.  Additionally, Mr. Flowers was not arraigned until two weeks before the start of his trial, resulting in the unsuccessful tactic of his lead attorney to forego all pretrial preparations and instead raise the arraignment oversight just prior to trial in a failed effort to get the case tossed or continued for speedy trial/arraignment violations.

Because of the strength of the evidence against Mr. Flowers for guilt[3], the fact that he received ineffective assistance of counsel in the guilt phase is negated by his inability to prove the necessary level of prejudice.  But the outcome is different for the penalty phase:  Mr. Flowers suffered the same ineffective assistance of counsel then, but to his obvious prejudice.  His conviction will stand, but he is entitled to a new sentencing hearing.

## II.  THE UNDERLYING OFFENSE

On direct appeal, the Alabama Court of Criminal Appeals stated the facts of this case as follows:

> The State's evidence tends to show the following.  On October 20, 1980, Flowers was convicted of murder in the second degree in the Coffee County Circuit Court; he was sentenced to 99 years' imprisonment.  He was paroled about six months prior to the murder with which he is now charged.  At the time of the murder, Flowers was living in Montgomery with his sister and her husband and had obtained employment at the Piknik Products plant in Montgomery.  Flowers originally had worked the night shift but, after some employees complained about him, he was moved to the day shift.  .  .  .

> .  .  .  On May 28, 1996, police were called to Piknik Products in Montgomery; they discovered [Annie] Addy's body in her car in the parking lot.  She had been shot four times.  Dr. James Lauridson, coroner for the Alabama Department of Forensic Sciences, testified that Addy died of gunshot wounds to her chest and abdomen.

---

[3] There was an eyewitness; Flowers confessed; a forensic ballistic match tied the murder weapon to Flowers; the murder weapon matched the description of the revolver owned by Mr. Flowers's brother-in-law, who discovered his gun was missing from its storage place after Flowers's arrest; Flowers made numerous incriminating statements to witnesses on the day of the murder; and there was no alibi.

Flowers and Addy were coworkers on a production line at Piknik Products. Latrice Williams, a production-line supervisor at Piknik, testified that Flowers and Addy did not get along and that they frequently fought at work. Williams testified that Flowers had threatened Addy and that on the day of the murder he repeatedly stated that "he was going to get that bitch, Annie [Addy]." (R. 333.)

At the time of the shooting, three witnesses heard gunshots and saw Flowers leaving the parking area. Donald Terry and Thomas Seofield, employees of Piknik, were working on a generator near the parking lot when they heard several gunshots. Terry testified that he saw Flowers leave the area where the shots had been fired. Seofield testified that he saw Flowers walking away from where Addy's car was parked. Both testified that they saw Flowers walking toward a garbage receptacle, where the murder weapon was later discovered. Burnett Hawkins, an employee of Piknik, testified at Flowers's preliminary hearing that he saw Flowers shoot a gun into Addy's car. On the day of the murder, Flowers confessed to police that he had killed Addy. Detective D. Cunningham of the Montgomery Police Department testified that Flowers told him the following:

> "He . . . stated that on the night of the shooting, he went to the plant, at which time he left his handgun outside under the tire of a vehicle, at which time he went inside the plant to the break room and also used the restroom. He stated that he then walked outside after everybody had gone outside, at which time he then stated that he then pulled a handgun from underneath the tire of the vehicle where he hid it, walked up to the car and fired some shots and walked off. He stated he fired approximately three times and walked off."

(R. 437-38.)

Marian Frazier testified that Flowers, who was her uncle, was living with her, her mother, and her stepfather at the time of the murder. She said that on the day of the murder he repeatedly said,

"I am going to kill me a bitch."  (R. 372.)  Frazier testified that the murder weapon was her father's and that it had been on a shelf in her mother's closet, but they realized it was missing when Flowers was arrested.  Frazier also said that her mother, Flowers's sister, became hysterical when she realized that the gun was missing.

A blue steel four-inch .38 caliber Smith & Wesson revolver was discovered in a garbage receptacle near the scene of the murder. Frazier identified the handgun as the gun that was missing from her parents's house. Forensic tests also showed that this gun was the murder weapon.

*Flowers v. State*, 799 So. 2d 966, 972–73, 977–78 (Ala. Crim. App. 1999).

## III.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Guilt Phase Performance

Within thirty days of Mr. Flowers's arrest, Robert Powers was appointed as lead counsel.  Paul Sasser was appointed as the first of three successive second-chair counsel.  Powers requested a preliminary hearing, which was held on August 15, 1996.  Two witnesses testified at the preliminary hearing:  eyewitness Burnett Hawkins[4] and Montgomery Police Detective D. Cunningham.  Powers cross-examined Hawkins (7 SCR Tab R-37 at 8–14, 15.)  Paul Sasser cross-examined

---

[4]  Burnett Hawkins, a second-shift at Piknik employee, happened to be at his car in the parking lot at the time and witnessed the shooting.  Hawkins explained why he was at his car:  "I had just clocked in for work and I realized that I didn't have my cigarettes, so I went back to my car to pick up my cigarettes. . . ."  (7 SCR Tab-R-37 at 4–5.)  Upon hearing gunshots nearby, he looked in the direction of the gunshots and saw Flowers firing shots into Addy's vehicle.  The evening of the shooting, Hawkins was interviewed by Montgomery Police Department (MPD) Detective D. Cunningham and described the details of the shooting to Detective Cunningham. (17 SCR 1325-31.)  Hawkins reiterated his eyewitness observations at the preliminary hearing. (7 SCR Tab R-36, 1-15.)

Detective Cunningham.  (7 SCR Tab R-37 at 24–37.)  After the preliminary hearing, Mr. Flowers was bound over to the grand jury, which indicted him on December 6, 1996.[5]

Powers was lead counsel for at least one-and-one-half years before the trial beginning February 9, 1998.  He adopted a risky strategy after indictment.  With a trial date set well in advance, there had been no arraignment, apparently through an oversight of the court.  Powers took the position that (1) Flowers was not "officially notified of the charges against him until he was arraigned"  (6 SCR R-671), and (2) Flowers's lack of arraignment was not his [Powers's] problem.  ("Q.  Why didn't you request an arraignment?  A.  Because that's not the function of the defense counsel to request that the Court set the schedule for the hearings."  (6 SCR R-671-72).)  For these reasons, he did not file the customary pretrial capital motions or do any substantive trial preparation until after the official arraignment.

Unfortunately, Powers and his client were acutely aware of Mr. Flowers's jeopardy.  Powers had earlier represented Flowers at his parole revocation hearing, after which Flowers was revoked and returned to state prison on his first murder conviction.  (6 SCR R-671.)  On August 21, 1997, the court set a trial date of February 9, 1998.  Thus, the defense could not plead prejudice or lack of notice of

---

[5] Flowers was personally served with the indictment in prison in December 1996.  Service was executed by Betty Teague, the Director of the DOC.  (6 SCR R-691-92.)

the upcoming proceedings when the court hastily arraigned Mr. Flowers at the pretrial hearing on January 28, 1998, thirteen days before the February 9 trial date.

Mickey McDermott became Flowers's second-chair counsel in late January 1998. Two other second-chair lawyers, Sasser and Vincent W. Jaye, came and went during the seventeen months between the preliminary hearing in August 1996 and McDermott's appointment in January 1998; neither Sasser nor Jaye offered much help to Powers. Nor did Powers assign them any meaningful role in trial preparation or devise a defense theory of the case. When he was appointed sixteen days before trial, Mickey McDermott had never heard of the case. Though he had testified in "approximately fifteen" capital cases in a prior career as a police officer (6 SCR R-628), this was his first capital case as an attorney.

Two motions to continue, one filed after McDermott joined the defense team, and one filed on the morning of trial, were denied. Thus, Mr. Flowers went to trial with two entirely unprepared attorneys, without the benefit of a mental or psychological exam (one was hurriedly conducted on the second day of trial), with most witnesses having not been interviewed, and with only one witness of his own, his older brother (who was not a fact witness).

As noted previously, the jury took twelve minutes to convict Mr. Flowers, and later the same day recommended the death penalty.

## B.    Penalty Phase Performance

Following the guilty verdict, without a recess, the court went immediately into the penalty phase of the proceedings.  After a brief opening statement by the State, Powers presented an opening statement that covers less than three indented, double-spaced pages of text.  (5 SCR R-567-569.)

In mitigation, the defense put on testimony equaling six-and-one-half typed, double-spaced pages of testimony, plus less than one page of redirect examination, of Johnny Flowers, the defendant's older brother.  Mr. Powers presented less than five double-spaced pages of closing argument to the jury.  After a lengthy charge from the court, the jury returned a recommendation of death by electrocution by a vote of ten to two, the same day as its guilty verdict.  On March 9, 1998, in a sentencing hearing that covers five double-spaced pages of text, the trial court sentenced Mr. Flowers to death.  (6 SCR R-614-618.)  That same day, the trial court entered a separate Sentencing Order.  (1 SCR 173-179.)

Trial counsel presented, effectively, no meaningful evidence or argument at the penalty phase and at sentencing.  More relevant, the evidence reflected counsel's investigative effort—also zero.

## C.    Post-Trial Proceedings

McDermott and Powers handled the case through sentencing, and both played dramatic roles in post-trial proceedings, beginning with a motion for new trial.

McDermott filed the motion on the sole ground of ineffective assistance of counsel. Then he and Powers withdrew, and Paul Copeland was appointed to handle the motion.  At the hearing for new trial, Copeland did a noteworthy job of building a record of what had not happened on the attorney side of things, but he did not put on mitigation evidence of what trial counsel could have presented to the jury.  In a couple of awkward moves, Copeland called both prosecutors as witnesses, and pointedly questioned the trial judge about a pretrial, *ex parte* communication from the lead prosecutor, David Glanzer, to the trial judge.  Copeland also questioned Glanzer about this memo:

> Q.  Did you at any time express some concern to this Court regarding the preparedness of the defense for this trial?
> A.  Yes, I did, and I did it *ex parte*.  It was coming, and I don't have an exact date of the memo, but I did keep a copy of the memo that [I found] when I was going through the file, and my best guess is January of '98.
> Q.  Early January or late January?
> A.  It would have to be early, because late January we had a status, and this was prior to the status.  And I believe there was a scheduled status set up.  But when I looked at the file in early January, I notice[d] there was no defense motions filed, and I thought this Court should know that and indicated to the Court that I was concerned there was [sic] no motions filed, and I thought it might be a good idea to schedule an earlier status, which I believe the Court did.
> Q.  You did that *ex parte*?
> A.  Right.

(6 SCR R-651.)

At first the judge denied he ever received such a memo.  However, during the hearing, he located it in the clerk's file, although inexplicably it was date-stamped "filed" by the clerk several weeks after the trial.

In his testimony, McDermott took the direct route:  owning up to the trial team's complete ineffectiveness at all phases of trial.  Powers took the defensive route:  ineffectively trying to justify his total lack of preparation and highly flawed speedy trial tactic.

At the hearing, McDermott laid out the scenario of his first look at Powers's file:

> Q.  . . . Mr. Powers' file, was it complete?  Did it give you a fairly comprehensive picture of the issues that might be raised at trial?
>
> A.  It did not. . . .  There were no motions in this file. . . .  I had expected motions for suppression of evidence, motions for a psychological examination, motions for the appointment of a private investigator, motion for subpoena duces tecum on evidence.  I saw none of those.
>
> Q.  . . . .What, if anything, did you do with regard to the fact the motions were not filed?
>
> A.  I contacted three other attorneys who I knew had worked on capital murder cases and consulted with them on what was the necessary items to be needed to be filed prior to the trial.  I consulted with the Southern Poverty Law Center.  I went over and personally picked up their manual on defense of capital murder cases, to include pre-made motions.  And I spent almost the remainder of my time until trial preparing those motions.

(6 SCR R-629-631.)

There were other salient background facts developed at the hearing.  On the morning of trial, McDermott knew "the case was not prepared. . . . One, defense witnesses were not yet subpoenaed.   Two, I had never met with the defense witnesses.   Three, there were no records of Mr. Powers having met with defense witnesses."   (6 SCR R-635.)   Additionally, a mere thirty minutes before the beginning of the trial, Powers informed McDermott that he, McDermott, would "take the lead"—in effect, be *de facto* lead counsel.  When asked about the motion to continue on the morning of trial, McDermott testified he told the court "words to the effect that we are not prepared."  (6 SCR R-637.)  The renewed motion for a continuance was denied, and the trial began.  "I simply had to begin."  (6 SCR R-638.)  But, "[t]here was much more I could have done in preparing for Mr. Flowers' defense."  (*Id*.)

From the testimony and argument at the motion for new trial hearing, the following facts and conclusions are clear about counsel's efforts at trial.  They were unprepared; they spent little time preparing for testimony and witnesses; McDermott spent most of his sixteen days trying to file appropriate, but untimely, motions that should have been filed and resolved months before trial.  It is unclear what Powers did in the days before trial.  At the motion for new trial hearing, he devoted his testimony to trying to justify his failed arraignment/speedy trial tactic.  Nevertheless,

despite all appearances of a constitutional violation, the trial court denied the motion for new trial.

Beverly Howard was appointed to represent Mr. Flowers on direct appeal. Flowers raised ineffective assistance of counsel due to counsel being unprepared for trial, among other issues.  In a thorough opinion affirming the trial court, Judge Sue Bell Cobb said that trial counsel for Flowers "did an admirable job, given the State's case against Flowers." *Flowers v. State*, 799 So. 2d at 993.  She also highlighted an essential fact about both phases of the trial:  "We cannot find that counsel's performance was deficient *when there is no indication in the record that any evidence of mitigation exists*."  (citations omitted) (emphasis added). Acknowledging the testimony of Flowers's older brother, Johnny, the court identified the only mitigating evidence presented by counsel at the trial, then observed:  "*No mitigating evidence, other than that presented to the jury, is contained in the record or even suggested in the appellate brief*."  *Id.*  (emphasis added).  The Alabama Supreme Court denied certiorari, *Flowers v. State*, 799 So. 2d 996 (Ala. 2001), as did the United States Supreme Court.  *Flowers v. Alabama*, 534 U. S. 901 (2001).

It was not until the Rule 32 hearing beginning November 15, 2006, before the same trial judge, that mitigation evidence was presented, and it came in truckloads from approximately twenty witnesses and hundreds of pages of documents.

13

Nevertheless, in an order filed May 22, 2007, the trial court denied the Rule 32 motion, adopting the State's proposed order *in toto*.  On appeal to the Alabama Court of Criminal Appeals (ACCA), the trial court was affirmed on memorandum (which consisted solely of quoting at length, *verbatim*, the order of the trial court), with Judge Sam Welch, concurring in part, as to the guilt-phase issues, and dissenting in part.  *Flowers v. State*, 50 So. 3d 497 (Ala. Crim. App. 2008).  In his dissent, Judge Welch pointed out that "there was mitigating evidence to be found with minimal investigatory effort; thus, I believe that trial counsel was ineffective and that new trial counsel was ineffective for failing to argue this in the motion for new trial."  *Id*. at 502.  The Alabama Supreme Court quashed certiorari.  *Ex parte Richard Jerome Flowers*, No. 1080340 (Ala. June 25, 2010) (mem.) (31 SCR Tab R-86.)  Mr. Flowers's petition for a writ of habeas corpus followed in this court, and this is that case.

## IV.  THE 28 U.S.C. § 2254 HABEAS PETITION

Excluding sub-claims, Flowers asserts fourteen grounds for relief.[6]

---

[6]  In July 2014, Flowers filed Notice of Supplemental Authority Affecting Procedural Default (Doc. # 51), requesting the court to take notice of *Smith v. State*, 160 So. 3d 40 (Ala. Crim. App. 2012) (opinion on return to remand), which issued after briefing in this case had been completed.  The court takes judicial notice thereof.

Additionally, in November 2017, following the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), Flowers was given leave to supplement Claim XIII with the *Hurst* decision in further support of his claim that Alabama's capital sentencing scheme is unconstitutional.  (*See* Doc. # 64.)  The State filed a response in opposition, asserting that regardless of *Hurst*, Alabama's capital sentencing scheme is constitutional.  (Doc. # 68.)

I.     Petitioner was denied the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution at all stages of trial and direct appeal.

II.    The trial court's failure to instruct on the lesser included offense of intentional[7] murder violated the Supreme Court's mandate in *Beck v. Alabama* and cannot be upheld solely on the basis that there was sufficient evidence to support the capital offense.

III.   The Alabama courts' decision, holding that Mr. Flowers failed to plead and prove a claim raised under *Brady v. Maryland* where evidence in support of that claim was presented at the Rule 32 evidentiary hearing, but the trial court hindered the petitioner's ability to prove his claim by refusing to declare a necessary witness material, violated Mr. Flowers' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

IV.   Mr. Flowers' Sixth Amendment right to confront witnesses was violated when the trial court allowed admission of prior testimony from a key witness, even though the State made only minimal efforts to locate the witness.

V.    Statements allegedly made by Mr. Flowers while in custody were erroneously admitted during trial.

VI.   A death sentence, one element of which is dependent on a juvenile act, violates the right to be free from cruel and unusual punishment.

VII.  The imposition of the death penalty against those who suffer from a mental disease or defect violates the Eighth and

---

[7] Due to a clerical/typographical error in Flowers's original petition (Doc. # 1) and the Amended Petition (Doc. # 30), he used the word "unintentional" instead of "intentional." In the briefing, the parties acknowledged this typographical error and corrected it.

Fourteenth Amendments to the Constitution of the United States.

VIII.   The prosecution engaged in misconduct throughout all phases of Mr. Flowers' trial, thereby depriving him of his rights to due process, a fair trial, and freedom from cruel and unusual punishment.

IX.   The trial court denied Mr. Flowers' rights to a fair trial by denying his pretrial motions for funds for an independent psychologist and for a continuance.

X.   The Alabama courts' exclusion of hearsay testimony addressed to showing prejudice under *Strickland v. Washington* with respect to capital sentencing is in conflict with clearly established Supreme Court precedent respecting a capital defendant's constitutionally protected due process, fair trial, and reliable sentencing rights to present any relevant evidence at a sentencing hearing and with the right to effective assistance of counsel.

XI.   The Alabama courts' decision, that the "practicability" requirement of Rule 32.2(d) of the Alabama Rules of Criminal Procedure bars a claim of ineffective assistance of trial counsel in Rule 32 proceedings, even though extra-record parts of that claim could not have been proved in prior proceedings, is in conflict with prior decisions of the Supreme Court of the United States and violates Mr. Flowers' rights to due process, a fair trial, and the effective assistance of counsel.

XII.   The Alabama courts' decision, holding that the specificity requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure prohibit incorporation by reference and can be applied to a pleading after evidence on the claim has been taken at an evidentiary hearing, violated Mr. Flowers' right to due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

XIII.   Alabama's capital sentencing scheme is unconstitutional.

XIV.  Execution would violate Mr. Flowers' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

(*See* Doc. # 30.)

The court defers, for now, consideration of all fourteen claims and determination of which claims, if any, are procedurally defaulted and whether Mr. Flowers has shown "cause" and "prejudice" to excuse any procedurally defaulted claims.  Rather, the court considers the *overarching* claim in the petition—a claim that is clearly not procedurally defaulted—the claim that he received ineffective assistance of counsel (IAC) at trial from Powers and McDermott.

## V.  STANDARD OF REVIEW

Because Flowers filed this action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court's review of his claims for federal habeas relief that were resolved on the merits by the state courts is governed by the AEDPA.  *See Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271,1281 (11th Cir. 2012); *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Under the AEDPA, this court cannot grant Flowers habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or (2) resulted in a decision that was based on an unreasonable

17

determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U. S. 133, 141 (2005); *Williams v. Taylor*, 529 U. S. 362, 404–05 (2000); 28 U.S.C. § 2254(d).

"Clearly established" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of the Supreme Court's cases at the time of the relevant state court decision. *Williams v. Taylor*, 529 U. S. at 412. "Contrary to" means the state court applied "a rule different from the governing law set forth in [Supreme Court] cases, or [ ] it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U. S. 685, 694 (2002) (alterations added).

An "unreasonable application" under § 2254(d)(1) occurs when a state court decision (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U. S. at 407. The "'unreasonable application' inquiry . . . ask[s] whether the state court's application of clearly established federal law was objectively unreasonable," *id*. at 409, which "requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U. S. 63, 75 (2003); *see also Harrington v. Richter*, 562

U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

However, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citation and quotation omitted).

Further, "review under§ 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." *Greene v. Fisher*, 565 U. S. 34, 38 (2011). In Flowers's case, the Rule 32 court issued a reasoned decision adjudicating his IAC claim on the merits. In affirming, the ACCA conducted no independent analysis of the record and simply adopted the Rule 32 court's findings as its own. The federal habeas court reviews the decision of the state's highest court, but in this particular case, the court—in essence—reviews the Rule 32 court's decision, as it is a reasoned state court decision that was adopted by the higher court. *See* note 9, *infra*.

When evaluating whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2), the federal court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the federal court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Wood v. Allen*, 558 U. S. 290, 301 (2010)). Section 2254(d)(2), like § 2254(d)(1), requires that federal courts afford the state court "substantial deference." (*Id.*) If "[r]easonable minds reviewing the record might disagree about" the state court factfinding in question, "on habeas review that does not suffice to supersede" the state court's factual determination. *Rice v. Collins*, 546 U. S. 333, 341–42 (2006). Additionally, a federal habeas court must presume that findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of correctness applies to only the underlying factual determinations." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 651 (11th Cir. 2014).

In sum, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (per curiam) (quotation omitted). But the Supreme Court has

explained, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller–El v. Cockrell*, 537 U. S. 322, 340 (2003). "Deference does not by definition preclude relief." *Id*. "[I]f a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler*, 569 U.S. 413, 421 (2013).

If a federal court determines that a state court decision is unreasonable under § 2254(d), "[the federal court is] unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013) (citation and internal quotation marks omitted).

## VI.  SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL

## A.  Clearly Established Federal Law

In *Strickland v. Washington*, 466 U. S. 668, 687 (1984), the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the

21

> defense.  This requires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U. S. at 687.

To satisfy the first prong of *Strickland*, *i.e.*, establish that counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U. S. 510, 521 (2003); *Williams v. Taylor*, 529 U. S. at 390–91.  The defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance.  *Strickland*, 466 U. S. at 687–91.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight.  *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of counsel at the time).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland*, 466 U. S. at 688-89.

To satisfy the "prejudice" prong, the defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U. S. at 534; *Strickland*, 466 U. S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id*.

In those instances where the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), the federal habeas court reviews the un-adjudicated prong *de novo*. *See Porter v. McCollum*, 558 U. S. 30, 39 (2009) (holding *de novo* review of trial counsel's performance was necessary because the state courts had failed to address this prong of the *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state court rested its rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U. S. at 534 (holding the same).

In Mr. Flowers's case, the Rule 32 court's analysis of his IAC claim stopped short. That court addressed his IAC claim *vis-à-vis* the guilt phase, but completely ignored Flowers's claim that trial counsel were ineffective at the mitigation phase.

(*See* 2 SCR 211-12.) Hence, this court reviews the claim of ineffective assistance of counsel at the penalty phase *de novo*, rather than under 28 U.S.C. § 2254(d).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir.), *cert. denied*, 562 U. S. 1082 (2010); *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995), *cert. denied*, 517 U. S. 1214 (1996). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U. S. at 698; *Strickland*, 466 U. S. at 690.

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review on the first prong of the *Strickland* test. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333–35 (11th Cir. 2013) (*en banc*) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland's* performance prong, not to the prejudice inquiry). The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U. S. 12, 19 (2013). Under § 2254(d)(1), "'a state prisoner must show

that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'" *White v.*

*Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall*, 572 U. S. 415, 420

(2014)); *Harrington v. Richter*, 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. **For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."** A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (citations omitted) (emphasis added.)

## B.   AEDPA Review

The Rule 32 Court's rejection of Mr. Flowers's IAC claims raised in the Rule

32 Petition on procedural grounds, *viz.*, that they were procedurally barred by

Alabama Rule of Criminal Procedure 32.2(a) and thus were entitled to summary dismissal under Alabama Rule of Criminal Procedure 32.7(d), is considered, for purposes of federal habeas review, as a ruling on the merits.  Summary dismissal of a claim for failure to satisfy a state procedural rule constitutes a ruling on the merits, which permits federal habeas review of a federal constitutional claim.  *See Frazier v. Bouchard*, 661 F.3d 519, 524–26 (11th Cir. 2011) (holding dismissal of ineffective assistance claim for failure to allege sufficient facts was a ruling on the merits of the *Strickland* claim and did not constitute a procedural default or otherwise bar federal habeas review of the claim), *cert. denied*, 568 U. S. 833 (2012); *Borden v. Allen*, 646 F.3d 785, 815–16 (11th Cir. 2011) ("[A]n Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review"), *cert. denied*, 566 U. S. 941 (2012); *Powell v. Allen*, 602 F.3d 1263, 1272–73 (11th Cir. 2010) (Alabama court's summary dismissal of federal constitutional claims under Rule 32 should be reviewed as a holding on the merits.), *cert. denied*, 562 U. S. 1183 (2011).

Thus, in considering the state court's summary dismissal of Flowers's IAC claims against his trial counsel, the federal habeas court must determine whether the state court could reasonably have concluded that Flowers's complaints about his trial

counsel's performance failed the *Strickland* test for ineffective assistance.[8]  This court necessarily considers the underlying *Strickland* standard.  Additionally, as background for AEDPA review, this court is mindful of the trial court's scheduling order being filed one-and-one-half years in advance of the trial date and of the pre-trial motions filed (or not), as these factors are intertwined with counsel's investigation and trial preparation.  They are part and parcel of the evaluation of counsel's overall performance and effectiveness.

## C.  Mitigating Evidence Presented at the Rule 32 Hearing

### 1.  Introduction

Mr. Flowers's Rule 32 counsel, Jeffery Duffey, uncovered and presented a plethora of mitigating evidence at the Rule 32 hearing, evidence that trial counsel missed due to their failure to conduct any investigation for mitigating evidence.  As more fully detailed below, roughly twenty witnesses painted a poignant picture of a

---

[8] The ACCA was the last and highest state court to consider Flowers's IAC claim raised in his Rule 32 Petition.  The ACCA's majority decision affirming the Rule 32 Court is an unpublished memorandum.  (31 SCR Tab-85 at 1-30.)  Its consideration of Flowers's IAC claim on appeal consists of (1) block quotations from various cases, (2) a restatement of the facts of the case contained its decision on direct appeal, and (3) extensive quotations, contained in eleven pages of single-spaced text, that were lifted *verbatim* from the Rule 32 court's decision that rejected Flowers's IAC claims against trial counsel because they were procedurally barred by a state procedural rule and summarily dismissed them under Ala. R. Crim. P. 32.7(d).  Given the ACCA's affirmance of the Rule 32 Court's disposition of Flowers's IAC claim, without conducting any independent written analysis, essentially, the Rule 32 court's decision is the last reasoned decision.  "Where the appellate court affirmed the Rule 32 court's holding for the Rule 32 court's reasons, we, in effect, review the initial Rule 32 court's decision."  *Powell*, 602 F.3d at 1268, n.2.

thrown-away, poverty-stricken, bullied, sexually abused, physically abused, and emotionally abused child, abandoned by his family (the latter a decidedly deceptive descriptor) and, except for a few caring school personnel, likewise abandoned by the social work and criminal justice apparatus of government.

Both Mr. Flowers's parents were, or became, alcoholics. An older brother testified that the father would hold the mother down and force alcohol down her throat. Every witness who knew the father testified that he was a drunk and abusive. Most testified that he abused his wife and the male children by striking them, throwing them around, hitting them with whatever was handy, and on occasion throwing knives at them. Ricky, the youngest boy, seemed to get more than his share of abuse.

When Ricky was approximately five years old, his father died in an accident at work when he fell into an industrial food-grinder. There was apparently little or no financial recovery for the family, and the mother drank away whatever there was. Thereafter, the mother was chronically depressed, dirty, drunk and disoriented; she showed up at school for a parent-teacher meeting highly intoxicated on one occasion. She brought men into the house who were also drunks, and one of whom sexually abused Ricky when he was young. Attempted sexual abuse by another happened again when Ricky was a young teen; this time he fought the would-be attacker and killed him.

Numerous witnesses testified of the condition of the various homes the Flowers family occupied while Ricky was at home.  The homes were dirty, sometimes unheated, frequently without electricity, some without running water or indoor plumbing.  At times, mattresses were scattered on the floor; at other times the four boys slept together in one bed.  Often, Ricky slept under the house with the dogs.

The houses were drafty, and some were "falling in" but still occupied.  As Coffee County Probation Officer Tim Byrd characterized one home in which Ricky lived:  "It was a shack basically is the best description I can give of it."  (23 SCR 45.)  One witness said it was the worst living situation he had ever encountered; another said you could see the ground through the floorboards.  All witnesses said the house was filthy and disheveled.

In describing the living conditions in one of the Flowers's homes, Horace Flowers, Ricky's eldest brother, explained that "sometimes the roof be caving in and leaking, but we stayed there (24 SCR 118); "all four of us [boys] used to sleep in one bed, two at the head, two at the foot." (*Id*. at 119.)  He further testified:  "Q. Did you have running water?  A. At times we did, at times we didn't.  Q.  Did you have heat?  A.  Times we did, and times we didn't."  (*Id*.)  As children, they were not taught how to brush teeth, take a bath, tie shoes, wash clothes, or clean house.  (*Id*. at 119–20.)

29

## 2. <u>Excerpts of testimony from Rule 32 hearing</u>

### a. *The Flowers Home and Parents*

i. <u>Karen Bowden, special education teacher</u>[9]:

- The Flowers were well-known. . . . In school . . . they just had a reputation for being children that you could never get the parents in.  You could never get things that you needed back and forth because the children were not looked after.  They were not cared for by the parents.  (16 SCR 1145.)

Out of the more than four hundred special education students she taught in twenty-nine years of teaching, Jerome stood out:

- There was something about Jerome.  He had a heart.  And I felt like he – didn't have a prayer from the day he was born. . . .  I knew he needed somebody to care for him.  (16 SCR 1146–47.)

- He was born into the Flowers family.  There were multiple children.  There was very little money.  And he was doomed, it seemed to me.  I didn't know how he was ever going to come out of it.  But I thought he had lots of sense.  You know, I saw that in him.  He had so much sense.  And he was in special education just – he is not – he had not been exposed as a young boy.  He didn't have kindergarten.  He didn't have – he wasn't read to.  He didn't have all the head start things that most young children do.  (16 SCR 1147.)

ii. <u>Marsha Tumberlin, special education teacher</u>:

- Our program had several of Jerome's own family members in it, and in addition to that we had multiple first cousins of Jerome. . . . Jerome's mother and father had a reputation of not taking care of their children.  . . . there was very much the knowledge that those children had to take care of themselves or fend for themselves, that  they were not seen about and they were not

---

[9] She taught Flowers for about one-and-one-half school years.  (16 SCR 1139.)

cared for.  I know from my year's experience with him that he was not provided adequate clothing by a parent, that the clothing he had that was adequate was provided for him by people who loved him very much and who saw about him every day.  I just know he came – I know they came to school, not just Jerome but Johnny and James too, without having been seen about.  (23 SCR 20-21.)

#### b. *Poverty*

i. <u>Karen Bowden, special education teacher:</u>

- Jerome was obviously from a very, very poor family.  My heart went out to him just because he sort of stood out in my classroom as one who needed some extra special attention.  (16 SCR 1140.)

ii. <u>Vernetta Deramus, school counselor who visited the Flowers home</u>:

- I was [at the Flowers home] some weeks two or three times a week. . . .  Mr. Flowers was a victim of poverty.  His home was very dilapidated.  The floors as you walk in had holes in the floors, and the home was not heated or lighted sometimes.  It was just in disarray. . . .  Yes, he was a victim of poverty, the worse [sic]. . . in the world  He was deprived, very deprived. . . .  Many times the lights were off. . . .  Very little [furniture].  They were cold.  They didn't have the basic quality of life needed to be successful.  [Mattresses] [o]n the floor.  (24 SCR 89-90.)

- I would call the mother.  I would try to find clothing for the children to put on so they could go to school.  It was very hard for the children, because there was no running water.  *It was an insurmountable poverty.*  (*Id*. at 90.)  (emphasis added.)

- [The mother] was always depressed.  She had no hope, no inspiration, no direction in life.  She had somewhat given up. . . . No, she didn't have any parenting skills.  She didn't have any conversation experience.  She didn't encourage the children to ask questions.  She was just poverty stricken.  She didn't have the courage nor the strength to direct the children.  (*Id*. at 92.)

- Q. Can you compare Mr. Flowers' home to other homes that you visited?
  A. Jerome's was the worst. It was in a rural setting where there was no facility and the community extendedness that he could have had to make things better for him. He wasn't given any positive direction to travel along life's highway. He was just surrounded by things that were negative. (*Id.* at 93.)

iii.  Declaration of Richard Lamar Devaughn, special education teacher:

- I vividly recall visiting the Flowers home, as I had never seen a more filthy home. It is my opinion that the house should not have been occupied by anyone. (22 SCR 2390.)

- After my visit to the Flowers home, I was so appalled that I felt it was my obligation to report the conditions to [the] assistant principal. (*Id.* at 2391.)

iv.  Affidavit of Gladys Neal, neighbor:

- [Ricky] and his family . . . were my neighbors for six years. . . . I knew Ricky's mother, Julie. [She] provided no guidance to her children. Ricky and his siblings had a horrible life. Julie drank a lot and did not feed her children. She lived with her boyfriend and his children too. I would sometimes feed Ricky and his siblings when he would come by my house. Ricky . . . would often go to other people's houses to . . . eat. They did not have heat in the home. (23 SCR 2400.)

- The house where Ricky lived was the pits. Pigs lived better than they did. I would not want a dog to live that way. No children in the world should live like that. (*Id.* at 2401.)

- At times, the children would sleep under the porch. . . . I think it was as punishment. (*Id.*)

- I knew Leroy Leverett [the step-father] and he was a mean man. (*Id.*)

- No attorneys or investigators have ever contacted me in the past, neither during the Coffee County trial or the Montgomery County trial. I would have talked to anyone who asked. (*Id.*)[10]

### c. *Education/School Issues*

i. <u>Karen Bowden, special education teacher:</u>

- He would come to school dirty . . . with actual sand and dirt in the top of his head. . . . I said, "Jerome, what – where – have you been rolling in the dirt? And he would say, "I slept under the house with the dogs." His clothes were dirty. (16 SCR 1140-41.)

- I asked him why he slept under the house with the dogs. He said there was screaming and hollering, and it was quiet and peaceful under there. And he said he would have to sleep in a bed with a bunch of other . . . children. (*Id.* at 1158.)

- His clothes were dirty. And I would try to . . . take in some things that I would get from here and there and let him change shirts and   . . . just primp him up a little bit so he would feel better about himself. Because we know that when children feel better about themselves, . . . they do better, they act better. (*Id.* at 1141-42.)

- I have picked him up and I [have] taken him home.  . . .  When I would drop him off . . . lots of children [were] there. And they were all equally dirty children. Not -- taken care of. (*Id.* at 1143-44.)

ii. <u>Marsha Tumberlin, special education teacher:</u>

- Jerome frequently came to my room from the other two rooms to have a smaller, quieter place to work. He did much better in my room than he did in other situations, because he could be isolated, he could be quiet, he could work in the kitchen area where there was a kitchen table and not have the aggravation of other students

---

[10] All fact witnesses presented at the Rule 32 hearing testified that they were not contacted by trial counsel and would have testified if asked to do so.

and other situations.  He did wonderfully fine in my classroom. (23 SCR 15-16.)

- Jerome came to school most days so filthy that we had to clean him up before he could start his school day.  He would start with me, and we would keep clean clothes for him, and we would take off his filthy clothes, and would wash them in the washer and dryer that was in my classroom.  The PE coach and my husband would take him and give him a shower and clean him up good and put clean clothes on him so for the rest of the day while he was around other people that he didn't smell bad and that he looked good.  We kept lotion so he could lotion his skin up, and felt good about himself.  (*Id*. at 16-17.)

- He would come to school with clothes that had been wet. He would have wet himself.  He smelled of urine.  Sometimes he smelled of animals like he had slept with dogs or something.  He was filthy.  There were days even that there was so much sand in his head that we had to lean him over and brush the sand out of his hair and head before we could even put him in the shower. He would just be covered with filth from head to toe.  It was just a horrible thing that that sweet child had to go through.  (*Id*. at 17.)

- There were days when he smelled like feces.  His underwear sometimes was so dirty that I just threw them away.  (*Id*. at 17-18.)

- We had some children who needed to eat as much as they could at school because we knew when they reached home that there wasn't going to be a meal until they came back to school the next day. . . .  That was true in the case of Jerome, and Johnny and James, who were brothers of Jerome.  (*Id*. at 18.)

iii.  <u>Gracie Flowers, Flowers's sister raised by family friend in Michigan</u>:

- [On a visit back to Alabama in 1973], . . . when I arrived, it was really in a trailer home.  They had no running water.  They were using kerosene lanterns . . . . the City would not hook up any type

34

of utilities . . . So there was no running water. Well, very little food, you know, that type of thing. (24 SCR 98.)

- But they were living pretty roughly when I got there, because it wasn't a lot of on-hand care. The children were not in school. All of them were not in school at the time I arrived. (*Id*. at 99.)

- [T]the neighbors . . . were very glad that someone had come and stepped in to help get the children under control. . . . I stayed about six months, but then I couldn't take it any longer, so I came back to Columbus. (*Id*. at 99-101.)

iv. <u>Declaration of Richard Lamar Devaughn, special education teacher:</u>

- Richard always seemed proud when he was able to get clean. (22 SCR 2391.)

- Richard was a good student and was eager to learn. Richard was not a trouble maker . . . . He was a pleasure to teach because he tried so hard. Richard really wanted to work and be something. (*Id.*)

### d. *Physical Abuse*

Joe Berry was one of the male friends of Ricky's mother after the death of his father. He stayed in the home for a while. As related by Sandra Flowers, Ricky's sister:

- He hollered a lot. He drank. He would fight with mama. He didn't like Ricky. . . . He would fight Ricky too. . . . throw stuff at Ricky. I remember him chasing Ricky with an ax[e]. I remember him and Ricky locking up and fighting one time out by a tree. (24 SCR at 137.)

Ricky's natural father was violent when drinking. According to his eldest brother Horace: "He would beat us and beat our mom. . . . He got Ricky, too. . . . He would

get belts, extension cord, water hose, whatever he could find.  He didn't care."  (24

SCR 114.)  He beat Mrs. Flowers when she was pregnant (*id*. at 115)  and made her

drink alcohol:

> Q.  How would he make her drink it?
> A.  Force it.
> Q.  How?
> A.  Like hold her and force her down and make her drink it . . . .
> Q.  You mean hold her mouth open?
> A.  Yessir.  He done that on occasion.

(*Id*. at 115–16.)  Horace remembered Joe Berry, too.  "I can remember one

particular day that he hit my mama's hand with an ax[e]."  (*Id*. at 117.)

### e. Sexual Abuse—Flowers and His Sisters

Ricky's younger sister, Sandra Flowers, testified that one of her mother's

male friends, Mr. Flemming, would come over to the house drinking.  "He didn't

like Ricky either.  He used to make Ricky cry and stuff.  I don't know what he do to

Ricky, but I remember he used to stay and make Ricky cry. . . .   [H]e would be in

that room messing with Ricky. . . . because Ricky be crying.  He would say stop and

be crying. But we never did go in there."  (24 SCR 128.)

Sandra also testified that Leroy Bojay Leverett "used to come down to the

house and used to be drinking.  He used to touch me, too. . . .  He used to touch me

and feel on me and bother me, molest me.  (*Id*. at 138–39.)  Leverette would become

Ricky's first murder victim.

36

### f. *Psychological Abuse and Bullying*

i. <u>Marsha Tumberlin, special education teacher</u>:

- He could come into my room . . . and do just fine. . . .  People picked on him, aggravated him, made fun of him and he didn't handle that well.  So it was frequent that he was given the opportunity to come to my room and work in the little kitchen area. . . .  They would make fun of the way that his father died.  His father died a tragic death in a peanut mill in our town.  He fell into a vat and was ground to death.  The children would say things like your daddy is hamburger meat.  It was upsetting to him.  They also made fun of the way that he walked.  Jerome had a little lilting walk.  He would walk on his tiptoes and they would pick at him for walking on his tiptoes.  They would also make fun of him for smelling like urine and for wetting his pants, and the things that they knew about him that were upsetting to him.  Some of those children that picked at him the worst were his very own family members []  were unmerciful to him because they knew the things that hurt him and upset him the most. They would upset him just to see him have an upset fit.  (23 SCR 21–23.)

- My father was the special education coordinator for our school system. . . .  We would send Jerome to my father when he had had a very bad day or a very upsetting incident.  We would send him down there like for a time-out room.  And he and my dad developed an extremely close relationship. My father was a Baptist minister in addition to being a school principal and coordinator.  And he could calm Jerome down when nobody else could seem to reach the point that would help this child to be able to make it through the school day. . . .  He was very good at redirecting him and making him understand that he was going back, behave, get on task, and get his job done.  He respected daddy a great deal and he would listen to him and do what he needed to do.  (*Id.* at 23–24.)

- *[Jerome was] the most uncared for child that I ever worked with, and I worked with lots of children who had very, very serious home li[v]es and very deprived disadvantaged backgrounds, and*

*that was the nature of what we did*.  We worked with special education students, and many of our students came from homes where they were not provided loving care or [were provided] substandard care.  If I had to pick a child out of my five years that I actually was working in a classroom involved with children, the child that I would pick for you today as my child who was the most unloved, uncared for, unseen about child, it would be Jerome.  (*Id*. at 28.) (emphasis added.)

- That would even be in comparison to his two siblings that I worked with.  James and Johnny were treated better at home than Jerome was.  It was almost as if Jerome was singled out at home for even more uncaringness than the other two were.  And they were dirty.  They came to school filthy too.  They came to school hungry too.  This child came to school smelling in a way that they didn't often smell.  And it literally was the smell of animals like he had slept with animals.  The children would jokingly say you sleep with the dogs.  I never went to see if he slept with the dogs, but I can tell you that the clothes I washed smelled like he had slept with dogs.  They were horrible.  They were filthy.  (*Id*. at 29.)

- *I would just tell you.  My heart went out to him then.  My heart goes out to him today.  He would be the child that I had in my five years of being in a classroom of special ed students that would stand out as the one who needed somebody the most.  And we worked hard to give him somebody for the time that we had him.*  (*Id.* (emphasis added).)

ii. <u>Horace Flowers, brother</u>:

- They [school children] picked on us kids, talked about us, stuff like this, because maybe we weren't dressed properly like everybody else or didn't have shoes to wear like others, and he [Ricky] was always talked about, picked on.  That sort of stuck with him a lot.  (24 SCR 121–22.)

### g. *Familial Child Drug and Alcohol Abuse*

Mr. Flowers's younger sister, Sandra, testified she began drinking alcohol and doing drugs when she was five or six years old: "I can remember my first drunk. I almost fell in the fireplace holding a baby." (24 SCR 142.) She smoked marijuana at about age eleven. (*Id.*) She also testified that "we would go to these little houses, they call them shot houses, and we drunk at home." (*Id.*)

### h. *The Change*

Around the age of fourteen or fifteen, Mr. Flowers became uncontrollable at home and sometimes at school.

i. <u>Sandra Flowers</u>:

- All of a sudden, Ricky had a problem. (24 SCR 139.) He set his hair on fire. . . . Ricky seemed to have mental problems. (*Id.*)

- Ricky did a lot of unusual things. I remember Ricky went to this church, and Ricky jumped out the church window. He said an angel throwed him out or something. He used to go out into the woods and stay. . . . Ricky just had problems. (*Id.* at 140.)

ii. <u>Declaration of Samuel McErvin, childhood acquaintance</u>:

- In 1977, McErvin became a member of the Church of Jesus Christ in Enterprise, Alabama, and was the foster child of one of the church's evangelists. (23 SCR 2393–94.)

- While I was a member of this church, I came to know . . . Ricky. . . . I would go with the evangelists to drop Ricky at his house. I recall that his house looked abandoned from the outside and I do not think it had electricity. (23 SCR 2394.)

- I recall an incident that happened with Ricky at the church. Ricky and I were sitting in the back of the church during the service. Ricky kept looking over at the window and was talking to himself. He was talking to himself for what seemed like a half hour. Then, all of the sudden, he stood up and ran straight through the church window breaking the glass. I do not know why he did this. . . . . [On the way to Ricky's house that night], I recall sitting in the back seat of the car with Ricky. He was talking to himself during the drive home. (*Id.* at 2394–95.)

- I recall Ricky was a little different than the other children. Even though he was a few years older than I was, I felt like I was more intelligent than Ricky. He just wasn't normal. (*Id.* at 2395.)

The incident where Ricky threw himself through a church window occurred on April 1, 1979. (21 SCR 1998.) On April 4, 1979, Ricky, on his own, went to see Tim Byrd, a Coffee County juvenile probation officer, and asked Mr. Byrd to put him in jail because "that was the only place for him." (*Id.*) With that, Mr. Byrd referred Ricky to the mental health center, where he was evaluated on April 4, 1979. The report from this evaluation states in part:

- Jerome reported that on the way to the [mental health] center he stood on the railroad tracks in front of a parked train hoping that it would leave and run over him. He . . . is concerned "with thoughts going through my mind that tell me to kill myself." (*Id.*)

- The evangelist at the church Jerome attended then, reported that he has confided in her that he is "going crazy and I'm losing my mind." *Id.*

- [I]t has been reported by Jerome's [school] principal and teacher that there has been a noticeable change in [his] behavior since his attendance at the Church of Jesus Christ in Enterprise beginning

in January, 1979.  Since that time the frequency and intensity of outbursts toward his peers and the aggressive, violent type behavior has increased.  He has requested that he be placed in jail and also indicated a possible intent to harm himself.  He apparently feels somewhat out of control." (*Id.* at 2000.)

### 3.  <u>History and Results of Mental/Psychological Evaluations</u>

From childhood, Ricky displayed odd behaviors, as recounted by his brother

Horace:

> Q.    Did you ever see Ricky do anything unusual that you thought was unusual?
> A.    He did a lot of things unusual.
> Q.    Did you ever see him bang his head on the floor or wall or anything?
> A.    Yeah, he always did that. We didn't know why, but he always done it.  . . . .  He fell a lot when he was walking . . . . He used to trip a lot . . . trip down or fall off the porch.
> Q.    Did you ever see him eat dirt?
> A.    He . . . sure did.

(24 SCR 123–24.)

Some of these behaviors entered into the diagnosis of psychologist, Ken

Benedict, Ph.D., contained in his Report of Neuropsychological Assessment:

> There is ample evidence of neuropsychological deficits and dysfunction that are not sufficiently explained by the client's history of psychosocial adversity.  More specifically, the affected [brain] areas are:  Visual-motor integration; complex spatial and quantitative reasoning; visual memory for abstract information; left-sided motor speed and sequencing; maintaining response sets; and learning under complex, changing and/or fast-paced conditions.

> The pattern of findings from this evaluation is more likely to be associated with acquired brain damage than developmental problems given the highly specific and differentiated pattern of

41

> findings.    It is not uncommon for individuals with this
> neuropsychological profile to have histories of closed head injuries
> and/or seizures. . . .    After integrating information from record
> review, client interview, prior assessment reports, and the results
> from the current evaluation, it is concluded that the identified brain
> damage existed prior to Mr. Flowers' first conviction in 1980.

(23 SCR at 2477.)

Dr. Benedict concluded that at the time of this capital offense, Flowers was

suffering from a mental impairment he identified as a cognitive disorder, not

otherwise specified.  (24 SCR 195, 197, 199.)[11]

Dr. George W. Woods, Jr., a board-certified neuropsychiatrist, performed a

forensic evaluation of Flowers in 2006.  Dr. Woods, too, concluded that Flowers

suffers from a cognitive disorder, not otherwise specified.  He opined that this

mental defect was present in 1979, as well as in 1996, and that Flowers probably has

had this impairment all his life.  (18 SCR 1423–24.)

In summary, Mr. Flowers's first experience with mental or psychological

evaluations appears to have been in response to patterns of bad behavior he

developed before his first charge for murder, behavior both at school and at home.

He was initially seen by South Central Mental Health in Enterprise on April 4, 1979.

(21 SCR 1997.)  He was then evaluated twice by Searcy Hospital in 1980 in

---

[11]  Dr. Benedict evaluated Flowers on two different occasions in 2005 and 2006.  Each
evaluation extended over two consecutive days:  December 7–8, 2005, and November 1–2, 2006.
All told, Dr. Benedict estimated that he spent nineteen hours with Flowers.  (24 SCR 184–85.) Dr.
Benedict's report is of record at 23 SCR 2469–2477.

connection with his first criminal charge, by order of the Circuit Court of Coffee County.  (20 SCR 1905–1993; 21 SCR 1994–2027.)  This record contains over one hundred twenty pages of detailed background and assessment—much of it mitigating—that neither the jury nor the sentencing judge ever heard.

## D.    State Court's Decision on Flowers's IAC Claim in the Rule 32 Petition

The state court correctly identified *Strickland v. Washington*, 466 U. S. 668 (1984), as the proper standard for evaluating Flowers's IAC claim.  To establish a viable IAC claim, Flowers must show that his trial counsel's performance was deficient and that he was prejudiced as a result.  *Strickland*, 466 U. S. at 687.

### 1.    Deficient Performance Under *Strickland*

To prove deficient performance, Flowers must demonstrate that trial "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  There is a "strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id*. at 689 (quotation omitted).  When this presumption is combined with § 2254(d), the result is double deference to the state court's ruling on counsel's performance.  As noted, double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland's* performance prong, not to the prejudice inquiry.  *Evans*, 703 F.3d at 1333–35.

43

Further, "strategic choices made [by trial counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U. S. at 690–91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

In the capital sentencing context, the Eighth and Fourteenth Amendments require "individualized consideration of mitigating factors." *Lockett v. Ohio*, 438 U.S. 586, 606 (1978). Pursuant to this rule, it is clear that under the prevailing professional norms at the time of Flowers's trial in 1998, his counsel had an "obligation to conduct a thorough investigation of the defendant's background."[12] *Williams*, 529 U. S. at 396; accord *Rompilla*, 545 U. S. at 385–86.

When assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association ("ABA") as appropriate guides. For example, in *Wiggins*, the Court

---

[12] As seen from the Supreme Court's decisions in *Sears v. Upton*, 561 U. S. 945 (2010); *Porter v. McCollum*, 558 U. S. 30 (2009); *Rompilla v. Beard*, 545 U. S. 374 (2005); *Wiggins v. Smith*, 539 U. S. 510 (2003); and *Williams v. Taylor*, 529 U. S. 362 (2000), the clearly established federal law and prevailing professional norms at the time of Flowers's trial in 1998 required his trial counsel to conduct a thorough background investigation for mitigating evidence. The trials in these cases pre-dated Flowers's trial. Sears was tried in 1993; Porter was tried in 1988; Rompilla was tried in 1988; Wiggins was tried in 1989; Williams was tried in 1986.

noted that the 1989 "ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  539 U. S. at 524 (emphasis omitted) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(C) (1989)).[13]

### a. Counsel's Performance at the Guilt Phase

For the reasons stated above, the court concludes that Mr. Flowers's counsel performed deficiently at the guilt phase.  The testimony of Flowers's counsel[14] at the motion-for-new-trial hearing clearly establishes that trial counsel were grossly unprepared for trial.  Robert Powers was lead counsel for approximately one and one-half years prior to trial, yet his case file reflects that he did minimal investigation and trial preparation during this time.  Mickey McDermott became second chair counsel fewer than three weeks prior to trial.  The Flowers case was McDermott's first capital murder trial; he recognized early on that due to insufficient preparation,

---

[13] However, this court is mindful that the ABA Guidelines provide broad, general guidance as to what is reasonable attorney performance; they are not hard-and-fast rules or commands that demand strict compliance.  *See Strickland*, 466 U. S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . .  are guides to determining what is reasonable, but they are only guides."); *see also Bobby v. Van Hook*, 558 U. S. 4, 7 (2009) (*per curiam*) ("Restatements of professional standards, we have recognized, can be useful as guides to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place."  (quotation omitted)).

[14] The court incorporates by reference the testimony of Robert Powers and Mickey McDermott at the motion-for-new-trial hearing, as set out in Part III.C. of this opinion.

both he and Powers performed deficiently and rendered ineffective assistance to Flowers at trial.

### b. Counsel's Performance at the Penalty Phase

The deficient performance of Mr. Flowers's counsel did not stop at the guilt phase; it extended into the penalty phase. In fact, counsel's substandard performance was more pronounced at the penalty phase, as they had failed to do any investigation for mitigating evidence to present at the penalty phase. The testimony from Mr. Flowers's brother, Johnny Flowers, the only defense witness at the penalty phase, was woefully insufficient to suggest an alternative to a death sentence.

## 2. **Prejudice Under *Strickland***

For Flowers to establish that he was prejudiced by counsel's deficient performance, he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694. "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. When evaluating the reasonable probability of a different result in a capital sentencing proceeding, the court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the

habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 558 U. S. at 41 (quoting *Williams*, 529 U. S. at 397–98).

### a. Prejudice at the Guilt Phase

Even though Mr. Flowers's trial counsel performed deficiently at the guilt phase, the State had a very strong case against him with overwhelming evidence of guilt. Thus, Mr. Flowers cannot prove he was prejudiced by his counsel's deficient performance. Mr. Flowers is entitled to no relief under the AEDPA on this portion of his IAC claim because the state court's denial of his claim that his trial counsel were constitutionally ineffective at the guilt phase was not an adjudication that either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U. S. Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U. S. at 141; *Williams v. Taylor*, 529 U. S. at 404–05; 28 U.S.C. § 2254(d).

### b. Prejudice at the Penalty Phase

The mitigating evidence presented at the Rule 32 hearing was the same evidence that his trial counsel could have presented to the jury at the penalty phase had they conducted any investigation for mitigating evidence. In addition to the wealth of lay testimony, Flowers also presented medical expert evidence from Ken

Benedict, Ph.D., a psychologist, and from Dr. George W. Woods, Jr., a neuropsychiatrist, who both concluded that Flowers suffered from a mental defect they identified as a cognitive disorder, not otherwise specified, which, in part, affects one's ability to adjust to change.[15]   Both experts agreed that this impairment was present at the time of the offense in May 1996.[16]   (*See* 24 SCR 195, 197, 199; 17 SCR 1374–79; 18 SCR 1423–24.)  This disorder may have resulted from (1) his mother's ingestion of alcohol in the months preceding his birth; (2) head injuries he suffered as a child[17]; (3) malnutrition as a child; or (4) a combination of some or all of these factors.  In other words, this mental defect is part and parcel of Flowers's background dating back to his early childhood, which is relevant to his moral culpability and the appropriate sentence.

> Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . .  may be less culpable.  Instead, they [the jury] heard absolutely none of that evidence, evidence which

---

[15]   The presence of this condition may explain, in part, why Flowers became focused on killing his co-worker Annie Addy.  Flowers and Addy both worked on the third shift at Piknik Products.  They did not get along well; Addy complained about Flowers to management.  In response to her complaints, management transferred Flowers to the first shift, which eliminated their having to work together.  Flowers was upset about being transferred; he preferred the third shift.  He suspected Addy's complaints about him  were responsible for the transfer.  He was unable to cope with this change.  He became focused on retaliating against Addy, likely resulting in her death.

[16]   Dr. Woods opined that this cognitive disorder was a life-long condition; Dr. Benedict opined that it was present prior to 1996.

[17]   Dr. Glen King testified that Flowers told him he was hit in the head by a brick thrown at him when he was eight to ten years old.  (25 SCR 321.)

might well have influenced the jury's appraisal of [Porter's] moral culpability.

*Porter*, 558 U. S. at 41 (cleaned up) (citation omitted).

The powerful mitigating evidence Flowers presented at the Rule 32 hearing exposed details about his childhood abuse and the borderline inhumane living conditions present in the family home, a place that for Flowers offered anything but the customary safety and security a family home should provide. The lay testimony humanized Flowers, as it portrayed him in a light the jury never saw and revealed the disturbing circumstances confronting Flowers in his formative years. The medical expert testimony from Drs. Benedict and Woods explained that Flowers was impaired from a mental defect that either was present at birth or resulted from head injuries and/or the physical abuse Flowers suffered as a child.

As the Supreme Court in *Rompilla* concluded when describing the significant mitigating evidence Rompilla's jury never heard:

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins v. Smith,* 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland,* 466 U.S., at 694, 104 S.Ct. 2052.

*Rompilla*, 545 U. S. at 393.

This excerpt from *Rompilla* applies here.  Even without the mitigating evidence Flowers presented at the Rule 32 hearing, two jurors voted against the death penalty.  Had counsel offered the abundance of mitigating evidence at trial that Flowers introduced at the Rule 32 hearing, there is a reasonable probability that at least one more juror would have voted for life imprisonment instead of the death penalty.  With a nine-to-three vote, instead of a ten-to-two vote, Flowers would have avoided a jury's recommendation of a death sentence.

Thus, Flowers has demonstrated that he was prejudiced by trial counsel's deficient performance at the penalty phase.  Having established both deficient performance and prejudice, Flowers has shown that his counsel were constitutionally ineffective.

### 3.  **The Trial Court's Failure to Address the IAC Claim in its Entirety**

The same judge presided at Mr. Flowers's trial, the motion-for-new-trial hearing, and the Rule 32 evidentiary hearing.  As noted above, despite all appearances of a constitutional violation that were presented at the motion-for-new-trial hearing, the court denied the motion for new trial based on counsel's ineffectiveness, stating:

> The Court has applied the principles of *Strickland v. Washington*, .   .   . when reviewing the Defendant's claim of ineffective assistance of counsel.  .   .   .

The Court finds that the performance of Defendant's counsel was not deficient and that no errors were committed which were so serious to raise [sic] to a level that the Defendant did not receive the representation guaranteed the Defendant by the Sixth Amendment. Therefore, the Court also finds that there were no errors so serious to deprive the Defendant of a fair trial, a trial whose result was reliable.   The Court further finds that the Defense counsel's performance was reasonably effective assistance considering all the circumstances at the time of their conduct.   The Court further finds that there were no deficiencies, either actual or constructive, in counsels' performance that prejudiced the Defendant.   In that regard, I find that absent any errors that counsel may have made, and this Court is not aware of any, that there is not a reasonable probability that the jury would have had a reasonable doubt *concerning the guilt of the Defendant.*   In regard to trial strategy, it is not the role of this Court to doubt the judgment of counsel.

Therefore, on the grounds of ineffective assistance of counsel, the Defendant's Motion for New Trial is DENIED.

(2 SCR 211–12) (emphasis added).

After determining that Flowers's trial counsel were not ineffective at the guilt phase, the trial court failed to consider counsel's performance at the penalty phase. The ruling expressly concerns the guilt phase and omits *any* reference to the penalty phase.[18]

---

[18] The trial court's failure to address Flowers's claim that trial counsel were ineffective at the penalty phase placed Flowers in a no-win situation.  When Flowers continued to present this IAC claim to the state court, it was summarily dismissed as being procedurally barred by a state procedural rule (even though the state court had never completely addressed all portions of the IAC claim Flowers initially raised in state court).  But if Flowers had not continued to raise his IAC claim in state court at every opportunity, the IAC claim would have been procedurally defaulted under state law, which, absent certain exceptions, would have precluded federal habeas review.  *See, e.g., Engle v. Issac*, 456 U. S. 107, 128 (1982); *Wainwright v. Sykes*, 433 U. S. 72, 82–83 (1977).

After the trial court rejected Flowers's IAC claim on the motion for new trial, Mr. Flowers continued to pursue this claim. First, he raised it on direct appeal, asserting five discrete claims of trial counsel's ineffectiveness, including claims that counsel were ineffective for failing to investigate, interview witnesses, and move for funds to hire a mitigation expert. In affirming his conviction and death sentence, the ACCA rejected all discrete claims of counsel's alleged ineffectiveness. *Flowers*, 799 So. 2d at 991–94.

Next, Flowers pressed his IAC claim against trial counsel in his Rule 32 Petition. However, the Rule 32 Court (the trial judge) denied Flowers's IAC claim as being procedurally barred by Alabama Rule of Criminal Procedure 32.2(a) and summarily dismissed it, pursuant to Alabama Rule of Criminal Procedure 32.7(d). (19 SCR 1658–76.) Flowers appealed, but the ACCA affirmed the Rule 32 Court's ruling on Flowers's IAC claim, stating: "The record supports the circuit court's findings, and we adopt them as part of this memorandum. Therefore, the appellant is not entitled to relief in this regard." (31 SCR Tab 85 at 1–20.) The ACCA wrote no independent analysis of that claim. The ACCA's unpublished memorandum is a wholesale adoption of the Rule 32 Court's ruling on Flowers's IAC claim. (31 SCR Tab 85 at 1–20.) Essentially, the Rule 32 Court's ruling and the ACCA's ruling on Flowers's IAC claim are one and the same.

In his dissent, Judge Welch noted the wealth of mitigating evidence that was "easily attainable," *Flowers*, 50 So. 3d at 498, as evidenced by the numerous witnesses Flowers presented at the Rule 32 hearing, which revealed "the awful circumstances of Flowers's life, which, I note, could have served as mitigating evidence." (*Id.* at 499.)  Judge Welch concluded that the circuit court erroneously denied the IAC claim:

> I believe that the evidence presented at the Rule 32 hearing clearly reflected that each counsel associated with this case failed to conduct any investigation into possible mitigating evidence.  *See Wiggins v. Smith*, 539 U.S. 510 . . . (2003).  I believe there was mitigating evidence to be found with minimal investigatory effort; thus, I believe that trial counsel was ineffective and that new-trial counsel was ineffective for failing to argue this in the motion for a new trial.

(*Id.* at 502.)

The state court's summary dismissal of the IAC claim cleared the way for federal habeas review.

### 4.   The State Court's Application of *Strickland*

The Rule 32 Court's rejection of Flowers's IAC claims as to trial counsel raised in the Rule 32 Petition on procedural grounds, *viz.*, that they were procedurally barred by Alabama Rule of Criminal Procedure 32.2(a) and thus were entitled to summary dismissal under Rule 32.7(d), is considered, for purposes of federal habeas review, as a ruling on the merits.  *See Frazier*, 661 F.3d at 524–26  (holding that dismissal of an ineffective assistance claim for failure to allege sufficient facts was

a ruling on the merits of the *Strickland* claim and did not constitute a procedural default or otherwise bar federal habeas review of the claim), *cert. denied*, 568 U. S. 833 (2012); *Borden v. Allen*, 646 F.3d at 815–16 ("an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review,"), *cert. denied*, 566 U. S. 941 (2012).

Thus, in considering the state court's rejection of Flowers's complaints about the performance of his trial counsel, the federal habeas court must determine whether the ACCA, the highest state court to consider Flowers's IAC claims, could reasonably have concluded that Flowers's complaints about his trial counsel's performance failed the *Strickland* test for effectiveness.

### a. *Counsel's Performance at the Guilt Phase*

Trial counsel's performance was deficient at the guilt phase, but given the State's overwhelming case against Flowers, he could not demonstrate that he was prejudiced by the deficient performance. Thus, counsel were not constitutionally ineffective at the guilt phase. The state court correctly applied *Strickland* when it rejected Flowers's IAC claim in respect to the guilt phase.

*b. Counsel's Performance at the Penalty Phase*

The state court failed to address that portion of Flowers's claim that his trial counsel were ineffective at the penalty phase; therefore, the state court adjudicated neither prong of the *Strickland* test.  Thus, the federal habeas court reviews this portion of Flowers's IAC claim *de novo*.  *See Porter*, 558 U. S. at 39 (holding *de novo* review of trial counsel's performance was necessary because the state courts had failed to address this prong of the *Strickland* analysis); *Rompilla*, 545 U. S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state court rested its rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U. S. at 534 (holding the same).

**5.**    ***De Novo* Review of Counsel's Effectiveness at the Penalty Phase**

*a. Deficient Performance*

Applying the *Strickland* test in *Williams*, *Wiggins*, *Rompilla*, and *Porter*, the Supreme Court repeatedly emphasized that defense counsel in a capital case have a duty to investigate the defendant's background for mitigating evidence.  *See Williams*, 529 U. S. at 396 ("[T]trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.").  There is no precise formula to determine the contours of the investigation necessary.  The extensiveness of the investigation is case-specific.  It varies in degree and type from case to case

and depends on numerous factors.  Each case is unique.  However, the predominant theme running through these four cases is that an investigation for mitigating evidence is mandatory, regardless of whether the defendant assists counsel's investigative efforts or frustrates those efforts.

In sum, counsel cannot decide up front to conduct no investigation and then after-the-fact categorize that decision as "strategic."  Counsel must conduct a reasonable investigation into defendant's background in search of mitigating evidence.  If counsel's efforts are to no avail, then counsel may legitimately decide that further investigation would be pointless.  As the Supreme Court noted in *Rompilla*:

> [T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.  *See Wiggins v. Smith,* 539 U.S., at 525, 123 S.Ct. 2527 (further investigation excusable where counsel has evidence suggesting it would be fruitless) . . . .

545 U. S. at 383.

In the quest for mitigating evidence, it was incumbent on Flowers's counsel to investigate his background.  Such an investigation would necessarily have included a review of his educational, medical, and criminal history records, his family and social history, and any other avenues for potential mitigating evidence that might arise during the investigation.  Flowers's lead counsel, Robert Powers, shirked his duty to investigate for mitigating evidence.  Mickey McDermott, who

became second-chair counsel fewer than three weeks prior to trial, did not abandon his duty, but he was simply too late to the table and had no time to conduct any meaningful investigation for mitigating evidence.   McDermott was in a mad scramble just to get up to speed on the case prior to trial, only to become *de facto* lead counsel on the first day of trial.   Thus, upon *de novo* review, Flowers has satisfied the "deficient performance" prong of *Strickland*.

> b.   Prejudice

To establish prejudice under *Strickland*, Flowers must show "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U. S. at 687.   "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Code of Alabama prescribes the sentencing procedure the Alabama courts must follow in death penalty cases.   At the time of Mr. Flowers's trial and sentencing hearing in 1998, an Alabama jury performed an advisory role in a capital sentencing proceeding.   The jury, after hearing the evidence presented at the second phase of a bifurcated proceeding, issued an advisory verdict recommending a sentence to the trial court based on its evaluation of aggravating and mitigating factors.   If the jury finds no statutory aggravating circumstances or finds that the statutory aggravating

circumstances do not outweigh the mitigating circumstances, the jury must return an advisory verdict recommending a sentence of life imprisonment without parole. *See* Alabama Code § 13A-5-46(e)(1)–(2) (1975). If, on the other hand, the jury finds one or more statutory aggravating circumstances and finds that it or they outweigh the mitigating circumstances, the jury must return an advisory verdict recommending a sentence of death. *See* Alabama Code § 13A-5-46(e)(3) (1975). The decision to recommend a sentence of death must be based on a vote of at least ten jurors. *See* Alabama Code § 13A-5-46(f) (1975). After the jury returns an advisory verdict, the trial court, based upon its independent determination and weighing of the aggravating and mitigating circumstances, makes the final decision as to the appropriate sentence. *See* Ala. Code § 13A-5-47(d)–(e) (1975).

"Given that the jury here recommended a sentence of death by the narrowest possible vote, . . . , [Mr. Flowers] need establish only 'a reasonable probability that at least one juror would have struck a different balance' between life and death." *Jenkins v. Ala. Dep't of Corr.*, 963 F.3d 1248, 1270 (11th Cir. 2020) (quoting *Wiggins*, 539 U. S. at 537). Mr. Flowers "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U. S. at 693. In assessing the reasonable probability of a different result, the court must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the

evidence in aggravation." *Porter*, 558 U. S. at 41 (internal citation, quotation marks, and alteration omitted).

In sentencing Mr. Flowers, the trial court found the presence of the aggravating circumstance required by Alabama Code § 13A-5-49(2) (1975).  This aggravating circumstance was based on the State's proof that prior to the present offense committed in 1996, Mr. Flowers had been convicted of murder in the second degree on October 22, 1980, in Coffee County, Alabama.  State law requires the finding of an aggravating circumstance when a defendant commits two murders within a span of twenty years.  *See* Ala. Code § 13A-5-49(2) (1975).  Because Mr. Flowers was convicted of murder twice in twenty years (in 1980 and in 1996), this statute required the trial court to find that circumstance to be an aggravating circumstance.  The trial court made the finding that "is present by application of statute." (1 SCR 176.)  The trial court found only this one aggravating circumstance.

The trial court then considered the seven mitigating circumstances that were potentially available to Mr. Flowers under Alabama Code § 13A-5-51 (1975)[19] and

---

[19] Alabama Code § 13A-5-51 (1975) provides:
Mitigating circumstances shall include, but not be limited to, the following:
(1)  The Defendant has no significant history of prior criminal activity;
(2)  The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(3)  The victim was a participant in the defendant's conduct or consented to it;
(4)  The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;

found that the evidence at trial did not support the existence of any statutory mitigating circumstances for Mr. Flowers.  (1 SCR 176-78.)  The trial court then considered if any non-statutory mitigating circumstances were applicable:

> [T]he Court has considered all aspects of Flowers['s] character or record and all circumstances of the offense *offered by him* as a basis for a sentence of life imprisonment without parole.  The Court has also considered all other relevant mitigating circumstances *offered by him*.  The Court finds that Flowers' emotional disturbance due to a difficult family history, and his time in the prison system since the age of seventeen is a mitigating circumstance.

(1 SCR 178) (emphasis added).  This characterization of "all aspects" and "all circumstances . . . offered by him" is veneer underlain by nothing—and therefore cannot support the weight of its conclusion, a death sentence.

Next, the trial court found that based on the nature of the aggravating circumstance, as well as on the jury's advisory verdict, the aggravating circumstance outweighed the mitigating circumstances.  With that finding, the trial court sentenced Mr. Flowers to death.  (*Id.* at 179.)

The mitigating evidence produced at the Rule 32 hearing very well may have inspired the jury or the trial court to find other statutory or non-statutory mitigating circumstances and/or to weigh the aggravating circumstance and the mitigating

---

(5)  The defendant acted under extreme duress or under the substantial domination of another person;

(6)  The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of laws was substantially impaired; and

(7)  The age of the defendant at the time of the crime.

circumstances differently.  For example, the medical expert evidence from Drs. Benedict and Woods that Mr. Flowers was suffering from a mental impairment[20] at the time of the offense in 1996 may have warranted the jury and/or the trial court to find the presence of the statutory mitigating circumstances that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, Ala. Code § 13A-5-51(2) (1975), and/or that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of laws was substantially impaired, Ala. Code § 13A-5-51(6) (1975).  Additionally, the abundance of lay testimony at the Rule 32 hearing cast Mr. Flowers in a light the jury never saw.  The lay testimony alone easily could have added more weight to the non-statutory mitigating circumstance that the trial court found, even without this mitigating evidence, *viz.*, "that Flowers' emotional disturbance due to a difficult family history, and his time in the prison system since the age of seventeen is a mitigating circumstance."  (1 SCR 178.)

Upon consideration of both the medical and psychological expert evidence and the lay testimony presented at the post-conviction hearing, this court concludes that "the available mitigating evidence, taken as a whole, might well have influenced the jury's [or the trial judge's] appraisal" of Mr. Flowers's moral culpability. *Wiggins*, 539 U. S. at 538 (citation and internal quotation marks omitted).  Had

---

[20] cognitive disorder; not otherwise specified.

Flowers's counsel offered the mitigating evidence at trial that Flowers introduced at the Rule 32 hearing, there is a reasonable probability that at least one more juror would have voted for life imprisonment instead of the death penalty.  With a nine-to-three vote, instead of a ten-to-two vote, Flowers would have been spared a recommendation of a death sentence.  There is a reasonable probability that the jury may have struck a different balance, a point the Supreme Court emphasized in *Porter*:

> Had the judge and jury been able to place Porter's life history "on the mitigating side of the scale," and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury—and the sentencing judge—would "have struck a different balance," *Wiggins*, *supra*, at 537, 123 S.Ct. 2527, and it is unreasonable to conclude otherwise.

558 U. S. at 42.

In short, the mitigating evidence at Mr. Flowers's Rule 32 hearing is "sufficient to undermine confidence in the outcome" actually reached at sentencing. *Strickland*, 466 U. S. at 694.  And, "it is unreasonable to conclude otherwise." *Porter*, 558 U. S. at 42.

For the reasons stated, and upon *de novo* review, there is a reasonable probability that if the mitigating evidence presented at the Rule 32 hearing had been presented at trial, it would have been a game-changer for Flowers, resulting in a life sentence instead of a death sentence.  Thus, Flowers has satisfied the prejudice prong of *Strickland*.

62

Having demonstrated both deficient performance and resulting prejudice, Flowers has shown that he received ineffective assistance of counsel at the penalty phase.

## VIII.  CONCLUSION

Mr. Flowers's claim that he received ineffective assistance of counsel at trial from Robert Powers and Mickey McDermott is due to be granted in part and denied in part.  While his trial counsel's performance was deficient at both the guilt and penalty phases, given the overpowering evidence of guilt, Mr. Flowers cannot establish that he was prejudiced by deficient performance at the guilt phase. However, he was prejudiced by counsel's deficient performance at the penalty phase.  Mr. Flowers is entitled to a new penalty phase trial.

The court preliminarily has considered the other claims raised in the habeas petition and concludes that, based on the record as it stands, briefed to date, the claim that he received ineffective assistance of trial counsel at the penalty phase is his most viable claim.  It is likely that Mr. Flowers will not prevail on any other claim raised in the habeas petition.

The parties will be given a reasonable time to consider their options.  If the parties are unable to reach a resolution, the court will enter an order establishing a new briefing schedule on issues not resolved by this opinion.  Given the age of this case, caselaw relevant to some of the remaining claims may have become outdated

by the emergence of cases that have evolved death penalty jurisprudence during the past decade and may provide additional support for either party's claims or defenses.

For these reasons, plus the efficient use of scarce judicial resources, it is **ORDERED** that:

1.  Petitioner Richard Jerome Flowers's original federal habeas corpus petition (Doc. # 1), as amended (Doc. # 30), and as supplemented (Doc. # 64) is GRANTED IN PART, only as to that portion of Mr. Flowers's Claim I alleging ineffectiveness of trial counsel at the trial's penalty phase.  Mr. Flowers is entitled to a new penalty phase trial because his trial counsel were constitutionally ineffective at that phase. To that extent, the writ issues.

2.  Within ninety days of the date of this order, the parties shall file a joint status report to advise the court if the parties have been able to reach an agreement as to the resolution of all issues in this action, and if so, the steps the parties have taken toward a new sentencing hearing for Mr. Flowers.

3.  The court defers consideration of the remaining claims pending the report of counsel and further orders of the court.

DONE this 13th day of January, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE